# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------x
                              :

**IN RE CIGNA CORP.**         **:**      **Master File No. 2:02CV8088**
**SECURITIES LITIGATION**  **:**
                              :

-------------------------------------------------------x

## CONSOLIDATED CLASS ACTION COMPLAINT

| | |
|---|---|
| **BERGER & MONTAGUE, P.C.** | **BERNSTEIN LIEBHARD & LIFSHITZ, LLP** |
| Sherrie R. Savett (I.D. #17646) | Mel E. Lifshitz |
| Carole A. Broderick (I.D. #12001) | Keith M. Fleischman |
| Barbara A. Podell (I.D. #28583) | Francis P. Karam (I.D. #77910) |
| Casey M. Preston (I.D. #86508) | Michael S. Bigin |
| 1622 Locust Street | Stephanie M. Beige |
| Philadelphia, PA 19103 | 10 East 40th Street |
| (215) 875 - 3000 | New York, NY 10016 |
| (215) 875 - 4604 (Fax) | (212) 779-1414 |
| **Counsel for the Pennsylvania State** | (212) 779-3218 (Fax) |
| **Employees' Retirement System** | **Counsel for Peter Szanto** |

### CO-LEAD COUNSEL FOR PLAINTIFFS

### and

| | |
|---|---|
| **OFFICE OF ATTORNEY GENERAL** | **PENNSYLVANIA STATE EMPLOYEES'** |
| **LITIGATION SECTION** | **RETIREMENT SYSTEM** |
| D. Michael Fisher Attorney General | Michael A. Budin, Chief Counsel |
| (I.D. #54855), | (I.D. #21528) |
| Daniel J. Doyle, Senior Deputy | Brian McDonough (I.D. #55866) |
| Attorney General(I.D. #54855) | 30 North Third Street |
| Susan J. Forney, | P.O. Box 1147 |
| Chief Deputy Attorney General | Harrisburg, PA 17108-1147 |
| 15th Fl. Strawberry Square | (717) 783-7317 |
| Harrisburg, PA 17120 | (717) 787-5751 (Fax) |
| (717) 787-2944 | |
| (717) 772-4526 (Fax) | |

### Counsel for the Pennsylvania State Employees' Retirement System

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      THE ROLES OF THE INDIVIDUAL DEFENDANTS . . . . . . . . . . . . . . . . . . . . . 12

VI.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . 15

VII.    SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.    The Need to Upgrade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.    The "Transformation" Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.    CIGNA Transferred Customers to Its New Computer Systems
              Before Determining Whether They Worked with Real Data,
              Causing Disastrous Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        D.    Migrations to Nowhere – Customer Data Is Severely Compromised
              During Migration to the New Platforms . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

              1.    CIGNA's Members Receive Even Poorer Customer
                    Service as a Result of Transformation . . . . . . . . . . . . . . . . . . . . . . . 25

              2.    CIGNA's Members Receive Even Poorer
                    Customer Service as a Result of Transformation . . . . . . . . . . . . . . . . 27

              3.    The New Systems Processed Claims Incorrectly . . . . . . . . . . . . . . . . 32

              4.    Transformation Exacerbates Mispricing of Contracts . . . . . . . . . . . . . 38

        E.    CIGNA's Old Computer Systems Provided Inaccurate Medical
              Membership Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        F.    The Devastating Effect of the Account
              Migrations on Customer Satisfaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

i

G.     CIGNA's Disclosure of Its Method for Calculating Reserves for Guaranteed Minimum Death Benefit Exposure Was Materially False and Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

VIII.    MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     A.     CIGNA Announces First Quarter 2001 Results . . . . . . . . . . . . . . . . . . . . 53

     B.     CIGNA Announces Second Quarter 2001 Results . . . . . . . . . . . . . . . . . . 57

     C.     CIGNA Announces Third Quarter 2001 Results . . . . . . . . . . . . . . . . . . . . 61

     D.     CIGNA Announces Full Year 2001 Results . . . . . . . . . . . . . . . . . . . . . . . 64

     E.     CIGNA Announces First Quarter 2002 Results . . . . . . . . . . . . . . . . . . . . 69

     F.     CIGNA Announces Second Quarter 2002 Results . . . . . . . . . . . . . . . . . . 75

IX.     THE TRUTH EMERGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

X.      SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

XII.    APPLICABILITY OF STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . 87

COUNT I
AGAINST ALL DEFENDANTS FOR VIOLATIONS
OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 . . . . . . . . . . . . . . . . . . 87

COUNT II
AGAINST THE INDIVIDUAL DEFENDANTS FOR
VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT . . . . . . . . . . . . . . . . . . . . . . 91

## I.    <u>INTRODUCTION</u>

1.      Lead Plaintiffs, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief are based upon, among other things, their investigation, including without limitation: (a) review and analysis of filings made by CIGNA Corp. ("CIGNA" or the "Company") with the Securities and Exchange Commission ("SEC"); (b) interviews with former employees and customers of CIGNA; (c) review and analysis of securities analysts' reports concerning CIGNA; (d) review and analysis of reports of conference calls between CIGNA and analysts; (e) review and analysis of press releases and other statements disseminated by the defendants; (f) consultation with experts; and (g) other publicly available information about CIGNA.  Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations after a reasonable opportunity for discovery.  Most of the facts supporting the allegations contained herein are known only to defendants or are within their control.

2.      This is a class action brought on behalf of a class of purchasers of the common stock of CIGNA from May 2, 2001 through October 24, 2002 (the "Class Period").  This Complaint asserts claims against CIGNA, and four of its senior executives, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") as a result of their dissemination of materially false and misleading statements to the investing public.

## II.    <u>SUMMARY OF ACTION</u>

3.      Throughout the 1990's, CIGNA worked to change its focus from being a global insurance supermarket to being a leading provider of employee health and pension benefits.  By

2000, CIGNA had grown to be the third-largest provider of employee health and pension benefits.  The Company's Employee HealthCare, Life, and Disability Benefits segment (the "HealthCare segment") generated approximately 80% of the Company's operating income in 2001, and 78% of the Company's operating income in 2002.

4.      Prior to the beginning of the Class Period, however, CIGNA faced increasing competition from several chief competitors, including United Healthcare, Aetna, Blue Cross & Blue Shield, and WellPoint, who were all offering customer-oriented products and processes built on web-enhanced computer systems.  Still operating on its multiple antiquated computer systems inherited from CIGNA's predecessors, known as the legacy system, CIGNA was at a serious competitive disadvantage when it came to obtaining new customers and retaining existing ones due to the service disadvantages resulting from its antiquated computer systems.

5.      Recognizing that upgrading its computer technology was essential to maintaining its competitive position, in 1999, CIGNA embarked upon a major overhaul of its computer technology, which it aptly called the "Transformation" project and which was targeted for completion in 2003.

6.       Wall Street analysts applauded CIGNA's decision to transform its computer technology and defendants consistently fed their expectations by disseminating positive statements during the Class Period, assuring the market that the Transformation project was on schedule and was progressing well, and projecting operating income for the full year 2002 of over $1.1 billion.

7.      Having started late, however, CIGNA was under considerable pressure to get the new system running in as short a time as possible.  Indeed, the Company's sales team, in order to

win large employer accounts, had promised that the new systems would be running in early 2002.

In addition, the defendants were under increasing pressure to cut costs after posting disappointing

second quarter results in 2001 and the new computer system promised both cost reductions and

productivity gains.  Thus, unbeknownst to investors, in its haste to complete the Transformation

project, CIGNA failed to perform the volume and end-to-end testing necessary to determine

whether the systems would work under real life conditions.

8.      Also unknown to investors was the fact that, at the same time defendants were

issuing positive statements about the progress of Transformation during the Class Period, the

Company was experiencing significant malfunctions in the new technology resulting in incorrect

and incomplete member eligibility and other data that was causing CIGNA to lose customers and

underprice contracts, and had the other consequences described in paragraph 10.

9.      In reality, in the process of migrating customers onto the new system, beginning in

July 2001 and continuing through January 1, 2002, members' eligibility data was either

completely lost or corrupted.  In addition, the claims processing function of the new software

platforms also malfunctioned, preventing accurate claims processing.  As a result of the

unreliable eligibility data, CIGNA customers experienced significant and pervasive service

problems, including, among other things, (1) miscalculation of bills; (2) delays in payment; (3)

identification cards without prescription icons - resulting in the inability to fill prescriptions; (4)

incorrect rates being paid for visits; (5) billing for procedures that were not performed; and/or (6)

the complete loss of coverage altogether.  These malfunctions were so pervasive that they had not

been cured by the end of 2002.

10.     Aside from the service problems experienced by CIGNA's customers, the

unreliable eligibility data also caused serious, undisclosed consequences for CIGNA itself:

- The inaccurate eligibility data created major service problems for members which caused CIGNA to lose 300 to 400 accounts.  In order to pacify customers experiencing these problems and induce new customers to sign on with the Company, CIGNA's sales teams were offering price concessions far below acceptable margins;

- The inaccurate eligibility data made it virtually impossible for CIGNA's underwriters to accurately price contracts.  As a result, CIGNA underpriced numerous contracts during the Class Period, often at levels so low that claims exceeded premiums.  When CIGNA was later forced to raise premiums at renewal, sometimes by as much as 150%, many large customers chose not to renew;

- The inaccurate eligibility data resulted in thousands of claims being incorrectly processed.  These claims had to manually reviewed, delaying the processing of these claims by months.  As a result, CIGNA failed to meet its obligations under customer  service requirements in many of CIGNA's contracts, requiring the Company to pay large penalties to its customers.  Customers also received erroneous bills as a result of the inaccurate eligibility data;

- The inaccurate data precluded defendants from reporting a correct number of covered lives during the Class Period, in turn making it impossible to issue earnings guidance and estimate costs.

11.     CIGNA's public statements, however, told a completely different story about the

Transformation project.  For example, on November 2, 2001, shortly before CIGNA's January 1,

2002 migration of 3.5 million members, defendant Stewart reassured the public that **"we are on**

**track with our own schedule ....  This will provide us with ... a better service experience,**

**significantly better service experience."**  On February 8, 2002, a little over one month after the

January 1, 2002 migration, while CIGNA was in the throes of its devastating claims and

customer service problems, defendant Stewart stated that the Transformation is an initiative that

will **"contribute to continuing satisfaction and continuing favorable retention levels with**

those customers." Incredibly, Stewart represented that the Transformation was proceeding smoothly, stating: **"I stress that there are no technology issues here."**

12. CIGNA's 2001 Annual Reports on Form 10-K, filed with the SEC on February 28, 2002, stated hypothetically that "the transition to newly designed systems presents risks regarding customer satisfaction and risks in the event of transition difficulties," when, in fact, those very "difficulties" were occurring and leaving significant deleterious impact on the Company's business at the time. Defendants assured the public that **"CIGNA is working to mitigate these risks through extensive testing of these new systems and by developing and implementing alternative plans to provide sufficient customer service resources in the event of difficulties."** These statements were blatantly false because CIGNA had not conducted tests of the new computer systems necessary to determine whether the systems would work under real life conditions, nor did CIGNA provide trained or experienced customer service representatives to handle problems caused by the malfunctions.

13. Then, in his letter to shareholders in the 2001 Annual Report filed with the SEC on February 28, 2002, defendant Hanway assured the investing public that the January 1, 2002 migration was proceeding smoothly, stating: **"In general, the initial customer experience has been positive, and key service metrics are improving.... [w]e are pleased with the progress to date."** To the contrary, customer service and claims processing had suffered an almost complete meltdown, causing CIGNA to violate key service metrics, such as turnaround time for claims processing, financial and clerical accuracy and customer call waiting and call handling times.

5

14. On May 2, 2002, defendant Stewart acknowledged "a bump in the road or two," but defendant Hanway quickly reassured investors that the "bump or two" were easily rectified, and were not having serious implications for customer satisfaction. **"I do think we've also demonstrated, when we do find errors, for whatever reason, we can respond very effectively and that's been acknowledged by our customers."** In truth, the "bump in the road" euphemistically referred to by defendant Stewart was actually a major crater and CIGNA knew that 43% of its customers were dissatisfied with the Company's services.

15. Former CIGNA employees confirm that these statements were known to be false when issued by defendants. In fact, defendants were fully aware of the magnitude of the problems CIGNA was experiencing with the Transformation project by way of numerous memos and reports issued throughout the Class Period. Moreover, defendants knew that a successful transformation was necessary for CIGNA to meet its announced earnings and net income guidance. Nevertheless, defendants continued to misrepresent and conceal the truth.

16. Finally, on October 24, 2002, CIGNA revealed that, contrary to its repeated and recent affirmations, it would not meet its earnings guidance for the third quarter and full year 2002 due to weak results of the Company's health care business. Instead of spending $125 million in 2002 on Transformation, as defendants originally represented, CIGNA spent $270 million in 2002, resulting in a decline of operating income of approximately half of that amount. The Company stated that operating income for the third quarter would be approximately $205 million, or $1.47 per share, which was significantly lower than the $1.90 to $2.05 per share range touted by Company officials on August 2, 2002, and materially lower than in the same quarter of 2001, as well as materially lower than the preceding quarter. The Company also stated that its

6

consolidated full year 2002 operating income, excluding non-recurring items, would be between $915 million and $950 million, or between $6.50 and $6.75 per share, which was substantially less than the recent confirmations of $7.85 to $8.15 per share in CIGNA's Form 10-Q for the second quarter of 2002 and its September 3, 2002 press release.  The Company revealed that a primary cause of this significant deterioration in CIGNA's financial performance was "[h]igher spending . . . to improve service operations and continued investment in the Company's new technology . . . ."  Further, the Company told investors that "[t]o address the challenges in the health care business" management was pursuing "[o]perating efficiencies" and "[e]nhanced customer focus."

17.     In a conference call with analysts following the revised guidance announcement, defendants finally admitted that the Company had not executed well on Transformation and due to more accurate data, it had restated its membership numbers, reducing its indemnity enrollment by more than 900,000.  Salomon SmithBarney analyst Charles Boorady stated in a report dated November 20, 2002:

> **It is important to watch every penny in this competitive, thin-margin business.  So it is not too comforting to hear the company lost track of almost 1 million customers.  That is an entire big city's worth of people.**

In addition, defendants expected the customer service and underwriting problems to reduce CIGNA's January 1, 2003 enrollment by 4% to 5%, to about 12.7 million lives instead of the increases repeatedly projected by defendants during the Class Period.  Defendant Hanway blamed the shortfall in operating income on increased spending to improve customer service, margin concessions and mispricing of contracts.

18.    Following the startling October 24 announcement, almost 37,000,000 shares of CIGNA common stock were traded on October 25, 2002, with the price of the Company's shares falling as much as 45% from the October 24, 2002 closing price of $63.60 per share to as low as $34.70 in sharp contrast to the price performance of its competitors' stock. (See attached Exhibit).

19.    Andrea Anania, CIGNA's Chief Information Officer and Executive Vice President, admitted in the March 15, 2003 issue of *CIO Magazine* that CIGNA had not performed sufficient volume or end-to-end testing to determine that the new systems worked before "going live."  Without this testing, the Company could not know whether and to what extent the new systems would malfunction.  In fact, the Company had not done testing necessary to determine whether the new systems would work under real life conditions.

20.    In the fourth quarter of 2002, the SEC began "an informal inquiry into matters relating to CIGNA," according to CIGNA's 2002 Form 10-K.

21.    The impact of the Transformation continues to be devastating to CIGNA.  After-tax adjusted operating income of CIGNA's HealthCare segment fell 43% from the fourth quarter of 2001 to the fourth quarter of 2002.  Fourth quarter 2002 indemnity results declined 62% from the fourth quarter of 2001 due to "margin deterioration in the company's experience-rated business, poor performance of certain new indemnity accounts, and higher spending on service and technology initiatives."  Fourth quarter 2002 HMO results from continuing operations decreased 27% from the fourth quarter of 2001, reflecting "higher operating expenses for customer service and technology initiatives and higher medical costs...."  CIGNA's net income

for the fourth quarter of 2002 fell 75% to $47 million or $.33 per share, compared with $191 million, or $1.32 per share in the fourth quarter of 2001.

22.     On February 7, 2003, CIGNA stated that it expects 2003 adjusted operating income to decline in 2003, to $6.25 to $6.50 per share, compared with $6.65 per share reported for 2002.  Analysts, however, had lost confidence in CIGNA's ability to deliver on its guidance. "Our confidence in CIGNA's ability to meet this guidance is low," stated Banc of America analyst Todd Richter.  Damon Ficklin, a Morningstar analyst, noted that two-thirds of CIGNA's prices had already been locked in place for 2003 at the time they figured out they had misjudged medical costs in 2002.  He stated: "It may have to go through a nice chunk of next year before we know where the business stands, to know if the mispricing is continuing."

23.     CIGNA's Healthcare segment results for the first quarter of 2003 continued to decline.  Total segment earnings declined 28% from the first quarter of 2002 to the first quarter of 2003, with a decline of 48% in indemnity results.

24.     Year-over-year and sequential total medical membership decreased 6% from 13,194,000 members as of March 31, 2002 to 12,348,000 members as of March 31, 2003, which includes a decline of 7% in estimated indemnity membership.  Moreover, even larger membership declines are in the offing.  A UBS Warburg employer poll conducted in April 2003 found that 28% of CIGNA's clients plan to switch to a rival.

## III.    JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. § 1331 (federal question jurisdiction).

26.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

27.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  CIGNA maintains its corporate headquarters and principal place of business in this District, and the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

28.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## IV.     PARTIES

29.     By Order dated May 15, 2003, the Court appointed the Pennsylvania State Employees' Retirement System and Peter Szanto as Lead Plaintiffs pursuant to 15 U.S.C. §78u-4.  Each of the Lead Plaintiffs is a member of the class and suffered damages as a result of their purchases of CIGNA common stock during the Class Period, as set forth in their Certifications previously filed with the Court.

30.     Defendant CIGNA is a Delaware corporation with its principal executive offices at One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania.  CIGNA is a holding company whose subsidiaries are major providers of employee benefits offered through the work place, including health care products and services, group life, accident and disability insurance, retirement products and services and investment management.

10

31.     Defendant H. Edward Hanway ("Hanway") has been Chairman of the Board of CIGNA since December 2000,  CIGNA's Chief Executive Officer since January 2000 and President since January 1999.  He was the President of CIGNA HealthCare from 1996 until 1999.  In 2001, Hanway received a salary of $986,500, a bonus of $2,625,000 and 140,000 stock options, which represents 4% of the total options granted to employees in 2001.  Defendant Hanway signed CIGNA's 2001 10-K report.

32.     Defendant James G. Stewart ("Stewart") served as CIGNA's Chief Financial Officer and Executive Vice President throughout the Class Period, having held the position since 1983.  He announced his resignation on October 23, 2002, the day  before the end of the Class Period and retired from the Company effective December 31, 2002.  In 2001, Stewart received a salary of $701,900, a bonus of $600,000 and restricted stock valued at $2.8 million.  Defendant Stewart signed CIGNA's 2001 10-K report.

33.     Defendant James A. Sears ("Sears") served as CIGNA's Chief Accounting Officer throughout the Class Period.  Defendant Sears signed CIGNA's 10-Q reports for the first, second and third quarters of 2001 and the first and second quarters of 2002 as well as the 2001 10-K report.

34.     Defendant Andrea Anania ("Anania") served as CIGNA's Chief Information Officer and Executive Vice President at all relevant times.  Defendant Anania has served as CIGNA's Executive Vice President, Systems, since February 2001 and Chief Information Officer since 1998.  Prior to being promoted to Executive Vice President, Anania served as Senior Vice President, Systems, from 1998 until February 2001.

11

35.    Defendants Hanway, Stewart, Sears, and Anania are referred to herein as the "Individual Defendants."

## V.    THE ROLES OF THE INDIVIDUAL DEFENDANTS

36.    The Individual Defendants, by reason of their executive and Board positions, were controlling persons of CIGNA during the Class Period and had the power and influence, and exercised the same, to cause CIGNA to engage in the conduct complained of herein.

37.    During the Class Period, each Individual Defendant occupied a position that made him or her privy to non-public information concerning CIGNA.  Because of this access, each of these defendants knew or recklessly disregarded the adverse material facts specified herein and that they were being concealed.

38.    Each of the defendants is liable for making false and misleading statements, and/or for willfully participating in a scheme and course of business that operated as a fraud on purchasers of shares of CIGNA common stock and damaged Class members in violation of the federal securities laws.  All of the defendants pursued a common goal, *i.e.*, inflating the price of CIGNA common stock by making false and misleading statements and concealing material adverse information.  The scheme and course of business was designed to and did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members; (ii) artificially inflate the price of CIGNA common stock during the Class Period; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase CIGNA common stock at inflated prices and to sustain damages.

39.    Each defendant had the opportunity to commit and participate in the violations of law described herein and did so.  The Individual Defendants were top officers of CIGNA and

they controlled its press releases, corporate reports, reports filed with the SEC and its communications with analysts.  Thus, the defendants controlled the public dissemination of, and could misrepresent, the information about CIGNA's business, products and current and future business prospects that reached the public and caused the inflation in the price of CIGNA common stock.

40.     Because of the Individual Defendants' positions with the Company, they had access to undisclosed adverse information about its business, operations, computer systems, reserve policies, finances, markets and present and future business prospects through access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and through reports and other information provided to them in connection therewith.

41.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the Individual Defendants identified above.  Each of the Individual Defendants, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

13

42.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other public documents, were aware or recklessly disregarded that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

43.     As officers and/or directors and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

44.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit upon purchasers of CIGNA common stock, by

14

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding CIGNA's business, present and future prospects, growth, operations and the intrinsic value of CIGNA's stock and induced the Class to purchase CIGNA securities at artificially inflated prices.

45.     At all relevant times, the market for CIGNA stock was an efficient market that promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of CIGNA common stock. Under these circumstances, all purchasers of CIGNA stock during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## VI.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

46.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons or entities who purchased CIGNA stock during the Class Period, May 2, 2001 through October 24, 2002, inclusive. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Approximately 140 million shares of CIGNA common stock were outstanding during the Class Period, and the stock was actively traded on the NYSE during the Class Period. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can

only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of members of the Class and that they are geographically dispersed.

48.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     Whether defendants participated in and pursued the common course of conduct complained of herein;

        (c)     Whether the defendants' publicly disseminated releases and statements during the Class Period misrepresented and/or omitted from disclosure material facts which were necessary to have been included in order to make the representations made therein not misleading;

        (d)     Whether the defendants acted willfully and/or recklessly in omitting and/or misrepresenting material facts;

16

(e)     Whether the market price of CIGNA securities was artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(f)     To what extent the members of the Class have sustained damages and the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action.

## VII.   SUBSTANTIVE ALLEGATIONS

### A.   The Need To Upgrade

52.     CIGNA and its subsidiaries provide employee benefits offered through the workplace.  The Company's subsidiaries are organized into five operating divisions, most important of which is Employee HealthCare, Life, and Disability Benefits (the "HealthCare segment").  The majority of CIGNA's operating income is generated by the HealthCare segment — generating approximately 80% of CIGNA's operating income in 2001 and 75% of the Company's revenues in 2002.

53.     The HealthCare segment is comprised of two businesses, managed care products and services and indemnity products and services.  CIGNA's products are offered to large corporations and small enterprises, and includes employers, unions, professional and other associations, and government-sponsored programs.

17

54.     As stated in CIGNA's 2001 10-K report, "The managed care and indemnity businesses are highly competitive," and several insurance companies and other entities compete with CIGNA in offering similar products.  Several chief competitors of CIGNA include United Healthcare, Aetna, Blue Cross & Blue Shield, and WellPoint.  In addition, there are several smaller competitors, such as First Health, who are gaining market share and competing more effectively.

55.     Before the Class Period, CIGNA HealthCare was under pressure to upgrade its computer system because CIGNA's competitors were already offering superior accessibility through  web-enhanced computer technology.  This put CIGNA at a serious competitive disadvantage in obtaining new customers as well as in retaining existing customers.

56.     CIGNA was also under pressure from existing and prospective customers to upgrade its computer technology in order improve customer service.  CIGNA's salesmen even guaranteed customers a new computer system by early 2002 to induce them to sign on with CIGNA.  Inasmuch as CIGNA's antiquated legacy computer systems were not integrated, CIGNA's customer service representatives were only capable of answering questions which related to the part of the plan to which they were assigned.  Thus, in order to provide the answer to any other question about a member's account, service representatives were required to re-route calls to other representatives in various areas, something CIGNA's new computer system was supposed to fix.

**B.      The "Transformation" Project**

57.     CIGNA started to upgrade  the HealthCare segment's obsolete disparate multiple computer systems inherited from its predecessor companies in 1999.  CIGNA called this

18

overhaul the "Transformation" project ("Transformation").  It was designed to be a five-year, billion-dollar "Transformation" of CIGNA's way of doing business.

58.    Through Transformation, CIGNA planned to change its old "legacy" systems  into two new platforms that would perform both the back-office functions, such as billing, enrollment, eligibility, and claims processing, while also providing customers with the ability to enroll and access their accounts online.

59.    CIGNA also claimed that the Transformation would streamline customer service functions, allowing CIGNA's customer service representatives to resolve members' issues in one call, rather than having to transfer members to various departments.  Using the new system, customer service representatives would have a single unified view of member profiles and have full access to the history of each members' interactions with the Company.

60.    Defendants stated that during the Class Period, the new service platforms would also have "auto adjudication" features, which would allow the Company to process claims without human assistance.  They said that new efficiencies would lower CIGNA's costs by tens of millions of dollars per year by reducing the number of customer service representatives it employed and centralizing its offices.  In short, the highly automated computer systems would reduce the HealthCare segment's administrative costs, provide CIGNA's underwriters with more accurate data, allow CIGNA to price contracts more accurately, improve customer service levels, and provide subscribers with the online options they demanded,  each of which would lead to better customer retention rates and enrollment growth.

61.    CIGNA's IT staff was responsible for the plan's execution - implementing the new computer platforms and migrating customer data from the old legacy systems to the new

integrated platforms.  The IT staff was spearheaded by defendant Anania and Chief Information

Officer of CIGNA HealthCare, Meg McCarthy.  In addition, Hayward Donagan ("Donagan") was

the IT manager responsible for the Transformation project.  Donagan reported to President of

CIGNA HealthCare, William M. Pastore, who in turn reported to defendant Hanway.

62.  Investors understood CIGNA's decision to invest in its infrastructure and upgrade

its computer technology as critical to its financial performance.  For example, on February 20,

2001, Morgan Stanley analyst Christine Arnold, who rated CIGNA's common stock a "strong

buy" with a price target of $130, issued a report in which she discussed the positive effects of

CIGNA's systems upgrade.  Arnold prefaced her discussion of the Transformation project by

stating: "[i]nnovation is the key to healthcare marketplace dominance."  She further stated:

> For a rather conservative company with roots in the insurance
> industry, Cigna really seems to be planning ahead.  Over time, the
> company's improved systems capabilities should allow it to tailor
> benefits at an individual level.  Mass customization of benefits
> holds promise in influencing consumer decisions by placing the
> cost-benefit tradeoffs in the hands of individuals. . . .  **As Cigna's
> information systems and underwriting capabilities grow
> (through platform consolidation and e-enablement as well as
> the experience gained with beta testing progressively more
> complex plan designs), the number of plans that it will be able
> to administer should grow**.
>
> * * *
>
> Technology Investment Spending to Precede Savings
>
> **Like most companies in the benefits space, Cigna will
> harvest cost savings and improved customer service from the
> internet and related technology advances**.  However, before the
> company can reap the savings, it will need to invest in its systems
> consolidation and upgrades.  Given our view that the health
> insurance marketplace is in the throws of a cyclical pricing upturn,
> coupled with a shift among employers towards self insuring, we

20

prefer that managed care companies invest in information technology capabilities in 2001 that will bear fruit in reduced administrative costs in 2002 and beyond — when rate hikes and topline growth may not be so easy to achieve.  Cigna is pursuing this strategy. . . .  (Emphasis added.)

**C.    CIGNA Transferred Customers to Its New
Computer Systems Before Determining Whether
They Worked with Real Data, Causing Disastrous Results**

63.    Unknown to analysts and investors, however, was that in its rush to appease frustrated customers and begin reporting the highly-anticipated benefits of Transformation, CIGNA failed to perform the necessary testing to ensure that data would migrate successfully and the computer systems would work.  In particular, CIGNA failed to conduct end-to-end tests and volume tests ("beta tests") of the new systems to determine if the systems functioned properly, nor did it conduct sufficient error processing while it encoded eligibility data for the new system. Without adequate testing, CIGNA lacked any basis for believing that the new computer system would function properly.  Thus, CIGNA's customers became the guinea pigs — the testing was not actually conducted until live customer data was transferred to the new platforms.

64.    In fact, according to the former supervisor of a team of CIGNA software developers responsible for coding patient eligibility data in preparation for migration, CIGNA even failed to conduct the most basic feasibility testing through which the Company would have been able to determine whether it could actually deliver the computer systems and applications its marketing staff was promising customers in functional form.  In essence, as the former team supervisor explained, "[t]hey sold the product without knowing whether they could deliver it."

65.    Alpha and beta testing are necessary to determine whether a computer system works before it "goes live."  Alpha testing is usually performed first by in-house programmers

21

with a small amount of data to determine if the system contains all of the required tools. Beta testing is then performed to determine if the tools actually work. Beta testing, often referred to as end-to-end testing, is the crucial testing phase because it tests with real data, real users and real situations. The purpose is to try to "smoke out" errors in the systems. Beta testing encompasses all systems from start to finish to insure that all systems work and communicate with each other. Beta testing also tests the amount of data and number of queries a system can handle through volume or stress testing, which is conducted to determine the peak capacity of the system. For example, a system may work with a small amount of data during alpha testing, but may be unable to handle the stress of large quantities of data. In fact, when the systems were subjected to large volumes of data or queries, they "blew up."

66. According to the head architect for the information management portion of Transformation and head of the production assurance team, CIGNA had to utilize a data-transfer software program in order to move data from the legacy systems to the new platforms. This software program was termed an "Extract Transformation and Load Tool." **In order for this program to generate code, the production assurance staff was required to rewrite portions of the program. By doing so, errors were introduced into the program. In fact, he stated that when CIGNA's production assurance staff ran the altered program, they realized that the program's "error-checking" and "control-checking" functions were not performing properly.** These checking functions review the data to ensure that none of it has been compromised and to make sure that all of the records properly transferred to the new systems. As a result, the data transferred from the legacy systems was corrupted.

67.     According to a former CIGNA claims processing manager, CIGNA offered discounted premiums in order to entice customers to serve as the guinea pigs — to agree to have their accounts be among the initial accounts that were migrated to the new computer systems.

68.     Indeed, defendant Anania, CIGNA's Chief Information Officer and Executive Vice President, belatedly admitted in the March 15, 2003 issue of *CIO Magazine* that CIGNA had not performed sufficient volume or end-to-end testing to determine that the new systems worked before "going live."

69.     As if failing to test the new technology with real data and large volumes of data was not bad enough, CIGNA also did not want to take the time to properly train its employees on the use of the new systems.  For example, according to a former CIGNA claims processing manager, he had only minimal training in the use of the new POWERmhs system for managed care claims processing, although the system was very complex with hundreds of screens and multiple systems.  Even though he had not become proficient with the new systems, he was tasked with training managers, new employees and rehires on the use of the POWERmhs system.

70.     CIGNA also told the investing public it was going to lay off customer service employees to reduce costs.  Thus, instead of waiting to see how the new systems performed after the Company's scheduled January 2002 migration, CIGNA precipitously laid-off thousands of customer service representatives during the fourth quarter of 2001.  CIGNA began moving its members to the new platforms in 2001, in relatively small numbers, such as 10,000 to 15,000 people at a time.  Even so, the systems malfunctioned badly, foretelling future disasters as more members were migrated  However, at the same time, CIGNA began laying off customer service representatives as part of a planned consolidation of 20 primary and specialty service centers into

23

9 regional centers.  CIGNA recognized an after-tax charge of $31 million in severance costs,

reflecting the expected reduction of 3,100 employees.

71.     CIGNA failed to adequately test the new technology in its haste to complete the

Transformation project.  For example, according to a former CIGNA claims processing manager,

prior to the planned migration on January 1, 2002, CIGNA performed only a single day of testing

the POWERmhs platform.  During this single test, in which CIGNA utilized dummy data,

problems with provider numbers, hospital contracting, member eligibility and other issues came

to light.  Despite these problems, CIGNA did not make changes to the system to correct the

errors before  migrating members to the new system.

72.     Similarly, CIGNA maintained a separate audit department that was responsible for

ensuring that no members were lost from the eligibility list during migration to the new platform.

However, according to a former CIGNA team leader in charge of coding patient eligibility data

for transfer to the new system, this audit department did not conduct sufficient "error processing"

to ensure that customers' eligibility data had not been compromised.

73.     The former team leader further stated that CIGNA failed to engage a systems

auditor or outside auditor to review production data prior to allowing the new platforms to go

live.  This type of review is standard whenever a company changes its information technology

systems.

74.     In addition, knowing that the software development team would be unable to

finish coding all of the eligibility data before the scheduled transfer of the data to the new

platforms, the former team leader, on numerous occasions, informed Jill Saint-Pierre, who was

24

responsible for testing the eligibility data to ensure its accuracy, that the team could not meet the tight deadline.

> **D.      Migrations to Nowhere - Customer Data Is Severely Corrupted During Customer Migration to the New Platforms**

75.      The absence of testing under real life conditions concealed extensive software defects which caused serious malfunctions when CIGNA began migrating customer data from the legacy systems to the new platforms beginning in 2001.  According to the former CIGNA team leader in charge of coding patient eligibility data, the malfunctions persisted into 2003.  As defendant Anania admitted in the March 15, 2003 issue of *CIO Magazine*: "The back-end data didn't work at the front end" due to the failure to perform end-to-end and volume testing of the new system in real life conditions.

> ### 1.      Inaccurate Eligibility Data Caused CIGNA to Issue Erroneous Bills

76.      According to a former senior underwriter, employed by CIGNA at the time, inaccurate eligibility data caused many substantial accounts to  receive erroneous bills from CIGNA.  The former underwriter confirmed that after the accounts were migrated to the new system in 2001, the new platform generated claims reports containing numerous material errors. Although CIGNA was aware that the system was generating bills containing errors, according to this former underwriter, the Company did not inform customers of the errors.  In fact, the former underwriter stated, "for a good while we didn't report [the erroneous bills to the customers], we knew they were dead wrong."

77.      Once customers began receiving inaccurate bills, such as in one case where a bill for the wrong number of members was sent to a customer (*e.g.*, a bill for 1,000 or 2,000 members

when the customer had 1,500 subscribers), the customers learned that CIGNA "blew their billing because the eligibility numbers were inaccurate." The former senior underwriter pointed to Washington University in St. Louis as one customer that dropped CIGNA after experiencing inaccurate billing and poor service following the migration of the University's account to the new platform in July 2001. The former underwriter further reported that during the first six months that the Washington University account was on the new computer system, the system generated a bill charging the University $700,000 on a claim that should have been charged to another account.

78.     In this same vein, in July 2001, a former CIGNA senior technology consultant also witnessed inaccurate billing as a result of the improper migration of eligibility data to the new computer system. The former technology consultant specifically identified United Technologies Corp. as one customer that received erroneous bills due to employee eligibility data errors.

79.     According to the former technology consultant, the billing errors were caused by a design problem which caused data to be left out of the reports.

80.     Additionally, according to the former technology consultant, billing errors occurred most often on retroactive bills and intensified as more and more accounts were moved onto the new platform.

81.     Lastly, the former technology consultant explained that in some cases customers would call to complain about erroneous bills, and, in other instances, CIGNA would simply not send the bill because they knew it contained errors. "We lost clients — a couple big ones — because we couldn't get them bills. It was a big cash flow problem for CIGNA," explained the

26

former senior technology consultant.  It took a full year for CIGNA to resolve its billing malfunctions, because the platform had to be redesigned to include information at the individual subscriber level.

> **2.     CIGNA's Members Receive Even Poorer
> Customer Service as a Result of Transformation**

82.     CIGNA began migrating a small number of members (i.e. 10,000 to 15,000 members at a time) to its new platforms in 2001, and promptly determined that the new system lost or corrupted member eligibility data.

83.     On January 1, 2002, CIGNA attempted a massive migration of customer data to the new platform from the legacy systems, moving 2.5 million existing members' accounts and one million new members' accounts, which required the help of manual overrides.  But like the earlier small migrations, members' eligibility data did not properly convert to the new platforms and problems again erupted immediately.  In sum, the new platforms could not handle the volume of claims being processed.

84.     CIGNA concealed and misrepresented the host of malfunctions which caused compromised eligibility data after the migration.  A former CIGNA senior applications developer explained how the compromised eligibility data led to a multitude of problems for CIGNA's customers.  For example:

- CIGNA could not confirm health coverage for some new members for several weeks;

- members lost coverage when their eligibility information would not load properly into the new systems;

- claims were improperly denied because the system had provided incorrect eligibility information;

27

- members received ID cards with incorrect identifiers;

- the system reported incorrect dates of birth and/or wrong address information;

- ID cards were issued without prescription icons, so members could not file their prescriptions;

- members were billed for procedures that were not performed;

- entire corporate coverage was lost;

- many providers were not on the system; and

- many providers' contractual payment rates were incorrect and those claims were paid at the wrong rate, if at all.

85.     The former senior applications developer further stated that the billing malfunctions resulting from the compromised eligibility data began surfacing after the system executed a major release of financial reports, eligibility reports and client bills in January 2002. As a result, the former senior applications developer reported:  "[T]hey had a lot of data issues." Instead of correcting the serious computer system malfunctions, CIGNA continued migrating accounts and compromising data.  "We spent a lot of time in the latter part of 2002 fixing the problems."  In fact, according to this former senior applications developer, the Company had to go back to the old legacy systems to manually retrieve the data that was lost.

86.     Meanwhile, members who experienced these malfunctions deluged CIGNA's customer service centers with complaints.  But inasmuch as CIGNA had laid-off a significant number of customer service representatives and claims processors during the fourth quarter of 2001 in order to report cost savings associated with Transformation, there were not enough service representatives to handle the overwhelming volume of calls.  The immediate nosedive in

CIGNA's customer service metrics, such as "average speed-to-answer", "auto-adjudication rates", "first call resolution", customer satisfaction with migration, and new set-up satisfaction, told senior management that CIGNA had to reverse its prior staff reductions. CIGNA was forced to re-hire previously laid-off customer service representatives and hire new customer service representatives, many of whom were too inexperienced on both the new and old computer systems to handle the members' complaints.

87.     Frustrated callers often waited for long periods on hold and, when they finally reached a customer service representative, the newly hired representatives had not been adequately trained to handle the new technology or solve the myriad problems customers were experiencing. For example, according to a former CIGNA claims processing manager, before going live, the average waiting time before a caller could speak with a customer service representative was between 45 seconds and one minute and it took the representative an average of 5 to 10 minutes to handle a call. After the January 1, 2002 migration, the waiting time averaged between 4 and 5 minutes and it took the representative between 15 and 20 minutes to handle each call.

88.     According to a former claims processor, the problems caused by the computer system malfunctions were exacerbated by the fact that the Company had slashed claims processing and customer service jobs prior to the migration. The reduced claims processing staff was required to manually input more account data than they had to with the old system. In addition, the new system could not process claims as quickly as the old system because claims processors had to look up more information in order for a claim to be processed.

89.     This former claims-processor explained that CIGNA's managed care accounts' claims data was not properly migrated to the POWERmhs platform.  Customers were forced to resubmit their information.  But even re-submissions failed to resolve the problems caused by the malfunction because the claims processors that received the customer information were not adequately trained on the new system.  In addition, faced with an overwhelming backlog of 30,000 customer inquiries or mail, ranging from not receiving insurance cards to claim status updates, claims processors spent their time trying to get a handle on these emergencies rather than performing actual claims processing on the new system.

90.     Similarly, a  former CIGNA claims service manager reported that the backlog of customer inquiries was up to thirty days even prior to the migration of data to the new computer system.  After the disastrous migration in January 2002, the backlog of customer inquiries grew even larger.  The former claims service manager was instructed by CIGNA's upper management to stay positive and make her employees work harder so the stock can rebound.

91.     This information is further corroborated by another former CIGNA customer service representative employed by CIGNA during the Class Period, who reported that CIGNA's customer service operations were severely understaffed, with only four representatives taking calls when seven were needed to do an adequate job.  This former service representative stated that call representatives were receiving an extremely large number of calls, between 85 and 100 calls over an eight hour shift.

92.     Yet another former CIGNA customer service representative reported that customer service representatives had to constantly ask customers to resubmit claim information because the information was lost during the migration to the new system or was incorrect.  With

regard to the huge backlog of customer mail or inquiries, this former claims representative stated that service representatives were instructed never to inform customers that inquiries were lost or delayed by the backlog.

93.     According to a former CIGNA claims processing manager familiar with the POWERmhs system, the problems created by the incorrect processing of CIGNA claims by the new system resulted in customers' claims not being processed, not being processed in a timely manner, or not being processed correctly.  As a result, members began to call CIGNA's depleted customer service centers.  In order to handle the volume surge, customer service representatives were working ten hour days.

94.     This former claims processing manager further reported that the increase in the handling time of member calls was a result of the increased volume of calls.  Further, when CIGNA recognized that they needed more customer service representatives, the Company  hired new and re-hired previously laid-off claim representatives.  Many of the new representatives were new hires, hired at lower salary levels, with no training on the POWERmhs system.

95.     According to this former claims processing manager, in order to resolve members' problems, customer service representatives had to switch between the 100 screens on POWERmhs, and even then, did not always find the answer.  Some of the more senior customer service representatives would actually go back into the old system to obtain correct information. Less experienced customer service representatives, however, did not know how to access the old system and were practically incapable of resolving members' problems.

96.     The former claims processing manager also stated that the CIGNA employees responsible for processing claims on the ProClaim platform had no experience or training on that system.

97.     According to the former claims processing manager, the problems encountered in the customer service representatives' handling of telephone calls were documented in a CIGNA monthly report entitled, the "Average Handling Time" report, or "AHT."  This report included the average time that a caller had to wait on hold before speaking to a customer service representative. The AHT also documented the average time that it took for each customer service representative to resolve the complaint.  The significantly increased times for both categories were included in the AHT which was distributed to all managers, as well as to defendants Hanway, Stewart, and Sears, throughout the Class Period.

### 3.     The New Systems Processed Claims Incorrectly

98.     In addition to transferring incomplete and/or inaccurate eligibility data resulting in customer complaints and erroneous billing, the new computer systems also incorrectly processed claims and, in many cases, were unable to process claims at all.

99.     For example, according to a former claims processing manager familiar with the POWERmhs platform, when POWERmhs went live in January 2002, there were "unbelievable problems."  The simultaneous transfer of 3.5 million customers to the new system on January 1, 2002 was too much at once.  POWERmhs was unable to handle the quantity of claims submitted after the members were moved to the platform, causing the platform to shut down.  There was a flurry of telephone conference calls with different CIGNA offices to decide how to handle the

problems and, eventually, additional personnel were brought in to manually re-load customer data into the new system which had been corrupted during the migration.

100.    However, while CIGNA was attempting to restore the lost and compromised customer data, thousands of claims were being incorrectly processed.  Indeed, according to this former claims processing manager, following the migration in January 2002, CIGNA was aware that there was a 75% error rate in claims processed by the new POWERmhs platform.

101.    According to this former claims processing manager, CIGNA had to manually review thousands of incorrectly processed claims which took about one or two months to be completed.

102.    The former claims processing manager further stated that additional problems were created by the amount of time it took CIGNA to process claims.  In its large national account contracts, CIGNA guaranteed that members' claims would be processed in a set time period.  The time to process varied from customer to customer, but the contracts all contained a provision that if CIGNA failed to process the claims within the contractually agreed time-frame, the Company was required to pay a penalty in the form of contributing funds to the customer's insurance costs.  The size of the penalties varied, but it was always for either an amount equal to a percentage of the claim or an amount equal to a percentage of the contract.  As a result of CIGNA's delays in processing claims, which was caused by both inaccurate claims data and POWERmhs' inability to handle the volume surge, CIGNA was severely penalized.

103.    While the POWERmhs platform processed managed care claims,  the ProClaim platform was used to process indemnity claims.  Indemnity claims processing was an even bigger disaster than managed care claims processing.  According to the former claims processing

33

manager, information was loaded differently into the ProClaim system, but CIGNA encountered some of the same malfunctions with ProClaim that it had with POWERmhs.  For example, member information numbers and eligibility data were often incorrect, insurance coverage information was incorrect and incorrect dates of birth and addresses were pervasive.

104.    The former claims processing manager further explained that in order to integrate the claims processing functions of POWERmhs and ProClaim, CIGNA utilized a wrapper architecture program, which was called Central Provider File (CPF),  to connect eligibility on the front-end with banking and billing on the back-end.  The wrapper program was original code rather than a purchased program.  CIGNA went live with ProClaim around the same time it went live with  POWERmhs in January and February 2002 and immediately encountered processing malfunctions, posting difficulties, and billing problems.  The wrapper program confused the providers' contract information, resulting in some providers being paid $50 per visit, while others were paid $15 or $20 for the same visit, and some providers were paid nothing.

105.    In fact, according to a former CIGNA actuary, **from February to April 2002, the ProClaim system could not process any medical indemnity claims submitted by members whose accounts were migrated to the new platform in January 1, 2002**.  This former actuary stated, "[E]veryone knew there had to be claims missing — they should have been coming through."

106.    The former actuary further explained that the quantity of claims that the ProClaim platform could not process was significant not only because of the effect it had on customer billing, but also because actuaries calculated reserves by comparing the number of claims

34

submitted versus premiums received.  During the three month hiatus, the actuaries had to provide estimates rather than actual numbers.

107.    According to the former actuary, CIGNA HealthCare CFO Mark Premminger received monthly reports showing claims and premium figures, and these reports would have indicated that medical indemnity claims were not being processed after the conversion to the new platform.

108.    Indeed, according to another former CIGNA actuary, who was responsible for financial reporting, CIGNA began the second phase of the migration in January 2002.  However, after learning that the new computer system was not functioning properly, **the Company was forced to halt the migration and fix the problem**.  When CIGNA finally was able to move the PPO business to the new system in early 2002, malfunctions surfaced again, forcing the company to stop the migration and repair the new platform.

109.    According to this former actuary, defendant Hanway and the President of CIGNA HealthCare, William Pastore, knew of these serious malfunctions with the ProClaim system.

110.    Not surprisingly, the malfunctions with claims processing caused by Transformation also  resulted in some of the Company's corporate clients cancelling their contracts with CIGNA.  Among the large corporations which cancelled their CIGNA contract was United Technologies, a company with 155,000 employees.  According to a former CIGNA senior underwriter,  CIGNA lost  300 to 400 accounts, both mid-market and national, because of data errors and service problems associated with the Transformation project.  Among the accounts lost, according to the former senior underwriter, were the Enterprise Rent-A-Car and the Federal Reserve Bank of Chicago accounts.  The former underwriter stated: "It was

35

ridiculous. We sweet-talked accounts and then didn't deliver." CIGNA's customers lost faith in the Company after it failed to back up all the promises and hype regarding the new computer system with results.

111.    The managers in claims processing and customer service were told that if they fielded calls from major corporate clients which indicated they might cancel their CIGNA coverage, they were to route those calls to the heads of their office for handling.

112.    Thus, Transformation was doomed not only by CIGNA's haste to get its new systems up and running, but also by its eagerness to cash in on the technology's promise of reduced costs and increased productivity. Despite evidence of serious problems with the new computer systems, CIGNA precipitously eliminated the very people who kept the members satisfied — the customer service representatives. CIGNA's late start, combined with its rush to jump-start the new systems and save money on headcount, caused the first major migration in January 2002 to be a disaster. The benefits in customer service that CIGNA expected to reap from Transformation not only did not materialize but actually backfired because members were antagonized and took their business to CIGNA's competitors.

113.    According to Fluor Corporation's ("Fluor") senior manager of benefits, CIGNA convinced Fluor to move all its claims to the new platform on January 1, 2002. Fluor, which is self-insured, pays CIGNA millions of dollars per year in claims processing fees for almost 50,000 employees. CIGNA represented that the new system was "the biggest and the best." Based on CIGNA's representations, Fluor agreed to migrate its employees accounts to the new platform.

114.   The senior manager of benefits reported that CIGNA said the new platform was a "bigger and better claims processing agent," and that CIGNA said it "really should be charging us more" for the streamlined processing.

115.   CIGNA also represented to Fluor that the changeover would be "essentially transparent to employees," which meant that employees were not supposed to notice any difference in how their claims were handled or in the customer service that CIGNA provided. According to Fluor, in reality, however, "It didn't come off that way.  There was quite a difference.  We had a lot of surprises we were not expecting.  All of their internal systems kind of fell apart."  From the start of the migration in January 2002, Fluor experienced data problems. For example, a lot of employees had to send claims "three, four or five times . . . documents got lost."  To make matters worse, customer service was poor.  For example, the average time it took for CIGNA's customer service representatives to answer the phone before the employees gave up trying — a service metric known as the "abandonment rate" — was six or seven minutes, according to Fluor's senior manager of benefits.  This statistic came from a quarterly report that CIGNA had to provide Fluor as part of their contract.  "The standard is five minutes, and we like to see it around two minutes," stated the senior manager.

116.   The senior benefits manager was so concerned about the problems that she sent complaint  letters and complained in person to CIGNA.  Indeed, the senior manager accompanied by several staff members traveled to CIGNA headquarters in Connecticut in February or March 2002 to meet with John Langenus, the head of national accounts, to discuss the customer service problems.  "I felt it was important for him to understand the difficulties we experienced."

117.   After a series of weekly meetings with Fluor representatives, CIGNA sent Fluor a written analysis of the problems sometime in the second quarter of 2002.  As a result of the analysis, CIGNA devoted a team to the Fluor account.  However, even with the efforts of this special team, it took six to nine months for CIGNA to resolve the problems Fluor experienced as a result of the Transformation project.

118.   Now Fluor faces a price increase from CIGNA even after experiencing such "such poor service."  The senior benefits manager reported that she did not want to tell workers that they have to pay even more money to continue to receive healthcare from CIGNA.  Therefore, Fluor is taking bids from CIGNA's competitors.

119.   Flour's  federal contractor subsidiary, Fluor-Hanford, which had been with CIGNA since the early 1990s paying the Company approximately $4 million a year in fees to administer its self-insured health plan, dropped CIGNA in January 2003 and now uses CIGNA's competitor United Healthcare to administer its plan.  According to Fluor-Hanford's coordinator of benefits, prior to 2003, CIGNA processed Fluor-Hanford's claims "the old-fashioned way, by hand".  However, cognizant of the difficulties experienced by its parent-company, "we were concerned about the claims processing" when we were scheduled to migrate to the new system in 2003.  Already dissatisfied with CIGNA's customer service, in fear of experiencing the same problems as its parent, Fluor-Hanford took its business to United Healthcare.

### 4.    Transformation Exacerbates Mispricing of Contracts

120.   In connection with its experience-rated contracts, CIGNA calculates premiums based on projected future losses.  If the contracts are priced too low and losses exceed premiums, CIGNA attempts to recover the excess by raising premiums for future policy periods.  However,

the policyholder is free to cancel the policy or not renew if the future premiums are too high.  In the event a customer does not renew, CIGNA must swallow the deficit.  As defendant Stewart acknowledged: "When you do not manage the pricing effectively and you have cases that have large deficits in them because you didn't price them well in the beginning, they have a tendency to want to leave you."  This is precisely what happened when CIGNA used bad data to set the prices for several large accounts.

121.    Before the Transformation project, CIGNA had been overstating its medical membership figures because the old computer systems were incapable of accurately tracking membership numbers.  Accordingly, one objective of the Transformation project was to provide CIGNA's underwriters with more accurate eligibility and claims data to enable them to price contracts with greater precision.

122.    For example, according to a former CIGNA senior underwriter, in addition to integrating billing, eligibility, claims and administrative tasks, the new platforms were supposed to provide more precise data to assist underwriters in pricing account contracts.  However, because customers' data was compromised during the migration to the new platforms, these intended benefits did not materialize.  The former underwriter reported that CIGNA's underwriters were instead forced to do their eligibility and pricing calculations off-system on Excel spreadsheets, which then had to be manually input into the new systems.  Thus, the new platforms actually created additional work.  In addition, each of the underwriters used their own methods to calculate eligibility numbers and pricing, which caused this former underwriter to question whether any of the eligibility figures were accurate and whether any of the prices assigned to customer contracts were appropriate.

123.    This former underwriter stated that underwriters provided reports containing customer information, such as eligibility rolls, to regional financial officers on a regular basis. That information was then entered into a "gains and losses database" for the entire region.

124.    As a result of the inaccurate eligibility data, in 2001, CIGNA materially mispriced the premiums on several large customers' experience-rated contracts for 2002.  As a result of the material underpricing of these experience-rated contracts for 2002, claims greatly exceeded the premiums CIGNA received, forcing CIGNA, at renewal, to increase the 2003 premiums for some of the large customers by as much as 150%.

125.    For example, in the case of CIGNA's experience-rated contract with the Miami-Dade County Public School District (the "Miami-Dade contract"), CIGNA, relying on two year-old claims experience data, offered rates for the 2002 contract that were so attractive that 85% of the school district's employees jumped to enroll in CIGNA's health plan.  As reported in the November 4, 2002 edition of *Business Insurance*, Scott Clark, the risk and benefits officer for the Miami-Dade school district, stated that CIGNA became the health insurer for 85% of the school systems' 40,000 benefit-eligible employees in January 2001 following "very competitive and aggressive pricing."  However, according to Mr. Clark, when the school system started the 2003 renewal process in March 2002, "we started getting frantic phone calls from CIGNA about the fact that claims being incurred were far exceeding the premiums they were collecting."  In April 2002, CIGNA informed the school district that it expected to lose $50 to $70 million on the account in 2002 and would have to increase premiums by 100% to 150%.  Mr. Clark stated that he "needed to protect the tax payers and our employees and move on" and, therefore, awarded Miami-Dade's 2003 health care contract to CIGNA's competitor, United Healthcare.

126.    After the Class Period, Goldman Sachs analyst Matthew Borsch ("Borsch") issued

a report on November 13, 2002 following a visit to CIGNA HealthCare's operations center in

Bloomfield, CT.   During his visit, Borsch discussed the Miami-Dade contract with Head of

National Accounts, John Langenus.  Borsch specifically reported, based on information provided

by CIGNA management:

> Underwriting mistakes in 2002 were primarily limited to 10 large
> accounts, one of which was the Miami-Dade contract underwritten
> in April 2001 and supervised under the large government and
> municipalities sales division (not national accounts).  **In the
> Miami-Dade contract, claims experience data used to
> underwrite the contract was 2 years old.  In this case, the 2
> year-old data was used to extrapolate demographic statistics
> and price the contract.**  (Emphasis added.)

127.    In addition to the Miami-Dade contract, CIGNA lost other large accounts as a

result of materially mispricing the premiums on 2002 experience-rated contracts and then

drastically increasing premiums for the 2003 contracts in an attempt to recoup its losses.

According to an August 2, 2002 investment report issued by analyst Roberta Goodman of Merrill

Lynch, CIGNA sought a 60% increase in premiums on the State of Arizona's experience-rated

contract after substantially mispricing the contract in 2001.

128.    Goodman also issued another investment report on November 4, 2002 in which

she criticized CIGNA's explanation concerning the reason why the mispricing of these accounts

was not revealed until the third quarter of 2002:

> We find it disturbing that Cigna did not recognize these problems
> until the third quarter (*why isn't Cigna reviewing its cost
> performance on a regular basis rather than waiting until the third
> quarter?*) particularly since local newspapers publicized issues
> with several large accounts in the late spring and early summer.
> (Emphasis in original)

E.     **CIGNA's Old Computer Systems Provided**
       **Inaccurate Medical Membership Figures**

129.   CIGNA had been overstating its medical membership figures throughout the Class Period because the legacy computer systems were incapable of accurately tracking membership numbers.

130.   CIGNA's material overstatement of its membership numbers was not revealed until the third quarter of 2002, when the Company reduced its reported indemnity members by more than 900,000 members from 7.3 million to about 6.4 million and its managed care membership by in excess of 160,000 members.  CIGNA restated the erroneously reported membership figures for prior periods, as follows:

|  | 2000 | | 2001 | |
|---|---|---|---|---|
|  | **Reported** | **Revised** | **Reported** | **Revised** |
| MANAGED CARE: | | | | |
| Guaranteed Cost: | | | | |
| Commercial | 2,033,000 | 1,921,000 | 2,111,000 | 2,016,000 |
| Medicare/Medicaid | 204,000 | 138,000 | 152,000 | 84,000 |
| Experience-rated, ASO and Minimum Premium | | | | |
| (Including POS and Gatekeeper PPOs) | 4,997,000 | 5,013,000 | 4,709,000 | 4,709,000 |
| Total Managed Care | 7,234,000 | 7,072,000 | 6,972,000 | 6,809,000 |
| | | | | |
| INDEMNITY (Estimated): | | | | |
| Medical | 2,017,000 | 1,4673,000 | 1,616,000 | 1,089,000 |
| Medical PPO | | | | |
| (excluding POS and Gatekeeper PPOs) | 5,062,000 | 4,669,000 | 5,780,000 | 5,352,000 |
| Total Indemnity | 7,079,000 | 6,142,000 | 7,396,000 | 6,441,000 |
| | | | | |
| TOTAL MEDICAL COVERED LIVES | 14,313,000 | 13,214,000 | 14,368,000 | 13,250,000 |

131.   Defendant Stewart explained the medical membership restatement during an October 28, 2002 investor conference call:

> It is industry practice to estimate medical indemnity membership using conversion factors that estimate the total number of covered lives, based on the number of employees covered.  **As a part of**

**the implementation of our new technology platforms we have obtained better data relative to the actual number of members per subscriber or employee.** (Emphasis added.)  This new information has prompted adjustments to the factors that we apply to the number of employees to get total members, and will we [sic] use those new factors to estimate total members.

**The net of all this is we have reduced our estimated indemnity members by 900,000 from 7.3 million to about 6.4 million, due to the change in the estimation methodology primarily, and a little bit of data clean-up as well.** (Emphasis added.) . . .

132.    CIGNA's use of inaccurate data to calculate its Medical Covered Lives figures resulted in the artificial inflation of CIGNA's reported market share during the Class Period. CIGNA's restated membership figures belatedly disclosed in October 2002 put it further behind United Healthcare and Aetna, which had 16.2 million and 14.4 million members.

133.    CIGNA was barely holding on to its position as the third largest health insurer, as WellPoint was on the verge of overtaking CIGNA.  A November 4, 2002 report issued by J.P. Morgan analyst Lori Price stated, "[g]iven WellPoint's robust growth compared to the expected declines at Cigna, WellPoint's enrollment should surpass CIGNA in 4Q02, such that it becomes the nation's third largest managed care company."

134.    On November 4, 2003, Merrill Lynch analyst Roberta Goodman ("Goodman") issued an investment report in which she discussed CIGNA's membership restatement. Goodman reported that it is not industry practice to estimate covered lives, as United Healthcare does not engage in such estimations.  Goodman also stated her concern that CIGNA could not possibly bill members correctly or properly gauge medical costs when it over estimated enrollment by more than 900,000 lives.  More specifically, the November 4, 2002 report stated:

As noted last week, Cigna "changed its estimation methodology" for membership (the company was over-estimating ASO [Administrative Services Only] enrollment by 900,000!) And, as adjusted, health plan enrollment was essentially flat vs. prior year, overall at 13,316,000 million, and by HMO (6,935,000) and indemnity (6,381,000). While Cigna termed this "industry practice", we note that United does not "estimate" members. And, despite Cigna's statement that the change in estimation methodology has no impact on trends, revenues and operating income, we find its use troubling. First, we think the use of "estimation methodology" rather than being able to count actual members suggests a lack of visibility of the top-line (*how do you bill for members correctly if you can't count them accurately?*). (Emphasis in original) Second, it suggests a lack of visibility into medical cost trends (*if you don't know how many members you have, how do you measure medical costs PMPM* [per member per month]*? For that matter, how does the company determine which claims to pay?*). (Emphasis in original) While these estimates may only be for ASO members, ASO plan sponsors have been demanding an increasing level of detail on cost trends etc. that cannot be determined without knowing exactly how [sic] members are in the plan are in the plan and who they are.

135.    In a November 20, 2002 investment report, Salomon SmithBarney analyst Charles Boorady emphasized the materiality of CIGNA's restatement of its medical membership figures and its previous inability to keep track of customers:

Total medical enrollment was 13.3 million for the third quarter, adjusted downward by approximately 940,000 due to changes in assumptions management used to estimate medical indemnity membership. It is important to watch every penny in this competitive, thin-margin business. **So it is not too comforting to hear the company lost track of almost 1 million customers. That is an entire big city's worth of people.** (Emphasis added.)

44

### F.   The Devastating Effect of the Account
            Migrations on Customer Satisfaction

136.   Unknown to investors, CIGNA's own internal customer service survey revealed that 43% of its members were dissatisfied with the customer service they received.

137.   In addition, undisclosed responses from an employer forum held on or around January 2002 indicated that CIGNA's service levels had deteriorated in early 2002.  Indeed, 25% of the employers attending the forum reported that they experienced problems with the conversion of their accounts to the new platforms.  Similarly, in a 2003 employer survey conducted by Goldman Sachs, CIGNA ranked last in customer service against Blue Cross/Blue Shield, United HealthCare, and Aetna.

138.   The magnitude of the malfunctions resulting from the botched migration of customer accounts to the new platforms was captured in the March 15, 2003 *CIO Magazine* article, which states in pertinent part:

> CIGNA CIO ANDREA ANANIA looked out at 250 peers at an October 2001 conference in Rancho Mirage, Calif., and declared that she had successfully reengineered her company's IT. These days, she said, projects are completed on time and within budget.
>
> Anania spoke too soon.
>
> Four months later, in January 2002, Cigna HealthCare's $1 billion IT overhaul and CRM initiative went live in a big way, with 3.5 million members of the health insurance company moved from 15 legacy systems to two new platforms in a matter of minutes.
>
> **The migration did not go smoothly. In fact, there were glitches in customer service so significant that millions of dissatisfied customers walked away, causing the nation's fourth largest insurer to lose 6 percent of its health-care membership in 2002.**  (Emphasis added.)

45

139.    Another fallout of the disastrous January 2002 migration was CIGNA's revision of its schedule for converting members to the new system.  In July 2002, CIGNA drastically slowed the pace of migration to 300,000 members.  Indeed, following the January 1, 2002 migration debacle, CIGNA decided to move only twenty of the large national accounts to the new platforms on January 1, 2003.

140.    Similarly, in contrast to defendants' Class Period statements, in order to obtain new business, CIGNA was forced to reduce its margins on customers' health care contracts. During an analysts conference call on October 28, 2002, defendant Hanway recognized CIGNA's need to grant price concessions to maintain new customers and retain existing customers, stating: "We did not price as effectively as we have in the past on this book of business, and we did make concessions for competitive reasons."

141.    According to a former CIGNA financial analyst, CIGNA  intentionally underpriced the policies because that was the only avenue by which it could compete with United Healthcare, and if the Company did not slash prices and reduce its margins they would not be able to retain existing clients and attract new customers.

142.    The negative effects of the disastrous migration were also manifested by numerous violations of performance guarantees built into the Company's large national account contracts — which it identifies as the 5,000+ employee multi-site companies.  These performance guarantees required CIGNA to compensate its customers if certain service levels were not met.  Ninety-six percent of the national accounts are administrative services only accounts.  Like its competitors, 20%-25% of CIGNA's fee from national accounts is subject to service performance metrics such as implementation and claims adjudication.

46

143.     Shortly after the end of the Class Period, defendants admitted that instead of gaining customers as a result of the Transformation, the Company expected to lose hundreds of thousands of members.  During an analyst conference call on October 28, 2002, defendant Hanway stated that he expected that membership would be down 4% to 5% on January 1, 2003 versus year ago levels. In other words, Hanway expected to lose 655,000 of the 13.1 million members reported in the Company's 2002 10-K report.  As of March 31, 2003, CIGNA's total medical membership was 12.3 million compared to 13.2 million at the end of fiscal 2001.  Thus, in addition to the downward revision of almost one million members, CIGNA lost approximately 900,000 additional members or nearly 7% of its members during this time period, many of which left CIGNA as a result of the problems that resulted from the Transformation project.

144.     On November 10, 2002, *The Philadelphia Inquirer* reported that CIGNA expects large customer losses, stating:

> [M]ost employers are reluctant to change [health] insurers, [however] problems with Cigna's pricing policies, billing systems and medical rules have made it tough to win new business.  It has also had trouble keeping some big name clients in line: In the last year, Cigna has lost accounts with big-name customers including Dade County, Fla.; DaimlerChrysler Corp.; and Campbell Soup Co. . . . **Cigna expects to lose up to 1 in 20 covered patients when companies renew their policies in January.**  (Emphasis added.)

145.     According to a former CIGNA senior underwriter,  CIGNA lost  300 to 400 accounts, both mid-market and national, as a result of data contamination and service problems associated with the Transformation project.  Among the accounts lost, according to the former senior underwriter, were the Enterprise Rent-A-Car and the Federal Reserve Bank of Chicago accounts.  The former senior underwriter also specifically mentioned Quantum Corp. as a

customer who dropped CIGNA after the Company failed to timely deliver ID cards and pay claims.

146.     In response to the onslaught of customer complaints, CIGNA intentionally lowered the premiums for several accounts in an effort to hold on to their business.  These price concessions came at the same time nearly all of CIGNA's competitors were raising prices by 15% or more, according to a November 4, 2002 *Wall Street Journal* article.

147.     In a report issued on December 17, 2002, analyst Joshua Rankin of Lehman Brothers discussed CIGNA's poor customer service levels and Transformation's impact on account retention:

> At the heart of CIGNA's account retention issues were poor service levels, which the company suggested was caused by, among other things, trying to push too many clients through the transformation process too quickly. . . .  Of the employers who migrated on 1/1/02, only 57% were satisfied with the conversion according to the company's internal research.  When service issues arose, the company was not adequately staffed at its call centers for the deluge of calls that started coming in early this year.  An example of the kind of issues that transformation led to related to CIGNA's assigning each member a new identification number upon conversion to the new system. The company admits they did not adequately communicate these changes with their providers so that when members went to the doctor or tried to fill a prescription, the new identification number was not recognized and the member was denied.  This type of miscommunication resulted in confusion, followed by frustration and ultimately dissatisfaction. . . .

148.     Analyst Charles Boorady of Salomon SmithBarney likewise reported the negative effect Transformation was having on service, account retention, and account pricing in a February 20, 2003 investment report:

> Transformation was expected to attract net new customers to CIGNA as the company began to deliver on enhanced

technology.  **The opposite is happening in the near term, as customers have been leaving due to the drops in service quality during the transition . . . about 1 million customers, or 8%, are marching out of CIGNA, in main part to UnitedHealth Group and Blue Cross and Blue Shield plans in 2003.**  (Emphasis added.)  . . .

149.    According to a former CIGNA claims processing manager, CIGNA's data contamination and claims processing problems  that arose from the migration of customer accounts to the POWERmhs platform caused a number of the Company's large national customers to cancel their contracts, including United Technologies Corp., a company with 155,000 employees, which was "at their wits' end over the problems."

150.    The aftermath of the disastrous account migrations and data contamination has not yet subsided.  On February 9, 2003, Goldman Sachs analyst Matthew Borsch issued a report commenting on CIGNA fourth quarter of 2002 earnings, which were down 34% from the year ago period.  Borsch stated in relevant part:

> The decline in earnings reflect weakness in CIGNA's healthcare business that result from problems with CIGNA's systems Transformation project that negatively impacted service and account retention that CI attempted to rectify through price concessions, leading too poor underwriting results.

> * * *

> We continue to view CI's problems as company-specific . . . .  CI's woes create mkt-share gain opportunities for competitors . . . .

151.    Similarly, On February 10, 2003, Merrill Lynch analyst Roberta Goodman issued a report in which she stated in relevant part:

> [S]ince other companies (most notably, United and the Blues) are continuing to advance their platforms, business processes and networks while Cigna's last 2+ years have been marred with

49

> service problems, we think Cigna will have competitive challenges
> even after the business is fully migrated to the new platform.  Thus,
> we think Cigna's enrollment prospects could remain poor as both
> national and regional competitors can build the case that they can
> deliver superior medical cost trends and more consistently good
> service.

152.    In fact, UBS Warburg analyst William McKeever downgraded CIGNA's common stock to "neutral" from "buy" on June 3, 2003 after an April 2003 employer poll showed that 28% of CIGNA's customers are planning to switch to a plan offered by CIGNA's competitors.

153.    As a result of the concealed and misrepresented disasters that characterized CIGNA's Transformation of its business, the costs of that project have jumped 20%, reducing 2002 operating income by tens of millions of dollars, and by the same amount in 2003.  At its inception in 1999, Transformation was scheduled to be a five-year project that was to be complete by mid-2003 and was slated to cost about $1 billion.  CIGNA forecasted that it would spend approximately $200 million in 1999, $225 million in 2000, $375 million in 2001, $125 million in 2002, and $75 million in 2003.  Based on information obtained from CIGNA, Goldman Sachs reported on November 13, 2002 that the total costs for Transformation will be $210 million more than CIGNA's prior projections, and the project will take longer than the five years the Company touted.  Now CIGNA expects to incur $270 in costs in 2002, up significantly from the initial projected amount of $125 million. The Company also now expects to incur $248 million in costs in 2003 up from $75 million.  Moreover, the Company initially projected that the project would be completed in 2003, but in order to repair the broken systems and restore service levels the Company will be forced to spend $75 million in 2004 on Transformation.

G.    **CIGNA's Disclosure of Its Method for Calculating Reserves for Guaranteed Minimum Death Benefit Exposure Was Materially False and Misleading**

154.    CIGNA's reinsurance operations were discontinued in 2000 and since that time have been an inactive business in run-off mode.  Included in those discontinued reinsurance operations were CIGNA's reinsurance obligations for a guaranteed minimum death benefit ("GMDB") under certain variable annuities issued by other insurance companies.  These variable annuities are essentially investments in mutual funds combined with a death benefit.

155.    Those annuities guaranteed that the benefit received at death will be no less than the highest historical account value of the related mutual fund investments on an annuitant's contract anniversary date.  Under the GMDB, CIGNA is liable to the extent the highest historical anniversary account value exceeds the fair value of the related equity and bond mutual fund investments at the time of the annuitant's death.  In periods of declining equity markets and in periods of flat equity markets following a decline, CIGNA's liabilities for the guaranteed minimum death benefits increase.

156.    During 2000, CIGNA recorded an after-tax charge of $84 million to strengthen reserves, following a review of reserve assumptions for the GMDB contracts.

157.    CIGNA's Form 10-K for the year ending December 31, 2001, filed with the SEC on February 28, 2002, set forth in Note 2 to the Financial Statements ("Summary of Significant Accounting Policies") CIGNA's method of estimating its obligations on the GMDB annuities, as follows:

> Future policy benefits are liabilities for estimated future obligations under traditional life and health policies and annuity products currently in force.  These obligations are estimated using actuarial methods based on assumptions as to premiums, future investment

51

yield, mortality, morbidity and withdrawals that allow for adverse deviation and **for specialty life reinsurance contracts that guarantee a minimum death benefit based on unfavorable changes in variable annuity account values, equity market returns and the volatility of the underlying equity and bond mutual fund investments.** ... **Assumptions for equity market returns and the volatility of underlying equity and bond mutual fund investments are based on historical market experience adjusted to reflect both short-term and long-term future expectations.** (Emphasis added).

158.    Future policy benefits, predominately relating to CIGNA's life and disability insurance products and guaranteed cost annuity contracts, including the GMDB annuities, comprised 12% of CIGNA's total liabilities at December 31, 2001.

159.    As of December 31, 2001, CIGNA revealed that the Company had reserves for these liabilities of approximately $300 million, according to CIGNA's Form 10-Q for the quarter ended September 30, 2002.

160.    The statement that the reserves were based on historical market experience was materially misleading because although the equity markets had been declining and depressed for approximately two years since March 2000, and declined dramatically in 2001, CIGNA concealed the fact that its method for determining its obligations under the GMDB did not reflect the actual unhedged deterioration in 2001 of the underlying mutual fund investments in the annuitants' accounts. CIGNA disclosed only that it relied upon assumptions based on historical market experience adjusted to reflect both short-term and long-term expectations.

161.    On September 3, 2002, CIGNA announced an after-tax charge of $720 million ($1.1 billion pre-tax) to strengthen the reserves related to the GMDBs and to adopt a program to reduce the equity market risk related to these contracts by selling exchange-traded futures

contracts and other instruments which may rise in value as the equity market declines and decline in value as the equity market rises.  According to the third quarter 2002 Form 10-Q, the $720 million charge consisted of:

- $620 million after-tax, principally reflecting the reduction in assumed future equity market returns as a result of implementing the program and, to a lesser extent, changes to the policy surrender, mortality, market volatility and discount rate assumptions used in estimating the liabilities for these contracts.  As noted below, CIGNA determines liabilities under the reinsurance contracts using an assumption for expected future performance of equity markets.  A consequence of implementing the program is, effectively, a reduction in the assumption for expected future performance of equity markets, as the futures contracts essentially eliminate the opportunity to achieve previously expected market returns; and

- $100 million after-tax reflecting deterioration in equity markets that occurred in the third quarter of 2002 (prior to implementation of the program).

162.    Throughout the Class Period, CIGNA failed to disclose the material fact that its method of determining its liabilities under the GMDB contracts did not reflect the actual unhedged deterioration of the underlying mutual fund investments.

## VIII.   MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.    CIGNA Announces First Quarter 2001 Results

163.    On May 2, 2001, the first day of the class period, CIGNA issued a press release announcing its results for the first quarter of 2001.  Operating income of $272 million, or $1.76 per share, was a 12% increase over the first quarter of 2000, excluding an $8 million after-tax gain on the partial sale of CIGNA's Japanese life insurance business.  Commenting on the Company's results, defendant Hanway stated "CIGNA's earnings growth reflects the breadth of

our products and service capabilities and our commitment to increasing consumer choice and

quality."

164.    In a conference call with analysts following the first quarter 2001 earnings

announcement, defendant Hanway emphasized CIGNA's commitment to improving membership

through the Company's Transformation initiative:

> As we have discussed previously, we are constantly working to
> improve our value proposition and are making substantial
> investments in technology, e-commerce, service improvement,
> including member Internet self-service which will significantly
> improve our capability at both the consumer and the employer
> level.  This investment in business process in infrastructure will
> support our next generation of products, which will include dual
> option features and further enhance our already strong breadth of
> product offerings.  ***We are very excited about this initiative, which
> we call Transformation.  In fact, we have already previewed our
> next generation product on this new platform and we are pleased
> with the enthusiastic response from both new and current
> customers***.

During the question and answer portion of the call, defendant Hanway represented that

CIGNA was confident with new sales growth and retention levels for the year, "[a]s I said, we

feel good about sales, they were in good shape, not only in the first quarter, but I think we feel

good about sales for the balance of the year.  We have a strong pipeline, and we actually have

some good strong commitments for the balance of the year."

In response to a question by Charles Boorady from Goldman Sachs concerning

Transformation, defendant Hanway touted the favorable reception of the new platform:

> Relative to the new product portfolio that we've been previewing,
> ***what we've done is exposed customers to both the new product
> and also the delivery platform of those products, how they and
> their employees will see a change in the level of service and the
> ability to self-transact to e-commerce and so forth.  That had
> gotten a very strong reception***.  We will also be able, with the new

54

suite of products, to provide more dual options, more specified tailoring of co-pays and deductibles, and a very modular approach to adding benefits that will be very administratively simple for employers and provide employees with a lot more choice. ***And the reaction has been quite positive, if anything, with our existing customers. They would like to move quicker in terms of getting on the platform with some of these new products as opposed to slower***. (Emphasis added).

Defendant Stewart further represented that Transformation was on track and progressing well:

The comments I made relative to Transformation covered some of those. ***We continue to make what I would describe as good progress in an effort we've been into now for probably two years*** and we've got - we've talked before - several years ahead of us to continue to move and consolidate those systems. ***We are right on our internal tracking, our internal time frame to get that done and we have some new business currently operating on the new platforms***, and that migration will accelerate as we go through the balance of this year and for the next couple. (Emphasis added).

Defendant Hanway further credited CIGNA's 12% increase in operating income to

favorable growth in CIGNA's Health Care and Disability segment:

Earnings in our largest segment, Employee Health Care, Life and Disability Benefits continued to be strong overall, growing at a mid-teens rate as expected. Our overall membership growth was disappointing, but we feel confident that we understand the issues and we are addressing them appropriately. We expect our sales momentum to remain strong and customer retention to return to historically high levels. As a result, we expect overall member growth to reach the 3-4% range for the full year.

165. The statements made in ¶¶ 163-164, were each false and misleading because they misrepresented and/or concealed the following material adverse facts:

a)      defendants had no reasonable basis to state that the Company was making good progress on Transformation, because the defendants knew or recklessly disregarded that the Company had failed to perform the testing necessary to determine whether the new systems would function properly under real life conditions;

55

b)      defendants knew or recklessly disregarded that the Company was not on schedule in connection with the Transformation; and

c)      defendants had no reasonable basis for the representations regarding membership levels or costs for the full year, because defendants knew that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

166.    Following the analyst conference call, analyst Boorady, who at the time was employed by Goldman Sachs, issued an investment report on May 3, 2001 entitled "CI: new IT rollout now driving enrollment, worst news in stock, RL [Recommended List], Target $170."  In his report, Boorady attributed slower enrollment in the HealthCare segment to "**a temporary retention issue that resulted from price, service, and product issues**" and that "**[t]he fix to service and product issues is being rolled out in the form of new computer systems that enable employers to self-serve through the Internet**.  We do NOT expect CIGNA to come down on price and expect enrollment to accelerate to the 5%-7% range in 2002."  (Emphasis added.)

167.    On May 4, 2001, CIGNA filed its Form 10-Q for the first quarter of 2001 with the SEC confirming the previously announced financial results.  The Form 10-Q was signed by defendant Sears.

168.    In Note 8 to the Financial Statements and in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), CIGNA reported that premiums and fees and other revenues for its HealthCare segment was $3.595 billion compared to $3.409 billion in 2000; HMO membership remained flat at 6.9 million, indemnity membership estimates increased to 7.4 million from 7.0 million in 2001; net income in the segment increased from $175 million in 2000 to $198 million in 2001 and operating income increased 13%.

56

169.     The statements made in ¶¶ 167-168, were each false and misleading because defendants had no reasonable basis to state actual membership levels, because defendants knew or recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

**B.     CIGNA Announces Second Quarter 2001 Results**

170.     On August 1, 2001, CIGNA announced its results for the second quarter of 2001. In the press release, the Company reported operating income of $262 million, or $1.73 per share, which exceeded the $1.71 per share for the second quarter of 2000.  The Company's Health Care segment reported operating income of $204 million compared to $181 million in second quarter 2000, a 13% increase.  HMO operating results were comparable with the second quarter 2000, while indemnity operating income increased 39% over the previous year.  HMO membership was 6.9 million compared to 7.1 million in the second quarter of 2000.  Indemnity membership was 7.3 million compared to 6.9 million in the year ago period.  Defendants credited the improved indemnity results to higher earnings from the experience-rated business, reflecting rate increases and membership growth, and improved results from the group disability business.  CIGNA reported that it expected growth in total membership to increase 3% for full year 2001.

171.     The statements made in ¶ 170, were each false and misleading because defendants had no reasonable basis to state actual current or expected membership levels for the full year, because defendants knew or recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

172.   In a conference call with securities analysts following the August 1, 2001 earnings announcement, defendant Hanway represented that customer reaction to the new platform was positive:

> Actually, the progress there has been good.  Mark referenced additional new product work that is part of ***Transformation and has progressed very, very well*** in terms of the necessary approvals and so forth.  The technology, I think as you know, is being rolled out in stages.  ***The early stages it has been rolled out both in the pilot sites as well as beginning more broadly now, demonstrates results consistent with our plan.  We have some new business, some new members on that technology and as we go through the balance of this year and particularly 1/1, we will be migrating existing customers.***  1/1 is a fairly significant point.  There will be several million existing members migrated around January 1st.  So I would say progress to date has been good.  ***The customer reaction to this, Charles, has been very positive ....***

173.   The statements made in ¶ 172, were each false and misleading because they misrepresented and/or concealed the following adverse facts:

a)     defendants knew or recklessly disregarded that customer reaction to Transformation was not positive as a result of problems stemming from the July 2001, migration of customers, including erroneous billing; and

b)     the representation that the Company was making good progress on Transformation was false, because in fact, the computer systems had demonstrated serious malfunctions and, because the defendants knew or recklessly disregarded that the  Company had failed to perform the testing of the new systems necessary to determine the extent of malfunctions that would occur under real life conditions.

174.   On August 1, 2001, following the analyst conference call, Boorady of Goldman Sachs issued an investment report in which he applauded the Transformation project.  In that report, Boorady explained to investors that

> 2Q01 was clearly a weak quarter, as is always the case after a weak 1Q01 in this business.  Worst now behind and we recommend

purchasing CI after any 2Q earnings dust settles.  **The 13% [year-over-year] net income growth in core health plan biz is better than almost every competitor and should accelerate in 2001 and 2002 when the $1bn Transformation project delivers faster enrollment and lower cost.**  (Emphasis added.)

\* \* \*

WORST BEHIND CIGNA.  We expect the worst is behind CIGNA now after a very weak first half 2001 related to a **competitive disadvantage that stemmed from years of neglect in systems and operations investments.  We see that issue being addressed with the Transformation project** that is now launching new systems and products and driving growth again in 2001.  (Emphasis added.)

175.    On August 3, 2001, CIGNA filed its Form 10-Q for the second quarter of 2001

with the SEC, confirming the previously announced financial results.  The Form 10-Q was

signed by defendant Sears.  In the MD&A section of the Form 10-Q, CIGNA reported that

operating income for the HealthCare segment had increased 13% for the second quarter and six

months of 2001, compared with the same periods in 2000.  The Company reported HMO

operating income of $111 million compared to $116 million in 2000.  Indemnity operating

income was reported as $93 million compared to $65 million in 2000.  Premiums and fees

increased 4% for the quarter and 5% for the six months of 2001, "primarily due to rate increases

and membership growth ...."  The Company also reported that, as of June 30, 2001, medical

membership (excluding Medicare members) was 6.9 million for the HMO operations, which was

flat from the prior quarter, and an estimated 7.3 million for the indemnity operations, which was

a decrease of an estimated 100,000 from the first quarter of 2001.

176.    The statements made in ¶ 175, were each false and misleading because defendants

had no reasonable basis to state current actual membership levels, because defendants knew or

recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

177.    On October 17, 2001, the prospectus filed in connection with the Company's $250 million offering of 6 ⅜% notes ("Prospectus") became effective and CIGNA sold the notes to the public that day.  The Prospectus, filed on Form 424(b)(5), supplemented CIGNA's "shelf" prospectus filed on November 25, 1997.  The Prospectus incorporated by reference, among other things, all reports filed by the Company "pursuant to Section 13(a) or 13 (c) of the 1934 Act" subsequent to the filing of the 1997 shelf prospectus.  Hence, the Prospectus incorporated by reference the Company's Forms 10-Q for the first and second quarters of 2001, as detailed above, including all statements set forth therein, which were false and misleading as set forth above.

178.    In an October 2001 conference in Rancho Mirage, California, defendant Anania stated that she had successfully re-engineered CIGNA's information technology.  Defendant Anania's statement was materially false and misleading because, as she was fully aware and later admitted, CIGNA had not performed the volume or end-to-end testing necessary to determine whether the new systems would work when they went "live."

179.    Analyst Christine Arnold of Morgan Stanley issued an investment report on October 23, 2001 in which she opined that CIGNA's customer service was the primary cause of the HealthCare segment's disappointing performance in 2001, and that "improving this situation is the key to its long-term success."  Arnold, who maintained an "outperform" rating on CIGNA's common stock with a $98 price target, went on to state that she was "hopeful that the company's business transformation process will improve both internal reporting and service metrics."

C.   **CIGNA Announces Third Quarter 2001 Results**

180.   On November 2, 2001, CIGNA announced its results for the third quarter of 2001, reporting net income of $270 million, or $1.81 per share, compared with $278 million, or $1.74 per share, during the third quarter of 2000.  The Company reported a 5% increase in after-tax operating income in the Health Care segment. Indemnity operating income increased 12% over the third quarter of 2000.  CIGNA credited the improved results higher earnings from retrospectively experience-rated health care business, reflecting rate increases and membership growth, and improved results for the group disability business.  Segment operating income for the first nine months of 2001 was $611 million, compared with $556 million for the first nine months of 2000.  CIGNA credited the increases in segment operating income to strong performance in the medical indemnity business, improved disability results, and growth in the specialty health care business.  CIGNA also reported increased membership in its Indemnity business of 3% since September 2000.  Overall, total medical lives covered was up 1% to 14.2 million over 13.1 million in 2000.  Commenting on CIGNA's performance, during a difficult quarter, defendant Hanway stated: "Despite current economic challenges, our businesses have put in a solid performance and positioned us for growth."

181.   Following the earnings announcement on November 2, 2001, defendants held a conference call with analysts.  Defendant Stewart commented on the status of Transformation:

> ***First of all, we are on track with our own schedule***, I will give you a sense of what that means in a second.  And I would say, as I have before, as we get closer and closer to customers with this, as they see it - touch it, **as the early adopters have begun to use it, they continue to be enthusiastic about what we can provide.  We will be moving a couple of million members to the new platform effective 01/01.  This will provide us with, as I said, a better**

61

*service experience, significantly better service experience*.  As well as greater flexibility in terms of products.  We will be able to provide more alternatives in terms of benefit structure and be able to tailor products much more effectively for both employers and employees.  *So, we feel good about our progress today, a lot more to do, but we are on track ....*  (Emphasis added.)

182.    The statements made in ¶¶ 180 and 181 were each false and misleading because they misrepresented and/or concealed the following material adverse facts:

a)    defendants had no reasonable basis to state membership levels, because defendants knew or recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems;

b)    the representation that early adopters were "enthusiastic" was false and misleading due to results of the computer malfunctions described herein;

c)    defendants had no reasonable basis to state that the migration of 3.5 million members would provide members with better service experiences because defendants knew or recklessly disregarded that the serious malfunctions in connection with the July 2001 migration had not been corrected;

d)    defendants had no reasonable basis to state that the Company was making good progress on Transformation, because the defendants knew or recklessly disregarded that the  Company had failed to perform adequate testing of the new systems; and

e)    the representation that the Company was on schedule in connection with the Transformation was materially misleading due to the failure to disclose the fact that the planned migration would result in a monumental compounding of the known consequences of the known grave computer malfunctions.

183.    On November 2, 2001, CIGNA filed its Form 10-Q for the third quarter 2001 with the SEC confirming the previously announced financial results.  In the MD&A section of the Form 10-Q, which was signed by defendant Sears, CIGNA reported that adjusted operating income in the Health Care segment increased 5% during the third quarter and 10% for the first

nine months of 2001, compared to the same periods in 2000.  As of September 30, 2001, HMO

membership was 6.9 million compared to 7 million in the third quarter 2000.  Indemnity

membership was estimated at 7.3 million compared to 7.1 million in the third quarter 2000.

CIGNA reported that:

> *Indemnity* results increased due to "higher earnings for
> retrospectively experience-rated health care business, which reflect
> rate increases and higher membership, as well as improved results
> in the long-term disability business and guaranteed cost health care
> business. . . .

As for the Company's outlook for 2001, management stated that it "expects full year adjusted

operating income in 2001 to be slightly below 2000 adjusted operating income of $1.11 billion."

184.    The statements made in ¶ 183, were false and misleading because defendants had

no reasonable basis to state actual membership levels because defendants knew or recklessly

disregarded that the Company did not have an accurate method of calculating membership

numbers due to inaccurate data on its computer systems.

185.    On November 6, 2001, analyst Boorady of Goldman Sachs issued a report

following the release of CIGNA's third quarter of 2001 financial results, reminding investors that

CIGNA "remains our best long-term value stock idea."  Boorady explained that results were

improving and the "worst of its 'Transformation' project is behind CIGNA."

186.    On January 9, 2002, CIGNA announced that it would realign service operations

and record a fourth quarter 2001 restructuring charge to account for the realignment.  More

specifically, the Company stated:

> As part of efforts underway to enhance service capabilities,
> CIGNA Corp. (NYSE: CI) announced today that it will realign
> service operations in its Employee Health Care, Life and Disability

Benefits segment and record a fourth quarter 2001 after-tax charge of approximately $65 million ($100 million, pre-tax).

"The actions that we announce today are part of our strategic commitment to further improve service for our customers and members. As part of this initiative, we are moving health care customers to new service platforms and supporting technologies and consolidating existing health care service operations into regional service centers. These changes will result in greater efficiencies for our customers and reduced operating expenses in 2003 and beyond," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

The $65 million after-tax charge relates predominantly to realignment and consolidation of service operations in CIGNA's Employee Health Care, Life and Disability Benefits segment operations. These changes will result in a net reduction of approximately 2,000 positions. The $65 million after-tax charge consists of approximately $33 million of severance costs and $32 million of facilities costs. Annual operating expense savings of $45-55 million after-tax are expected to be realized in 2003 and beyond as a result of these actions.

Once all health care customers are transitioned to the new service platforms and supporting technologies, CIGNA expects its health care operation to have nine primary service centers along with several speciality service centers that will fulfill the service needs of the 14+ million consumers enrolled in CIGNA's medical benefit plans and the 13+ million dental members.

With the exception of this charge, CIGNA expects operating income for full year 2001 and 2002 to be in line with previous guidance, which excludes other non-recurring items.

**D.**     **CIGNA Announces Full Year 2001 Results**

187.   On February 8, 2002, CIGNA issued a press release announcing its full-year 2001 financial results. CIGNA reported operating income of $1.1 billion, or $7.22 per share, for the year, which was 6% higher than in 2000. For the fourth quarter, CIGNA reported that operating income was $277 million, or $1.92 per share, on revenues of $4.9 billion. The Company further

64

reported that indemnity operating income increased 11% sequentially and 14% over the fourth

quarter of 2000, due to both higher earnings from retrospectively experience-rated healthcare

business and CIGNA's medical indemnity and group disability businesses.  Operating income for

the Health Care segment for full year 2001 was $830 million compared to $762 million for the

same period in 2000.  HMO membership was 6.9 million compared to 7.1 million in 2000.

Indemnity membership was 7.4 million compared to 7.0 million in 2000.  Defendant Hanway

stated the following with regard to CIGNA's purportedly "improved financial results": "In 2001,

our employee benefits business made progress on key strategic initiatives while delivering

improved overall financial results.  The progress made in 2001 will contribute to our long-term

growth.

188.    The statements made in ¶ 187, were each false and misleading because defendants

had no reasonable basis to state actual membership levels, because defendants knew or recklessly

disregarded that the Company did not have an accurate method of calculating membership

numbers due to inaccurate data on its computer systems.

189.    Following the Company's earnings announcement for fourth-quarter and year-end

2001, CIGNA held a conference call with analysts.  Defendant Stewart reconfirmed that CIGNA

was seeing improvement in customer retention and that Transformation would continue to

contribute to increased retention levels:

> We have talked about account retention as I acknowledged in
> January.  We saw improvement in the large employer sector.  We
> continued to focus on account management and continue to drive
> down through the book of business.  ***We think that the initiatives
> that we have taken relative to new product development relative
> to the service and Transformation are initiatives that will
> contribute to continuing satisfaction and continuing favorable***

*retention levels with those customers*.  We have made some progress in the areas that we were focusing.  (Emphasis added.)

190.  Defendant Stewart also stated with respect to the January 2002 migration:

The 3.5 million members that we had mentioned represents about 1,500 accounts.  A number of them got new ID cards.  For example, just in terms of educating pharmacists required a lot of work and drove a fair amount of core volume.  We responded to them very quickly.  We had additional resources; we had news to anticipate increased core volume.  That has worked well.  *I stress that there are no technology issues here.  There were some specific customer issues that we worked on pretty aggressively, which for the most part are behind us.*  (Emphasis added.)

191.  In an interview with Carmen Roberts of Bloomberg News that same day, defendant Hanway represented that CIGNA's pricing of policies was favorable:

And, while you are correct, we didn't raise prices as much as we should have early last year, which caused us some difficulties throughout 2001, *our pricing right now, as we come into 2002, is quite good.*

192.  On February 28, 2002, CIGNA filed its Form 10-K for 2001 with the SEC, confirming the previously announced financial results.  The Form 10-K was signed by defendants Hanway, Sears and Stewart.

193.  The 2001 Form 10-K also contained the following with regard to "technology" in the Health Care Benefits segment:

CIGNA's health care, life and disability benefits businesses are highly dependent on automated systems and systems applications. These businesses are working to improve their system infrastructure, standardize business processes and design more flexible, easier-to-use products.  CIGNA is engaged in a multi-year project to convert its health care business to newly designed systems and processes.  The transition to newly designed systems presents risks regarding customer satisfaction and retention in the event of transition difficulties.  *CIGNA is working to mitigate*

> *these risks through extensive testing of these new systems and by*
> *developing and implementing alternative plans to provide*
> *sufficient customer service resources in the event of difficulties.*
> (Emphasis added).

194.    The Company also reported that, as of December 31, 2001, medical membership

(excluding Medicare members) was 6,972,000 for the HMO operations, which was down from

7,234,000 in the year ago period, and 7,396,000 for the indemnity operations, which was up from

7,079,000  on December 31, 2000.

195.    In connection with the Company's HealthCare segment, adjusted operating

income increased 9% in 2001 and 7% in 2000.  In addition, the Company reported that

management expected full year 2001adjusted operating income of $1.1 billion to improve in

2002.

196.    CIGNA's 2001 Annual Report included a letter to the shareholders signed by

defendant Hanway.  In this letter, defendant Hanway touted the purported strong performance of

the HealthCare segment and the success of the Transformation project.  Defendant Hanway

stated:

> Our health care enrollment, excluding Medicare, grew 1 percent in
> 2001, which was slower than the industry-leading 8 percent growth
> rate we achieved in 2000.  In spite of the medical cost and
> enrollment growth challenges, we still expanded our profit margin
> in this segment.
>
> * * *
>
> One significant effort in CIGNA HealthCare, which we call
> Transformation, focuses on redesigning, streamlining and
> consolidating business processes and systems platforms. . . .
>
> In January 2002 we had 3.5 million health care members on new
> service and technology platforms.  ***In general, the initial customer***

*experience has been positive, and key service metrics are
improving*.  While we still have work to do with respect to
completing this critical initiative, *we are pleased with the progress
to date*.  [Emphasis added].

197.    The statements made in ¶¶ 189-196 were each false and misleading because they

misrepresented and/or concealed the following material adverse facts:

a)      defendants' statements that Transformation would contribute to continuing
        customer satisfaction and favorable retention levels was false and misleading
        because defendants knew or recklessly disregarded the January 1, 2002 migration
        caused compromised and incorrect data to be transferred into the new system,
        resulting in numerous customer problems and complaints;

b)      defendants' statements that Transformation would contribute to continuing
        customer satisfaction and favorable retention levels was false and misleading
        because defendants knew or recklessly disregarded that customer dissatisfaction
        levels were high as evidenced by CIGNA's key service metrics and its own
        internal customer survey;

c)      defendants' statements that Transformation would contribute to continuing
        customer satisfaction and favorable retention levels was false and misleading
        because defendants knew or recklessly disregarded that the Company was losing
        accounts as a result of service issues;

d)      defendants' statements that 3.5 million members were migrated to the new system
        and that there were no technology issues were false and misleading because
        defendants knew or recklessly disregarded that the new system could not handle
        the volume of claims being migrated and in fact shut down during the process. As
        a result, CIGNA employees had to manually input client information from the old
        system into the new system;

e)      defendants' statements that there were no technology issues in connection with
        Transformation were false and misleading because defendants knew or recklessly
        disregarded that the Company was experiencing serious technology problems in
        connection with POWERmhs and ProClaim systems, resulting in the Company's
        inability to process claims;

f)      defendants' statements that CIGNA's pricing of policies was "good" was false
        and misleading because, defendant knew or recklessly disregarded, that CIGNA's
        underwriters had insufficient data to adequately price contracts and often had to
        raise premiums at later dates;

g)     defendants had no reasonable basis to state actual or expected membership levels, because defendants knew that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems; and,

h)     the representations about Transformation were also materially misleading due to the overwhelming computer system malfunctions and other consequences thereof described herein and the failure to disclose these facts.

### E.     CIGNA Announces First Quarter 2002 Results

197.    On May 2, 2002, CIGNA issued a press release announcing its financial results for the first quarter of 2002.  The Company reported operating income of $275 million, or $1.92 per share, which exceeded the $272 million, or $1.76 per share, earned in the first quarter of 2001.  HMO membership was 7.0 million compared to 6.9 million in the first quarter of 2001.  Indemnity membership decreased slightly to 7.2 million compared to 7.3 million in the first quarter 2001.  Additionally, CIGNA represented that operating income for the full year 2002 was expected to be in the range of $7.85 to $8.15 per share.  More specifically, the Company stated:

> The company currently expects to generate operating income per share in 2002 in the range of $7.85-$8.15.  These amounts reflect the full year 2002 effect of $48 million after-tax from the implementation of SFAS No. 142.  2001 operating earnings included $52 million after-tax from the company's former Japanese life insurance operation, which was fully divested in November 2001.

198.    Following CIGNA's first quarter 2002 earnings announcement, defendants held a conference call with analysts on May 2, 2002.  Defendant Stewart reported that earnings growth in the quarter was driven by improvements in the long-term disability business, fee increases in the medical indemnity business and higher results in our experience-related health business.

69

199.    Defendant Hanway described the first quarter as a "reasonable start to 2002," stating that earnings in total for the first quarter in the HealthCare segment were consistent with CIGNA's expectations.

200.    Focusing on CIGNA's outlook for the remainder of 2002, defendant Hanway stated:

> Thus, the **total earnings for the segment, including amortization of non-goodwill intangibles, are expected to be in the range of $925 - $955 million, and this compares to a 'Street' estimate of about $960 million**.  Consistent with our previous guidance, **we continue to expect full year medical membership growth in the 1-2% range, and improvement from a flat first quarter reflecting the impact of actions to increase growth that I mentioned previously**.  (Emphasis added).

201.    Defendant Stewart stated:

> **And, I would also say that, as we said in February, we're talking about a massive system here.  We also acknowledged that we had a bump in the road or two, relative to the conversions and customers and making sure there was a little bit of money in the quarterly results for that expense**.  But, when you look at the overall picture, I think the expense ratios are behaving themselves. (Emphasis added).

202.    Defendant Hanway stated:

> I would just add one additional thought.  I don't know if you were inferring this or not, but none of the decisions we have made relative to the pacing of either putting new business on the system, or the migration of existing customers is driven by expense issues. **What's driving us is ensuring that the quality and effectiveness of the service for both the new customers and the migrated customers.  I feel very good about the current state of Transformation and the quality of service that can be delivered from it.**

*    *    *

70

>*I do think we've also demonstrated, when we do find errors, for whatever reason, we can respond very effectively and that's been acknowledged by our customers.  So, I think we've gotten the migration process now, I won't say down to a science, but engineered pretty well*.

* * *

>*I would say we have tracked very closely the satisfaction levels of a large group of customers.  And I would say those satisfaction levels have been consistently improving.  So, we are to the point now where we have customers who are clearly willing to recommend this particular capability as being an advantage.  So, that to me is a good measure of the progress we're making, both in getting the migration done effectively, but also in delivering some of the promise of Transformation*.  (Emphasis added).

203.    During the question and answer portion of the call, defendant Hanway stated that

Transformation was providing members with improved customer service:

>*First of all, we've been quite pleased with what we've seen in the area of increased auto adjudication for claims.  We've been quite pleased in what we've seen in the improvement for what we call first call resolution rates.  That's where you call in and you don't get bounced around to three or four different people, or you don't have to wait for a return call, but we have all the information available to give you an answer quickly*.  So, at an aggregate or a macro level, what we are seeing in those areas is consistent with what we had expected.  (Emphasis added).

204.     Defendant Hanway further emphasized the Company's focus on improving

membership:

>*We are expecting that membership is going to improve for the balance of the year, which is a good early indicator*.  And, as we get into the large account cycle here in the summer, or early fall, we'll continue to get reinforcement that the direction we're going is right.  We're focused on two things.  *One is continuing to improve retention, which we're doing now in middle market*.  And the other is new sales, and we think we can improve in both areas.  (Emphasis added).

71

205.     In an interview with Susan Lisovicz and Ali Velshi of the *Money Gang* the same day, defendant Hanway denied that CIGNA was experiencing difficulties with Transformation, specifically dismissing a large number of complaints arising from members in Georgia:

> [W]e clearly want to be known for the level of our consumer service and don't think that, that particular survey in Georgia is indicative at all of what we're delivering across the country.

206.     In an interview with Monica Bertran of Bloomberg News, also on May 2, 2002, defendant Hanway represented that CIGNA's pricing of premiums was favorable and accurate:

> **Well, we actually had very good progress in raising premiums.  It more than offset the cost of the health-care increases.**  The investment losses you refer to, are from our investment portfolio, and really aren't related to the health-care prices.  **Our price increases were good**, and our loss ratios in the HMO business improved.
>
> \*   \*   \*
>
> **I think we have to always be sure that we are keeping premiums ahead of loss costs, which we have done**.  (Emphasis added).

207.     When questioned about the progress of Transformation, defendant Hanway assured investors that, despite some minor problems, the Transformation process was running smoothly:

> Well, this is a massive undertaking, first of all, and, certainly, anything of this size, you're going to have a few bumps in the road. We had that.  I think we've learned quite a bit.  **The processes are working well, and we feel very confident about getting the benefits, both for ourselves, but also for our customers**.
>
> **So 'Transformation' is proceeding as we expected**.  (Emphasis added).

72

208.     On or about May 2, 2002, CIGNA filed its Form 10-Q for the first quarter of 2002

with the SEC, confirming the previously announced financial results.  The Form 10-Q was

signed by defendant Sears and reported that in the HealthCare segment increased Indemnity

results for the first quarter 2002 were primarily due to "improved results in the long-term

disability business, primarily due to higher rates and improved claim execution; and higher

earnings for the experience-rated health care business, reflecting rate increases."  In addition, the

Company reported that, as of March 31, 2002, medical membership (excluding Medicare

members) was 7.0 million for the HMO operations, which was a slight increase from 6,972,000

reported in the prior quarter, and an estimated 7.3 million for the Indemnity operations, which

was below the 7,396,000 reported for the full year 2001.  Notably, the Company did not disclose

that it experienced substantial problems in migrating accounts to its new computer system within

the Employee HealthCare segment which commenced onJuly 1, 2002.  Additionally, the

Company did not disclose that as a result of job cuts in its customer service operations, the

computer integration problems were exacerbated.

209.     The Form 10-Q also contained a sub-section describing CIGNA's "Restructuring

Program" (Note 4):

> In the fourth quarter of 2001, CIGNA adopted a restructuring
> program primarily to consolidate existing health service centers
> into regional service centers.  As a result, CIGNA recognized in
> operating expenses a pre-tax charge of $96 million ($62 million
> after-tax) in the Employee Health Care, Life and Disability
> Benefits segment.  The pre-tax charge consisted of $48 million of
> severance costs ($31 million after-tax) and $48 million in real
> estate costs ($31 million after-tax) related to vacating certain
> locations.

73

The severance charge reflected the expected reduction of approximately 3,100 employees.  As a result of the consolidation of health service centers, CIGNA expects to hire approximately 1,100 employees, thereby resulting in a net reduction of approximately 2,000 employees under this program.  As of March 31, 2002, 639 employees had been terminated under the program (203 employees were terminated in the first quarter of 2002).

210.    The statements made in ¶¶ 197-209 were each false and misleading because they misrepresented and/or concealed the following material adverse facts:

a)      defendants had no reasonable basis to state actual or expected membership levels or costs for the full year, because defendants knew or recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

b)      defendants' statements that CIGNA's pricing of policies was good, in that the Company had good progress in raising premiums was false and misleading because defendants knew or recklessly disregarded that CIGNA's underwriters had insufficient data to adequately price contracts and as a result of raising premiums at later dates was losing customers;

c)      defendants' statements that the Company experienced only "bumps in the road" in connection with migration were false and misleading because defendants knew or recklessly disregarded that the numerous customer and technology problems were far more serious and causing CIGNA to lose customers, misprice policies and pay penalties;

d)      defendants' statement that the Company had "migration down to a science" was false and misleading because defendants knew or recklessly disregarded that the numerous customer and technology problems experienced in January 2002 were continuing;

e)      defendants' statement that customer satisfaction levels were improving was false and misleading because defendants knew or recklessly disregarded that customer dissatisfaction levels were high as evidenced by CIGNA's key service metrics and the Company's internal customer survey;

f)      defendants had no reasonable basis to state that it expected to generate operating income of at least $1.1 billion in 2002 due to the increased costs and loss of customer accounts as a result of the problems with Transformation; and,

g)    defendants had no reasonable basis to state membership levels, because defendants knew or recklessly disregarded that the Company did not have an accurate method of calculating membership numbers due to inaccurate data on its computer systems.

F.    **CIGNA Announces Second Quarter 2002 Results**

210.   On August 2, 2002, CIGNA issued a press release announcing its financial results for the second quarter of 2002.  The Company reported that operating income, excluding non-recurring items, was $279 million, or $1.95 per share, which exceeded the $262 million, or $1.73 per share CIGNA earned in the second quarter of 2001.  For the first half of 2002, operating income was $554 million compared to $534 for the first half of 2001.  The Company reported indemnity operating income of $100 million for the quarter, which was an increase over $95 million in the first quarter 2002, and $99 million for the second quarter 2001.  CIGNA also reported indemnity membership of 7,184,000, a slight decrease from 7,363,000 during the second quarter 2001.

211.   On August 2, 2002, CIGNA filed its Form 10-Q for the second quarter of 2002 with the SEC, confirming the previously announced financial results.  The Form 10-Q, which was signed by defendant Sears, set forth the same description of the Restructuring Program (Note 4) as previously reported in the Company's Form 10-Q for the first quarter 2002.  In the MD&A section of the Form 10-Q, CIGNA reported operating income in its Health Care segment of $228 million (excluding goodwill), compared to $216 in the second quarter 2001, an increase of 6% for the second quarter and 4% for the six months of 2002 compared with the same periods in 2001.  Indemnity results increased 2% for the second quarter and 7% for the six months of 2002 due to "improved results in the long-term disability business, primarily due to higher rates and

75

improved claim execution."  In addition, the Company reported that, as of June 30, 2002,

medical membership (excluding Medicare members) was 7.0 million for the HMO operations,

which was flat from the 7.0 million in the prior quarter, and an estimated 7.2 million for the

Indemnity operations, which was down from 7.3 million reported for the first quarter of 2002.

212.    The statements made in ¶¶ 210-211 were false and misleading because defendants

had no reasonable basis to state membership levels because defendants knew or recklessly

disregarded that the Company did not have an accurate method of calculating membership

numbers due to inaccurate data on its computer systems.

213.    Note 10 of the 10-Q report, which was, entitled "Contingencies and Other

Matters," contained the following statements concerning the assumptions used to calculate the

Company's GMDB liability:

> *Specialty life reinsurance contracts*.  The run-off reinsurance
> operations include specialty life reinsurance contracts that
> guarantee certain minimum death benefits based on unfavorable
> changes in variable annuity account values.  ***Liabilities for this
> business are estimated using actuarial assumptions as to
> premiums, future investment yield, mortality, withdrawals, equity
> market returns and the volatility of the underlying equity and
> bond mutual fund investments.  These assumptions are based on
> CIGNA's experience, actuarial tables and historical market
> experience adjusted to reflect both short-term and long-term
> future expectations.***  As previously disclosed, significant and
> sustained stock market declines could trigger increased payments
> under these contracts.  If the stock market were to remain at or fall
> below current levels for a sustained period, CIGNA would be
> required to increase reserves for these contracts in amounts that
> would be material to CIGNA's consolidated results of operations
> and could be material to its financial condition.  These amounts are
> not expected to be material to CIGNA's liquidity.  [Emphasis
> added].

214.    This statement was materially false and misleading because defendants failed to disclose that CIGNA's method of determining its GMDB liability did not take into account the actual unhedged deteriorated value of the underlying mutual fund investments since the end of 2000.

215.    Additionally, in the section of the Form 10-Q entitled "Outlook for 2002," the Company represented that it expects operating income for the year 2002 to exceed $1.1 billion, stating in pertinent part as follows:

> Subject to the factors noted in the Cautionary Statement . . . , management expects full year adjusted operating income to improve slightly in 2002 compared to 2001 adjusted operating income of $1.1 billion.

216.    Defendants knew that their operating income projection was false or misleading because they knew or recklessly disregarded that the Company's operating income in the second half of 2002 would decline due to increased costs of the Transformation and other financial consequences of the computer malfunctions and serious consequences thereof described herein.

## IX.    **THE TRUTH EMERGES**

217.    On September 3, 2002, CIGNA announced that it would be forced to increase reserves for its annuity reinsurance obligations and that it was adopting a plan to hedge potential future losses.  As a consequence, the Company would record an after-tax charge of $720 million in the third quarter.  Defendant Hanway attributed the $720 million charge to recent declines in the stock market, stating:

> Recent declines and volatility in the equity markets significantly increased the company's exposure to future death claims on certain variable annuity run-off reinsurance contracts.  The actions we are taking substantially reduce the impact of the future equity market

declines arising from these contracts and maintain the financial
strength that our customers expect.

218.    Notwithstanding the fact that the stock market had been in a severe, steady decline

for at least two years, CIGNA revealed, in the press release, that its reserves for obligations

arising from its annuity reinsurance contracts, as of June 30, 2002, were only $300 million,

stating as follows:

> CIGNA estimates its liabilities for this business using assumptions
> as to equity market returns and the volatility of the underlying
> equity and bond mutual fund investments, future investment yield,
> mortality and policy surrenders.  CIGNA had reserves of
> approximately $300 million as of June 30, 2002 for these
> liabilities.

219.    Seeking to forestall a collapse in its stock price, CIGNA reassured the market that

these developments would not impact its operations, expressly representing that operating

income for the third quarter and the full year would not be negatively impacted.  More

specifically, the press release stated:

> **The Company also said that it expects operating income for the
> third quarter and full year 2002, excluding non-recurring
> items referenced in "Outlook for 2002" on page 19 of CIGNA's
> second quarter Form 10-Q, to be in-line with previous
> guidance.  On its August 2, 2002 conference call the company
> indicated that, excluding those non-recurring items, it expected
> third quarter 2002 earnings in the range of $1.90 to $2.05 per
> share and full year 2002 earnings in the range of $7.85 to $8.15
> per share.**  [Emphasis added].

This statement was materially false and misleading for the reasons set forth in ¶ 213.

220.    As a result of the $720 million charge and its impact on CIGNA's capital

structure, S&P placed CIGNA's counterparty rating and financial strength on "CreditWatch

negative" on September 4, 2002, stating in relevant part:

The rating action follows CIGNA's announcement of a $720 million after-tax GAAP reserve increase related to its run-off reinsurance block of guaranteed minimum death benefits (GMDB) on variable annuities.  The reserve reflects the amount needed to conservatively fund the increased GMDB exposure resulting from recent market volatility and the expense necessary to pre-fund a hedging program designed to offset the effects of market changes on GMDB costs.  Standard & Poor's believes the hedging program will effectively address the impact of future market volatility on the GMDB block.

**Although Standard & Poor's acknowledges an improved risk profile for the product line because of the hedging program, financing this significant reserve will put pressure on the historically strong quality of CIGNA's balance sheet and capital structure.**  "The ratings were placed on CreditWatch to reflect concerns about CIGNA's emerging capital structure rather than the residual risks within the GMDB block." [Emphasis added].

221.    Following the $720 million charge and S&P announcements, the share price of CIGNA common stock dropped by 6%, closing at $80 on September 4, 2002, down from $85.12 on August 30, 2002.

222.    On October 18, 2002, CIGNA issued a press release announcing that it would record an additional $315 million charge in connection with the arbitration award relating to the Company's obligations arising from its reinsurance agreements for the Unicover workers' compensation reinsurance pool.

223.    On October 23, 2002, CIGNA announced that defendant Stewart would be retiring from his post as Chief Financial Officer in December 2002.

224.    After the stock market close on October 24, 2002, CIGNA announced that, contrary to its recent affirmations, it would not meet its third quarter and full year 2002 guidance excluding the recent $720 million and $315 million charges.  The Company stated that it

79

expected third quarter operating income to be $1.47 per share, significantly lower than the

previously touted range of $1.90 to $2.05 per share.  For the full-year 2002, CIGNA stated that it

expected operating income of $915 million to $950 million (instead of $1.1 billion as represented

in the Form 10-K, the August 2, 2002 press conference, and the September 3, 2002 press

release), or approximately $6.50 to $6.75 per share.  The Company attributed the substantial

shortfall to weak results in the HealthCare segment, stating:

> The company expects operating income (net income excluding
> realized investment results) for the third quarter of approximately
> $205 million or $1.47 per share, excluding the previously
> announced charges of $720 million after-tax and $315 million
> after-tax for the run-off reinsurance operations, and a $9 million
> after-tax charge to increase reserves for a previously disclosed
> Medicare cost reporting matter.
>
> The change in expectations primarily reflects weaker than expected
> health care results in the Employee Health Care, Life and
> Disability segment.  Third quarter operating income for the
> company's Employee Retirement Benefits and Investment Services
> segment and the International segment are expected to be in line
> with previous guidance.

* * *

> The company said that it expects consolidated full year 2002
> operating income, excluding nonrecurring items, in the range of
> $915 million to $950 million or approximately $6.50 to $6.75 per
> share.  The Employee Health Care, Life and Disability segment is
> expected to have operating income, excluding nonrecurring items,
> in the range of $725 million to $750 million for the full year.

225.    During a conference call with securities analysts on October 28, 2002, the

Company specified that the downward earnings revision was attributable in significant part to the

HealthCare segment where the Company was forced to grant margin concessions on health care

policies to retain customers and obtain new customers as a result of malfunctions when accounts

80

were migrated to the new computer system, which were exacerbated by CIGNA's shortage of

customer service representatives to compensate for the glitches.  In addition, the Company, while

cognizant that it lacked accurate data regarding its medical membership, priced premiums for

experienced-rated policies.  After determining that premiums for policies were underpriced, the

Company raised, or attempted to raise, premiums in the subsequent policy period to compensate

for the losses, which led to the defection of several large customers.  Following the systems

integration problems, the Company was also forced to incur expenses to improve customer

service, which included increasing staffing at its cut-back customer service operations.  CIGNA

also reduced its indemnity members by more than 900,000 members from 7.3 million to about

6.4 million and its managed care membership by in excess of 160,000 members, as set forth in

detail above.  The President of CIGNA HealthCare, Patrick Welch, admitted:

> Unfortunately, we have not executed well on Transformation.  The
> cost is greater than anticipated, much of the economic and service
> benefits are yet to be realized and transformation shortfalls have
> led to service shortfalls which have led to lower sales and
> retention.  We have examined transformation in detail and believe
> the objectives are still valid.  We are moving forward to achieve
> our goals of enhancing customer service while improving
> productivity.  We continue to make progress.
>
> First, as to account migrations from our legacy systems to the new
> in-state platforms.  **We did have problems with migrations on
> January 1st, of 2002** and we have put processes in place to
> improve this.  Now the migrations, the accounts that migrated
> midyear went well and we expect the migrations on January 1st of
> '03 to go well also.  We realize that migrations really represent the
> first critical step to ensure a good service experience for our
> customers.

226.   Defendant Hanway discussed CIGNA's 2003 outlook:

First, at the consolidated level, for 2003 our expectation is operating income of $875-925 million. And that translates to $6.25-$6.50 per share. **Our estimate of 2003 operating income for the Employee Health and Life segment is $675-725 million. That's a decline of about $25-$50 million, relative to our 2002 operating income estimates of $725-$750 million**.

I'd characterize 2003 as a rebuilding year. As we stabilize and improve service, strengthen our underwriting processes, continue to invest in and make progress on Transformation, and permit our actions to enhance medical costs management and improved sales execution and account retention.

**Even with 2003 as a rebuilding year, we do not expect to see quantitative progress as measured by membership growth or operating income improvement. Relative to membership, given what we know at this point, we expect the January 1, 2003 membership to be down in the 4-5% range on a same-store basis**. Relative to operating income, the year-over-year $250$50 million projected decline in 2003, which I cited, is consistent with the decline in our business base; that is, the 4-5% decline in membership.

227. As stated by CIBC World Markets analyst, John Szabo, in *The Philadelphia Inquirer* on October 26, 2002:

> "CIGNA's problems may put it in a precarious financial position," CIBC World Markets analyst John Szabo warned. He blamed CIGNA's problems on its "disastrous" attempt to upgrade its computer technology, "which by nearly every measure has been a complete failure."

228. In that same vein, Goldman Sachs analyst Matthew Borsch called CIGNA's failure to hit its earnings projections "worse than worst case," attributing the Company's financial woes to its 5-year, $1 billion Transformation project. Lehman Brothers analysts, Joshua Raskin, referred to the project as "out of control" and said that "the only results we have seen are added costs." According to Alliance Capital Management fund manager Norman Fidel, "CIGNA's problems are basically due to their information-systems transformation, which left

82

them not knowing their costs and with customer-service problems. . . .   It doesn't have

implications for the rest of the industry."

229.    After placing CIGNA's credit on CreditWatch, S&P cut CIGNA's counterparty

credit rating to "BBB+" from "A" on October 31, 2002.  On October 29, 2002, CIGNA's senior

debt was downgraded to "A-" from "A" and its subordinated debt to "BBB+" from "A-" by Fitch

Ratings.  On November 1, 2002, A.M. Best Co. downgraded CIGNA's corporate debt rating.

Each of the ratings agencies cited their respective reevaluations of CIGNA's risks and the costs

required to implement the hedging program as the basis for their downgrades.

## X.    SCIENTER ALLEGATIONS

230.    As alleged herein, defendants acted with scienter in that they knew or recklessly

disregarded that the public statements and/or documents issued or disseminated in the name of

the Company were materially false and misleading; defendants knew that such statements and/or

documents would be issued or disseminated to the investing public; and defendants knowingly

and substantially participated or acquiesced in the issuance or dissemination of such statements

and/or documents.  As set forth in detail elsewhere herein, defendants, by virtue of their receipt

of information reflecting the true facts regarding CIGNA, their control over, and/or receipt and/or

modification of the Company's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning CIGNA, participated in the fraudulent actions alleged herein.

231.    Actual knowledge or reckless disregard of the undisclosed adverse material facts

alleged herein can be imputed to defendants, rendering their public statements materially false

and misleading for the following reasons:

(a)     The Transformation project was a multi-year, billion dollar upgrade of CIGNA's computer system platform in the HealthCare segment, which was CIGNA's largest segment, accounting for approximately 75%-80% of CIGNA's operating income.  As defendant Hanway stated on February 8, 2002, the Transformation is "a fundamental repositioning and re-engineering of our business."  Since this was a major transformation of CIGNA's operations and defendants were the highest ranking executives of CIGNA, defendants knew or were reckless in not knowing of the material undisclosed facts alleged herein.

(b)     As a result of defendants' positions with the Company, they had access to the documents which contained the facts that made their statements materially misleading and knew or recklessly disregarded those facts, including (1) CIGNA's own internal research which revealed that almost half of the customers who migrated on January 1, 2002 were dissatisfied; (2) key service metrics about which defendant Hanway commented in his letter to shareholders in the 2001 Annual Report.  (Those key service metrics included turnaround time for processing claims, financial and clerical accuracy in claims processing and call waiting and resolution time); (3) "Average Handling Time" – AHT reports, which were monthly reports detailing the average time that a caller had to wait or hold before speaking to a customer service representative and a customer service representative to resolve a call, which were received by defendants Hanway, Stewart and Sears, among others.  The significantly increased time for both categories after the January 1, 2002 migration were included in this monthly report, which was distributed to defendants Hanway, Stewart and Sears, among others; and (4) CIGNA was experiencing losses of some of its largest customers.

(c)     There was a complete absence of medical indemnity claims coming through CIGNA's new platform for three months (February through April) after the January 1, 2002 migration of 3.5 million accounts to the new platforms.  The total absence of any claims for three months in CIGNA's largest business unit was at the very least a red flag of serious problems with the Transformation, which defendants knew or recklessly disregarded.

(d)     By virtue of her position, defendant Anania knew about the absence of testing of the new computer systems under real life conditions and the consequences that resulted therefrom.

(e)     Defendants had motive and opportunity to misrepresent and omit the material facts alleged herein because, as CIGNA's highest executive offices with opportunity to do so:

(i)     Approximately 90% of defendant Hanway's total pay opportunity is variable compensation such as bonuses and stock options.  It is at risk and tied to competitive business results.  In assessing the performance of CIGNA to determine defendant Hanway's compensation, the People Resources Committee of CIGNA's Board considers, among other things, the profitability of each business unit, customer service and membership growth in the healthcare business.  As major components in defendant Hanway's compensation, he had a motive and opportunity to misrepresent and omit the material facts alleged herein regarding customer service, membership numbers and the profitability of the HealthCare segment.

(ii)    According to CIGNA's March 2002 and March 2003 Proxy Statements, defendant Hanway's overall compensation package for 2001 and 2002 took into account "investments in customer service, technology and e-commerce that are expected to have a positive impact on future earnings." Since the success of the Transformation project was tied directly to defendant Hanway's compensation, he had a motive and opportunity to misrepresent the material facts alleged herein.

(iii)   Defendant Hanway's compensation package for 2002 took into account "disappointing core healthcare results."  Since his compensation was

directly tied to healthcare results, which were negatively impacted by the Transformation, he had motive and opportunity to misrepresent and omit the material facts alleged herein.

(iv)    The Executive Compensation Program, which applied to defendants Hanway and Stewart provides that annual bonus awards recognize contributions to annual business results as measured against competitors and against CIGNA's operational plans.  Financial results must be achieved within the context of customer service, quality and financial integrity standards. Therefore, defendants Hanway and Stewart had motive and opportunity to misrepresent and omit the material facts alleged herein.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

232.    The market for CIGNA's securities was an efficient market at all relevant times, for the following reasons, among others:

(a)    The Company's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by several securities analysts employed by major brokerage firms who prepared reports which were distributed to the sales forces and

certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

233.     As a result of the foregoing, the market for CIGNA's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in CIGNA's stock price.  Under these circumstances, all purchasers of CIGNA's common stock during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

234.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized or approved by an executive officer of CIGNA who knew that those statements were false when made.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS
### OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

235.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

236.    During the Class Period, CIGNA and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CIGNA's common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase CIGNA's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

237.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for CIGNA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

238.    CIGNA and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CIGNA as specified herein.

239.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to cause investors to have an incorrect picture of CIGNA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CIGNA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CIGNA's common stock during the Class Period.

240.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

241.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CIGNA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' misstatements regarding the Company's  business, operations and earnings throughout the Class period, defendants, had actual knowledge of the misrepresentations and omissions alleged or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

242.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CIGNA's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CIGNA's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired CIGNA common stock during the Class Period at artificially high prices and were damaged thereby.

243.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and omissions, and believed the statements made by CIGNA and the other defendants to be true and complete.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of CIGNA, which were not disclosed by defendants, Lead Plaintiffs and other

members of the Class would not have purchased or otherwise acquired CIGNA common stock,

or, if they had acquired such securities during the Class Period, they would not have done so at

the artificially inflated prices which they paid.

244.    By virtue of the foregoing, defendants have violated Section10(b) of the Exchange

Act, and Rule 10b-5 promulgated thereunder.

245.    As a direct and proximate results of defendants' wrongful conduct, Lead Plaintiffs

and the other members of the Class suffered damages in connection with their respective

purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

246.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

247.    Each of the Individual Defendants acted as a controlling person of CIGNA within

the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the statements filed by the Company with

the SEC and disseminated to the investing public, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Lead

Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or

had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Lead Plaintiffs to be misleading prior to and/or soon after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

248.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

249.    As set forth above, CIGNA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of CIGNA's and the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper, including but not limited to corporate governance changes.

## **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 3, 2003                    Respectfully submitted,

**BERGER & MONTAGUE, P.C.**


By:      _____
         Sherrie R. Savett (I.D. #17646)
         Carole A. Broderick (I.D. #12001)
         Barbara A.  Podell (I.D. #28583)
         Casey M. Preston (I.D. #86508)
         1622 Locust Street
         Philadelphia, PA 19103
         (215) 875 - 3000
         (215) 875 - 4604 (Fax)
         **Counsel for the Pennsylvania State**
         **Employees' Retirement System**

         **BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
         Mel E. Lifshitz
         Keith M. Fleischman
         Francis P. Karam (I.D. #77910)
         Michael S. Bigin
         Stephanie M. Beige
         10 East 40th Street
         New York, NY 10016
         (212) 779-1414
         (212) 779-3218 (Fax)
         **Counsel for Peter Szanto**

         **CO-LEAD COUNSEL FOR PLAINTIFFS**

                        **And**

93

**OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION**
D. Michael Fisher, Attorney General
Daniel J. Doyle (I.D. #54855), Senior Deputy Attorney
General
Susan J. Forney, Chief Deputy Attorney General
15th Fl. Strawberry Square
Harrisburg, PA 17120
(717) 787-2944
(717) 772-4526 (Fax)

**PENNSYLVANIA STATE EMPLOYEES'
RETIREMENT SYSTEM**
Michael A. Budin, Chief Counsel (I.D. #21528)
Brian McDonough (I.D. #55866)
30 North Third Street
P. O. Box 1147
Harrisburg, PA 17108-1147
(717) 783-7317
(717) 787-5751 (Fax)

**Counsel for the Pennsylvania State
Employees' Retirement System**

368465~3.WPD

94