UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------x
                                                       :
IN RE CIGNA CORP.                                      :     Master File No. 2:02CV8088
SECURITIES LITIGATION                                  :
                                                       :
-------------------------------------------------------x

## SECOND REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett (#17646)
Carole A. Broderick (#12001)
Barbara A. Podell (#28583)
Phyllis M. Parker (#77336)
Roslyn G. Pollack (#17487)
Joshua C. Schumacher (I.D. #200142)
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)
**Counsel for the Pennsylvania State
Employees' Retirement System**

**BERNSTEIN LIEBHARD
 & LIFSHITZ, LLP**
Mel E. Lifshitz
Keith M. Fleischman
Francis P. Karam (#77910)
Michael S. Bigin
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
(212) 779-1414
(212) 779-3218 (Fax)

**CO-LEAD COUNSEL**

**OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION**
Thomas W. Corbett, Jr., Attorney General
Daniel J. Doyle (#54855), Sr. Deputy
Attorney General
Susan J. Forney, Chief Deputy Attorney
General
15th Fl. Strawberry Square
Harrisburg, PA 17120
(717) 787-2944
(717) 772-4526 (Fax)

**LEGAL OFFICE OF THE
PENNSYLVANIA STATE
EMPLOYEES' RETIREMENT
SYSTEM**
Michael A. Budin, Chief Counsel (#21528)
Brian McDonough, Deputy Chief Counsel
(#55866)
30 North Third Street
Harrisburg, PA 17101
(717) 783-7317
(717) 787-5751 (Fax)

**Counsel for the Pennsylvania State
Employees' Retirement System**

**TABLE OF CONTENTS**

PAGE

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Summary of Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.    THE ROLES OF THE INDIVIDUAL DEFENDANTS  . . . . . . . . . . . . . . . . . 15

VI.   LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS  . . . . . . . . . . . . . . . 18

VII.  SUBSTANTIVE ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    The Need to Upgrade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    The "Transformation" Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.    CIGNA Transferred Customers to Its New Computer Systems
            Before Determining Whether They Worked with Real Data,
            Causing Disastrous Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      D.    Migrations to Nowhere - Customer Data Is Severely Corrupted
            During Customer Migration to the New Platforms  . . . . . . . . . . . . . . . . . . 28

            1.    Inaccurate Eligibility Data Caused CIGNA To Issue
                  Erroneous Bills  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            2.    CIGNA's Members Receive Even Poorer
                  Customer Service as a Result of Transformation  . . . . . . . . . . . . . . . 30

            3.    The New Systems Processed Claims Incorrectly  . . . . . . . . . . . . . . . 35

            4.    Transformation Exacerbates Mispricing of Contracts . . . . . . . . . . . . . 41

E.      The Devastating Effect of the Account
        Migrations on Customer Satisfaction ................................. 45

VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS DURING
       THE CLASS PERIOD .................................................... 50

       A.      The November 2001 Misrepresentation ............................. 51

       B.      The February 2002 Misrepresentations ............................. 54

       C.      The May 2002 Misrepresentations ................................. 58

IX.    OCTOBER 2002: DEFENDANTS ADMIT FACTS THEY HAD PREVIOUSLY
       MISREPRESENTED OR CONCEALED ..................................... 65

X.     MID-2003: THE CHICKENS COME HOME TO ROOST - CIGNA
       HEALTHCARE'S EARNINGS, MEMBERSHIP AND STOCK PRICE
       PLUNGE ONCE AGAIN – 2002 FINANCIAL REPORTING "ERRORS"
       ARE    CORRECTED ..................................................... 71

XI.    SCIENTER ALLEGATIONS .............................................. 73

XII.   LOSS CAUSATION .................................................... 78

XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE:
       FRAUD-ON-THE-MARKET DOCTRINE ................................... 80

XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ...................... 81

COUNT I - Against All Defendants For Violations Of Section 10(b) Of The Exchange
Act and Rule 10b-5 ......................................................... 81

COUNT II - Against The Individual Defendants For Violations of Section 20(a)
Of The Exchange Act ....................................................... 85

JURY TRIAL DEMANDED .................................................... 87

## I.    INTRODUCTION

1.    Lead Plaintiff submits this Second Revised Consolidated Amended Class Action Complaint pursuant to the Court's March 24, 2006 Memorandum and Order. Lead Plaintiff asserts the facts and claims set forth herein principally based upon documents produced by defendants in discovery in this action. Plaintiff's allegations are also based on the investigation of its counsel, which includes without limitation: (a) review and analysis of filings made by CIGNA Corp. ("CIGNA" or the "Company") with the Securities and Exchange Commission ("SEC"); (b) interviews with former employees and customers of CIGNA; (c) review and analysis of securities analysts' reports concerning CIGNA; (d) review and analysis of 2001 and 2002 conference calls between CIGNA and investment professionals and others, which were and are available in audio format on Bloomberg News Services; (e) review and analysis of press releases and other statements disseminated by the defendants; (f) consultation with experts; and (g) other publicly available information about CIGNA. Lead Plaintiff is aware that further evidentiary support exists for its allegations and believes that further substantial evidentiary support will exist for the allegations after a reasonable opportunity for discovery. Certain of the facts supporting the allegations contained herein are known only to defendants or are within their control.

2.    This is a class action brought on behalf of a class of purchasers of the common stock of CIGNA from November 2, 2001 through October 24, 2002 (the "Class Period"). This Complaint asserts claims against CIGNA, and three of its senior executives, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") as a result of their dissemination of or liability for the dissemination of materially false and misleading information concerning CIGNA to the investing public.

1

## II.    SUMMARY OF ACTION

### A.    Summary of Claims

3.    This Complaint asserts claims based on defendants' misrepresentations and omissions of material facts, in particular the following:

•    **False Statements About Transformation Operations and Execution**

### (a)    2001 False Representation That CIGNA's Transformation Project Was On Track

Defendants represented on November 2, 2001 that the Company's Transformation project was "on track." As set forth herein, this representation was false and misleading in that (1) by February 2001 and thereafter defendants knew that there were material delays in the development of and serious errors in critical applications that could not be rectified before the expected January 1, 2002 migration of customers to the Transformation systems; (2) this caused delay in development of other applications and the need to re-engineer certain of them; and (3) it would not be possible to test the applications adequately before the January 2002 migration, if at all.

Indeed, in many cases it was necessary to resort to simulation testing, which, as defendant Hanway euphemistically observed, did not "have a successful track record." In fact, as defendants knew and defendant Hanway pointed out in a memorandum to defendant Stewart discussing an October 2001 analysis of Transformation, not only was Transformation not "on track" when the Company migrated millions of customers to the new systems on January 1, 2002, but that there would be a "customer relations nightmare," due to the systems' "[i]nability to pay claims correctly," "[i]nability to bill customers correctly," and "[s]ignificant eligibility disjoints and related service issues (phones, access to care issues, etc. . . .)," due to development disasters and delays described herein. These disasters caused the "nightmare" foretold by defendant Hanway, and were a material

2

cause of a sharp decline in the price of CIGNA stock at the end of the Class Period that damaged Plaintiff and the Class. Furthermore, it was necessary for CIGNA to spend an additional $300 million to render the defective applications fully functional.

### (b) February 2002 – False Representations Concerning the Success of Transformation

On February 8, 2002 and May 2, 2002, defendant Hanway made a number of false representations about Transformation, as set forth herein, stating on February 8 that "I would stress that there are no technology issues here," and that "specific customer issues . . . for the most part are behind us," representing on May 2 that Transformation "is proceeding as we expected," and, on the same dates, made various other positive and materially misleading positive representations about the status and success of Transformation. These representations were knowingly false in that, in fact, as stated above, Transformation caused the Company to be unable to bill correctly, unable to pay claims correctly and caused "significant eligibility disjoints" which resulted in improper denials of coverage to customers causing a "customer relations nightmare."

### (c) False Representation About Testing

CIGNA's 2001 Form 10-K, that was filed with the SEC on February 28, 2002, represented that the Company was mitigating the risks of the new Transformation systems "through extensive testing." In fact, as CIGNA's Chief Information Officer admitted after the Class Period, CIGNA's testing of the Transformation systems was anything but "extensive" before customers were subjected to those systems as a result of a business decision to proceed before they were tested adequately.

### (d) False Representations About Pricing

Defendant Hanway represented on February 8, 2002 that "our pricing . . . is quite good," and represented on May 2, 2002, that "[o]ur price increases were good." In fact, as the Company stated

3

at the end of the Class Period, CIGNA's pricing was unfavorable due to the need to make price concessions as a result of the "customer nightmare" caused by Transformation. Also, because Transformation systems did not produce accurate claims information, underwriters lacked the information necessary to price accurately.

**(e)     False Representations About The Impact of Transformation On Large Employers**

On February 8, 2002, defendant Hanway represented that in January 2002, CIGNA "saw improvement in the large employer sector" and was experiencing "favorable retention levels" with those customers. In fact, CIGNA's Senior Vice President for National Accounts stated internally, that in January of 2002, IBM, GE, GM, Phillip Morris, ITT, Fluor and Bank of America were among the migrated CIGNA accounts that should be classified "as having had a 'bad' experience," and would defer or choose a competitor if they were making a buying decision at the time.

**(f)     False Member Growth Representation**

On May 2, 2002, defendant Hanway represented that the Company "continue[d] to expect full year medical membership growth in the 1-2% range . . . from a flat first quarter." That representation was false and misleading in that HealthCare customers were experiencing service disasters and defendants repeatedly noted internally that "[m]embership continues to decline." In fact, rather than growing, CIGNA's membership **declined** in 2002, while the Company's competitors' membership grew, and gained market share at CIGNA's expense.

**B.     Factual Background**

4.     Throughout the 1990's, CIGNA worked to change its focus from being a global insurance supermarket to being a leading provider of employee health and pension benefits. By 2000, CIGNA had grown to be the third-largest provider of employee health and pension benefits.

4

The Company's Employee HealthCare, Life, and Disability Benefits segment (the "HealthCare segment") provided approximately 80% of the Company's reported operating income in 2001, and 78% of the Company's operating income in 2002.

5.     Prior to the beginning of the Class Period, however, CIGNA faced increasing competition from several chief competitors, including United Healthcare, Aetna, Blue Cross & Blue Shield, and WellPoint, all of which were offering customer-oriented products and processes built on web-enhanced computer systems.  Still operating on its multiple antiquated computer systems, known as legacy systems, inherited from multiple CIGNA predecessor companies, CIGNA was at a serious competitive disadvantage when it came to obtaining new customers and retaining existing ones due to the service disadvantages resulting from its antiquated computer systems.

6.     Recognizing that upgrading its computer technology was essential to maintaining its competitive position, in 1999, CIGNA embarked upon a major overhaul of its computer technology, which it aptly called the "Transformation" project and which was targeted for completion in 2003.

7.     Other large healthcare companies, in particular Aetna and Oxford Health Plans, had earlier converted their computer systems to new integrated, advanced platforms too rapidly, without adequate testing, causing dire results for those companies' customers and investors.  As a Merrill Lynch analyst remarked in a report on CIGNA:

> We remember all too well that other companies have had near death experiences when they sought to convert systems platforms too rapidly.  But we also worry that by the time CIGNA fully implements its "transformation" platform, major competitors will have moved to their next generations, obviating some of the competitive benefits that the platform will provide.

8.     In reality, in the process of migrating customers onto the new system, beginning in July of 2001 and continuing through January 1, 2002, members' eligibility data was either

completely lost or corrupted. In addition, the claims processing function of the new software platforms also malfunctioned, preventing accurate claims processing. As a result of the unreliable eligibility data, CIGNA customers experienced significant and pervasive service problems, including, among other things, (1) miscalculation of bills; (2) delays in payment; (3) identification cards without prescription icons - resulting in the inability to fill prescriptions; (4) incorrect rates being paid for visits; (5) billing for procedures that were not performed; and/or (6) the complete loss of coverage altogether. As defendant Hanway was personally informed by a disgruntled customer, in an e-mail on the subject "Massive problems with CIGNA paying claims:"

> Ever since CIGNA "upgraded" its system in January, EVERY single claim submitted for my dependents has been butchered. The provider submits the claim with the suffix indicated on the id card but the claim seems to be processed for a different dependent. Since my children have different PCP's, it ends up with virtually every claim being processed as out-of-network instead of in-network or w/o pre-authorization so the physician is paid the wrong amount and I end up receiving bills. What is wrong with your system? I had no problem until January and now I ONLY have problems. Can anybody fix this? This is ridiculous!

These malfunctions were so pervasive that they had not been cured by the end of 2002.

  9.  Aside from the service problems experienced by CIGNA's customers, the unreliable eligibility data also caused serious, undisclosed consequences for CIGNA itself:

- The inaccurate eligibility data created major service problems for members which caused CIGNA to lose 300 to 400 accounts. In order to pacify customers experiencing these problems and induce new customers to sign on with the Company, CIGNA's sales teams were offering price concessions far below acceptable margins;

- The inaccurate eligibility data made it virtually impossible for CIGNA's underwriters to accurately price contracts. As a result, CIGNA underpriced numerous contracts during the Class Period, often at levels so low that claims exceeded premiums. When CIGNA was later forced to raise premiums at renewal, sometimes by as much as 150%, many large customers chose not to renew; and

- The inaccurate eligibility data resulted in thousands of claims being incorrectly

6

processed. These claims had to be manually reviewed, delaying the processing of these claims by months. As a result, CIGNA failed to meet its obligations under customer service requirements in many of CIGNA's contracts, requiring the Company to pay large penalties to its customers. Customers also received erroneous bills as a result of the inaccurate eligibility data.

10.     Andrea Anania, CIGNA's Chief Information Officer and Executive Vice President, admitted in the March 15, 2003 issue of *CIO Magazine* that CIGNA had not performed sufficient volume or end-to-end testing to determine that the new systems worked before "going live." Without this testing, the Company could not know whether and to what extent the new systems would malfunction. In fact, the Company had not done testing necessary to determine whether the new systems would work under real life conditions.

11.     Internal CIGNA documents show it was critical for CIGNA to maintain the impression that the development and implementation schedule of the Transformation project was not experiencing any delays or malfunctions, and that the applications comprising the Transformation project had been thoroughly and adequately tested, because customers and investors knew all too well the catastrophic consequences that any delays or failures to test adequately could have. Therefore, if delays, malfunctions or testing deficiencies were known, customers would shun CIGNA, and CIGNA's competitors would and did use CIGNA's Transformation disasters as a marketing tool to gain market share at CIGNA's expense, which caused investors to suffer mightily as the market price of CIGNA stock plummeted. From the beginning of the Class Period, defendant Hanway expected the Transformation project to be used to the Company's detriment by its competitors. In fact, as defendant Hanway told the President of CIGNA's HealthCare segment in a May 2001 internal CIGNA memorandum:

> **As we approach 1/1/2002, I expect our competitors will aggressively use transformation against us in the marketplace.**

7

12.     The Transformation project was to encompass, in stages, CIGNA's many healthcare products and services, including health maintenance organizations ("HMOs"), medical and dental indemnity programs, medical and dental preferred provider organizations ("PPOs"), pharmacy programs, behavioral health programs, etc.  In 2001, the Transformation project consisted of many applications with specific development and testing schedules for each.  In a significant number of instances, as discussed herein, the development of various applications was interdependent, such that the delay of one application had a snowball effect, delaying the development of other applications. Delays in development of applications would inevitably prevent CIGNA from delivering a properly functioning system to customers by January 1, 2002.  However, as a result of competitive pressures, CIGNA had decided to migrate millions of its HealthCare customers to its new platforms on January 1, 2002, regardless of known serious malfunctions in certain critical applications, such as the eligibility, billing and claims applications, and the known absence of adequate testing in others.  As a result of the foregoing, it was vital for customers to believe that CIGNA's Transformation project was on schedule as to all material elements since any customer migrated on January 1, 2002 ran a serious risk of being migrated to what defendant Hanway termed a customer "nightmare." Therefore, it was essential for competitive reasons for defendants to create the public perception that CIGNA's Transformation project was "on track."

13.     Deception was an essential element of this strategy as evidenced by internal CIGNA documents stating that the Company wanted to assure that the "external audience" was not aware of delays in Transformation development, as well as the fact that defendant Hanway stated, in May 2001, that competitors would use Transformation against the Company in the marketplace. Deception was also an essential element of the strategy because customers would not migrate (on

January 1 or July 1, 2002) to a system if they had any reason to believe it might be malfunctioning, nor could CIGNA attract new customers or retain other customers. Having chosen not to defer migration of customers to the Transformation systems until they were functioning properly, defendants could only avert competitive disaster by misrepresenting and concealing the true facts concerning the status of the Transformation project, its costs and the fact that Transformation was a customer "nightmare," which, *inter alia*, could not bill customers correctly or pay claims correctly and denied coverage improperly due to malfunctioning eligibility applications and applications related to coverage determinations.

14.     **Defendants Hanway and Stewart knew that the defects in Transformation systems resulted in "[i]nability to pay claims correctly;" "[i]nability to bill customers correctly;" and "[s]ignificant eligibility disjoints and related service issues . . ."** Nevertheless, defendant Hanway, after having "[p]ushed this from several dimensions," told defendant Stewart in 2001 that there was "no going back" – that CIGNA could not defer the migration of millions of hapless CIGNA customers to the malfunctioning Transformation systems until these and other "major issues" had been resolved. Defendant Hanway told defendant Stewart point blank "[we] do not have the option [to delay the January 2002 migration]."

15.     Defendant Hanway knew and stated to defendant Stewart that the January 2002 migration to systems which could not bill customers correctly, or pay claims correctly and had "significant eligibility disjoints" would, as he put it, result *"in a financial and customer relations nightmare,"* and, even before the January 2002 migration, was devising a communication plan for "damage control."

16.     In May 2001, defendants told securities analysts that CIGNA's 2001 total research

9

and development costs, **including Transformation costs**, were expected to be $250-$300 million. In fact, the Company's 2001 operating plan, completed and agreed to by the beginning of 2001, for Transformation spending **alone** was $341 million, which was stated to have been "very aggressive" and "a stretch." Defendants knew that the plan was almost immediately outdated, as application development failures causing delays that added tens of millions of dollars to 2001 development costs began to surface as early as February 2001 and multiplied thereafter, such that 2001 Transformation costs were estimated to be approximately $390 million by September 2001. **Had that fact been disclosed publicly, it would have indicated that CIGNA's Transformation project was in trouble, because when a company materially exceeds its planned developments costs, it is because the project has run into trouble.** Indeed, the defendants knew that the Transformation was not "on track" and had encountered serious problems from the materially increasing development costs alone.

      17.    On November 2, 2001, defendant Stewart falsely represented as to Transformation that *"we are on track with our own schedule."*

      18.    As set forth herein, Transformation was anything but "on track" with CIGNA's schedule. **Indeed, the errors and unresolved issues in the development of critical applications that manifested themselves in 2001 added more than $300 million to Transformation costs, according to an internal CIGNA analysis.** These issues also caused the "customer relations nightmare" that dramatically reduced CIGNA's medical membership in 2003 and 2004, from more than 13 million in 2001 to somewhat more than 9 million at the end of 2004, and caused CIGNA's HealthCare earnings to plummet, resulting in a "financial nightmare," just as defendant Hanway had foretold.

10

19.     The false representation that the Transformation project was "on track" with the Company's own schedule deceived the public about the critical facts that foretold the "financial and customer relations nightmare" that was on the horizon.

20.     In a publicly accessible conference call on August 2, 2002, defendant Hanway reaffirmed his prior May 2, 2002 estimate of $925-$955 million for 2002 HealthCare operating earnings.

21.     On October 24, 2002, CIGNA issued a press release reducing the Company's estimate of 2002 HealthCare operating earnings to $725-$750 million, almost $200 million or 22% lower than the $925-$955 million estimates by defendant Hanway in the August 2 conference call and the Company's Form 10-Q, which were reaffirmed as recently as CIGNA's September 3, 2002 press release. The October 24 press release also disclosed that 2002 consolidated operating income was similarly expected to be $200 million less than the prior estimates.

22.     On October 24, 2002, CIGNA issued a press release which disclosed that the Company's estimate of 2002 HealthCare operating earnings had plummeted by an astounding 21% from the Company's September representation of $925-$955 million to an estimate of $725-$750 million, a staggering drop in just a few weeks of $200 million, and dramatically lower than 2001 HealthCare operating earnings. This announcement caused the price of CIGNA stock to drop 45% and almost $30 per share, with an amazing 37 million shares traded.

23.     In an October 28, 2002 conference call and in a November 1, 2002 press release, defendants attributed these disastrous results in large part to "higher spending to improve service" and "continued investment in technology." These results came as no surprise to defendants, who had known of the "higher spending to improve service" for months, as evidenced by internal CIGNA

11

documents that report and discuss the number of employees of CIGNA HealthCare's Service Operations.

24.     Also, on November 1, 2002, defendant Hanway admitted that another cause of the dire results, announced on October 24, was due to the Company's "underpricing", caused by the fact that "[w]e reduced margins on both renewals and new sales, in order to retain existing members or write new cases."

25.     On November 1, 2002, defendant Hanway also observed that investors and analysts had become "skeptical" about the Company's guidance, that he had been asked why the Company hadn't known about the $200 million forecast revision sooner, and that he had also been asked, "given the fact that CIGNA's competitors were doing very, very well, what's happened with [CIGNA]."

26.     The SEC shared analysts' skepticism, and commenced an investigation of CIGNA following the October 24, 2002 announcement.

27.     In the fourth quarter of 2002, the SEC began "an informal inquiry into matters relating to CIGNA," according to CIGNA's 2002 Form 10-K.

28.     On February 7, 2003, CIGNA stated that it expected 2003 adjusted operating income to decline in 2003, to $6.25 to $6.50 per share, compared with $6.65 per share reported for 2002. Analysts, however, had lost confidence in CIGNA's ability to deliver on its guidance. "Our confidence in CIGNA's ability to meet this guidance is low," stated Bank of America analyst Todd Richter. Damon Ficklin, a Morningstar analyst, noted that two-thirds of CIGNA's prices had already been locked in place for 2003 at the time they figured out they had misjudged medical costs in 2002. He stated: "It may have to go through a nice chunk of next year before we know where the business

12

stands, to know if the mispricing is continuing."

29.     A UBS Warburg employer poll conducted in April 2003 found that 28% of CIGNA's clients planned to switch to a rival.

## III.     JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. § 1331 (federal question jurisdiction).

31.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

32.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  CIGNA maintains its corporate headquarters and principal place of business in this District, and the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

33.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## IV.     PARTIES

34.     By Order dated May 15, 2003, the Court appointed the Pennsylvania State Employees' Retirement System as Lead Plaintiff pursuant to 15 U.S.C. §78u-4. Lead Plaintiff is a member of the Class, having purchased CIGNA common stock during the Class Period, as set forth in its Certification previously filed with the Court, and having suffered damages as a result

13

of those purchases.

35.     Defendant CIGNA is a Delaware corporation with its principal executive offices at One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania.   CIGNA is a holding company whose subsidiaries are major providers of employee benefits offered through the work place, including health care products and services, group life, accident and disability insurance, retirement products and services and investment management.

36.     Defendant H. Edward Hanway ("Hanway") has been Chairman of the Board of CIGNA since December 2000,   CIGNA's Chief Executive Officer since January 2000 and President since January 1999.  He was the President of CIGNA HealthCare from 1996 until 1999. In 2001, Hanway received a salary of $986,500, a bonus of $2,625,000 and 140,000 stock options, which represents 4% of the total options granted to employees in 2001.  Defendant Hanway signed CIGNA's 2001 10-K report and Form 10-Q for the second quarter of 2002.

37.     Defendant James G. Stewart ("Stewart") served as CIGNA's Chief Financial Officer and Executive Vice President throughout the Class Period, having held the position since 1983.  He announced his resignation on October 23, 2002, the day  before the end of the Class Period and retired from the Company effective December 31, 2002.  In 2001, Stewart received a salary of $701,900, a bonus of $600,000 and restricted stock valued at $2.8 million.  Defendant Stewart signed CIGNA's 2001 10-K report.

38.     Defendant James A. Sears ("Sears") served as CIGNA's Chief Accounting Officer throughout the Class Period.  Defendant Sears signed CIGNA's 10-Q reports for the first, second and third quarters of 2001 and the first and second quarters of 2002 as well as the Company's 2001 10-K report.

14

39.     Defendants Hanway, Stewart and Sears are referred to herein as the "Individual Defendants."

## V.     THE ROLES OF THE INDIVIDUAL DEFENDANTS

40.     The Individual Defendants, by reason of their executive and Board positions, were controlling persons of CIGNA during the Class Period and had the power and influence, and exercised the same, to cause CIGNA to engage in the conduct complained of herein.

41.     During the Class Period, each Individual Defendant occupied a position that made him privy to non-public information concerning CIGNA. Because of this access, each of these defendants knew or recklessly disregarded the adverse material facts specified herein and that they were being concealed.

42.     Each of the defendants is liable for making false and misleading statements, and/or for willfully participating in a scheme and course of business that operated as a fraud on purchasers of shares of CIGNA common stock and damaged Class members in violation of the federal securities laws. All of the defendants pursued a common goal, *i.e.*, inflating the price of CIGNA common stock by making false and misleading statements and concealing material adverse information. The scheme and course of business was designed to and did:   (I) deceive the investing public, including Lead Plaintiff and other Class members; (ii) artificially inflate the price of CIGNA common stock during the Class Period; and (iii) cause Lead Plaintiff and the other members of the Class to purchase CIGNA common stock at inflated prices and to sustain damages.

43.     Each defendant had the opportunity to commit and participate in the violations of law described herein and did so. The Individual Defendants were top officers of CIGNA and they

controlled its press releases, corporate reports, reports filed with the SEC and its communications with analysts.    Thus, the defendants controlled the public dissemination of, and could misrepresent, the information about CIGNA's business, products and current and future business prospects that reached the public and caused the inflation in the price of CIGNA common stock.

44.    Because of the Individual Defendants' positions with the Company, they had access to undisclosed adverse information about its business, operations, computer systems, finances, markets and present and future business prospects through access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and through reports and other information provided to them in connection therewith.

45.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the Individual Defendants identified above.    Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

46.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein,

16

including SEC filings, press releases, and other public documents, were aware or recklessly disregarded that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

47.    As officers and/or directors and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

48.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit upon purchasers of CIGNA common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding CIGNA's business, present and future

17

prospects, growth, operations and the intrinsic value of CIGNA's stock and induced the Class to purchase CIGNA securities at artificially inflated prices.

49.    At all relevant times, the market for CIGNA stock was an efficient market that promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of CIGNA common stock. Under these circumstances, all purchasers of CIGNA stock during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## VI.    LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons or entities who purchased CIGNA stock during the Class Period, November 2, 2001 through October 24, 2002, inclusive. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable. Approximately 140 million shares of CIGNA common stock were outstanding during the Class Period, and the stock was actively traded on the NYSE during the Class Period. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of members of the Class and that they are geographically dispersed.

52.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of

18

federal law that is complained of herein.

53.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

54.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether defendants participated in and pursued the common course of conduct complained of herein;

(c)    Whether the defendants' publicly disseminated releases and statements during the Class Period misrepresented and/or omitted from disclosure material facts which were necessary to have been included in order to make the representations made therein not misleading;

(d)    Whether the defendants acted willfully and/or recklessly in omitting and/or misrepresenting material facts;

(e)    Whether the market price of CIGNA securities was artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(f)    To what extent the members of the Class have sustained damages and the proper measure of damages.

19

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action.

## VII.     SUBSTANTIVE ALLEGATIONS

### A.     The Need To Upgrade

56.     CIGNA and its subsidiaries provide employee benefits offered through the workplace.  The Company's subsidiaries are organized into five operating divisions, most important of which is Employee HealthCare, Life, and Disability Benefits (the "HealthCare segment").  The majority of CIGNA's operating income is generated by the HealthCare segment — generating approximately 80% of CIGNA's operating income in 2001 and 75% of the Company's revenues in 2002.

57.     The HealthCare segment is comprised of two businesses, managed care products and services and indemnity products and services.  CIGNA's products are offered to large corporations and small enterprises, including employers, unions, professional and other associations, and government-sponsored programs.

58.     As stated in CIGNA's 2001 10-K report, "The managed care and indemnity businesses are highly competitive," and several insurance companies and other entities compete with CIGNA in offering similar products.  Several chief competitors of CIGNA include United Healthcare, Aetna, Blue Cross & Blue Shield, and WellPoint.  In addition, there are several

smaller competitors, such as First Health, which are gaining market share and competing more effectively.

59.    Before the Class Period, CIGNA HealthCare was under pressure to upgrade its computer system because CIGNA's competitors were already offering superior accessibility through web-enhanced computer technology.    This put CIGNA at a serious competitive disadvantage in obtaining new customers as well as in retaining existing customers.

60.    CIGNA was also under pressure from existing and prospective customers to upgrade its computer technology in order improve customer service.  CIGNA's salesmen even guaranteed customers a new computer system by early 2002 to induce them to sign on with CIGNA.    Inasmuch as CIGNA's antiquated legacy computer systems were not integrated, CIGNA's customer service representatives were only capable of answering questions which related to the part of the plan to which they were assigned.  Thus, in order to provide the answer to any other question about a member's account, service representatives were required to re-route calls to other representatives in various areas, something CIGNA's new computer system was supposed to fix.

**B.    The "Transformation" Project**

61.    CIGNA started to upgrade the HealthCare segment's obsolete disparate multiple computer systems inherited from its predecessor companies in 1999.  CIGNA called this overhaul the "Transformation" project ("Transformation").  It was designed to be a five-year, billion-dollar "Transformation" of CIGNA's way of doing business.

62.    Through Transformation, CIGNA planned to change its old "legacy" systems  into two new platforms that would perform both the back-office functions, such as billing, enrollment,

21

eligibility, and claims processing, while also providing customers with the ability to enroll and access their accounts online.

63.    CIGNA also claimed that Transformation would streamline customer service functions, allowing CIGNA's customer service representatives to resolve members' issues in one call, rather than having to transfer members to various departments.  Using the new system, customer service representatives would have a single unified view of member profiles and have full access to the history of each member's interactions with the Company.

64.    Defendants stated that during the Class Period, the new service platforms would also have "auto adjudication" features, which would allow the Company to process claims without human assistance.  They said that new efficiencies would lower CIGNA's costs by tens of millions of dollars per year by reducing the number of customer service representatives it employed and centralizing its offices.  In short, the highly automated computer systems would reduce the HealthCare segment's administrative costs, provide CIGNA's underwriters with more accurate data, allow CIGNA to price contracts more accurately, improve customer service levels, and provide subscribers with the online options they demanded,  each of which would lead to better customer retention rates and enrollment growth.

65.    CIGNA's IT staff was responsible for the plan's execution - implementing the new computer platforms and migrating customer data from the old legacy systems to the new integrated platforms.  The IT staff was spearheaded by Andrea Anania, Chief Information Officer of CIGNA HealthCare.   In addition, Heyward Donigan ("Donigan") was the IT manager responsible for the Transformation project.  Donigan reported to President of CIGNA HealthCare, William M. Pastore, who in turn reported to defendant Hanway.

22

66.     Investors understood CIGNA's decision to invest in its infrastructure and upgrade its computer technology as critical to its financial performance.  For example, on February 20, 2001, Morgan Stanley analyst Christine Arnold, who rated CIGNA's common stock a "strong buy" with a price target of $130, issued a report in which she discussed the positive effects of CIGNA's systems upgrade.  Arnold prefaced her discussion of the Transformation project by stating: "[i]nnovation is the key to healthcare marketplace dominance."  She further stated:

> For a rather conservative company with roots in the insurance industry, Cigna really seems to be planning ahead.  Over time, the company's improved systems capabilities should allow it to tailor benefits at an individual level.  Mass customization of benefits holds promise in influencing consumer decisions by placing the cost-benefit tradeoffs in the hands of individuals. . . .  **As Cigna's information systems and underwriting capabilities grow (through platform consolidation and e-enablement as well as the experience gained with beta testing progressively more complex plan designs), the number of plans that it will be able to administer should grow.**
>
> *     *     *
>
> Technology Investment Spending to Precede Savings
>
> **Like most companies in the benefits space, Cigna will harvest cost savings and improved customer service from the internet and related technology advances.**  However, before the company can reap the savings, it will need to invest in its systems consolidation and upgrades.  Given our view that the health insurance marketplace is in the throws of a cyclical pricing upturn, coupled with a shift among employers towards self insuring, we prefer that managed care companies invest in information technology capabilities in 2001 that will bear fruit in reduced administrative costs in 2002 and beyond — when rate hikes and top line growth may not be so easy to achieve.  Cigna is pursuing this strategy. . . .  (Emphasis added.)

23

C.      **CIGNA Transferred Customers to Its New Computer Systems**
        **Before Determining Whether They Worked with Real Data,**
        **Causing Disastrous Results**

67.     Unknown to analysts and investors, however, was that in its rush to appease

frustrated customers and begin reporting the highly-anticipated benefits of Transformation,

CIGNA failed to perform the necessary testing to ensure that data would migrate successfully and

the computer systems would work.   In particular, CIGNA failed to conduct end-to-end tests and

volume tests ("beta tests") of the new systems to determine if the systems functioned properly,

nor did it conduct sufficient error processing while it encoded eligibility data for the new system.

Without adequate testing, CIGNA lacked any basis for believing that the new computer system

would function properly.   Thus, CIGNA's customers became the guinea pigs — the testing was

not actually conducted until live customer data was transferred to the new platforms.

68.     In fact, according to the former supervisor of a team of CIGNA software

developers responsible for coding patient eligibility data in preparation for migration, CIGNA

even failed to conduct the most basic feasibility testing through which the Company would have

been able to determine whether it could actually deliver the computer systems and applications its

marketing staff was promising customers in functional form.   In essence, as the former team

supervisor explained, "[t]hey sold the product without knowing whether they could deliver it."

69.     Alpha and beta testing are necessary to determine whether a computer system

works before it "goes live."   Alpha testing is usually performed first by in-house programmers

with a small amount of data to determine if the system contains all of the required tools.   Beta

testing is then performed to determine if the tools actually work.   Beta testing, often referred to as

end-to-end testing, is the crucial testing phase because it tests with real data, real users and real

24

situations. The purpose is to try to "smoke out" errors in the systems. Beta testing encompasses all systems from start to finish to insure that all systems work and communicate with each other. Beta testing also tests the amount of data and number of queries a system can handle through volume or stress testing, which is conducted to determine the peak capacity of the system. For example, a system may work with a small amount of data during alpha testing, but may be unable to handle the stress of large quantities of data. In fact, when the systems were subjected to large volumes of data or queries, they "blew up."

70. According to the head architect for the information management portion of Transformation and head of the production assurance team, CIGNA had to utilize a data-transfer software program in order to move data from the legacy systems to the new platforms. This software program was termed an "Extract Transformation and Load Tool." **In order for this program to generate code, the production assurance staff was required to rewrite portions of the program. By doing so, errors were introduced into the program. In fact, he stated that when CIGNA's production assurance staff ran the altered program, they realized that the program's "error-checking" and "control-checking" functions were not performing properly.** These checking functions review the data to ensure that none of it has been compromised and to make sure that all of the records properly transferred to the new systems. As a result, the data transferred from the legacy systems was corrupted.

71. According to a former CIGNA claims processing manager, CIGNA offered discounted premiums in order to entice customers to serve as the guinea pigs — to agree to have their accounts be among the initial accounts that were migrated to the new computer systems.

72.    Indeed, Anania, CIGNA's Chief Information Officer and Executive Vice President, belatedly admitted in the March 15, 2003 issue of *CIO Magazine* that CIGNA had not performed sufficient volume or end-to-end testing to determine that the new systems worked before "going live."

73.    As if failing to test the new technology with real data and large volumes of data was not bad enough, CIGNA also did not want to take the time to train properly its employees on the use of the new systems. For example, according to a former CIGNA claims processing manager, he had only minimal training in the use of the new PowerMHS system for managed care claims processing, although the system was very complex with hundreds of screens and multiple systems. Even though he had not become proficient with the new systems, he was tasked with training managers, new employees and rehires on the use of the PowerMHS system.

74.    CIGNA also told the investing public it was going to lay off customer service employees to reduce costs. Thus, instead of waiting to see how the new systems performed after the Company's scheduled January 2002 migration, CIGNA precipitously laid off thousands of customer service representatives during the fourth quarter of 2001. CIGNA began moving its members to the new platforms in 2001, in relatively small numbers, such as 10,000 to 15,000 people at a time. Even so, the systems malfunctioned badly, foretelling future disasters as more members were migrated  However, at the same time, CIGNA began laying off customer service representatives as part of a planned consolidation of 20 primary and specialty service centers into 9 regional centers. CIGNA recognized an after-tax charge of $31 million in severance costs, reflecting the expected reduction of 3,100 employees.

75.     CIGNA failed to adequately test the new technology in its haste to complete the Transformation project. For example, according to a former CIGNA claims processing manager, prior to the planned migration on January 1, 2002, CIGNA performed only a single day of testing the PowerMHS platform. During this single test, in which CIGNA utilized dummy data, problems with provider numbers, hospital contracting, member eligibility and other issues came to light. Despite these problems, CIGNA did not make changes to the system to correct the errors before migrating members to the new system.

76.     Similarly, CIGNA maintained a separate audit department that was responsible for ensuring that no members were lost from the eligibility list during migration to the new platform. However, according to a former CIGNA team leader in charge of coding patient eligibility data for transfer to the new system, this audit department did not conduct sufficient "error processing" to ensure that customers' eligibility data had not been compromised.

77.     The former team leader further stated that CIGNA failed to engage a systems auditor or outside auditor to review production data prior to allowing the new platforms to go live. This type of review is standard whenever a company changes its information technology systems.

78.     In addition, knowing that the software development team would be unable to finish coding all of the eligibility data before the scheduled transfer of the data to the new platforms, the former team leader, on numerous occasions, informed Jill Saint-Pierre, who was responsible for testing the eligibility data to ensure its accuracy, that the team could not meet the tight deadline.

**D.**     **Migrations to Nowhere - Customer Data Is Severely Corrupted
During Customer Migration to the New Platforms**

79.     The absence of testing under real life conditions concealed extensive software

defects which caused serious malfunctions when CIGNA began migrating customer data from the

legacy systems to the new platforms beginning in 2001.  According to the former CIGNA team

leader in charge of coding patient eligibility data, the malfunctions persisted into 2003.  Anania

admitted in the March 15, 2003 issue of *CIO Magazine*: "The back-end data didn't work at the

front end" due to the failure to perform end-to-end and volume testing of the new system in real

life conditions.

**1.     Inaccurate Eligibility Data Caused CIGNA to Issue Erroneous Bills**

80.     According to a former senior underwriter employed by CIGNA at the time,

inaccurate eligibility data caused many substantial accounts to  receive erroneous bills from

CIGNA.  The former underwriter confirmed that after the accounts were migrated to the new

system in 2001, the new platform generated claims reports containing numerous material errors.

Although CIGNA was aware that the system was generating bills containing errors, according to

this former underwriter, the Company did not inform customers of the errors.  In fact, the former

underwriter stated, "for a good while we didn't report [the erroneous bills to the customers], we

knew they were dead wrong."

81.     Once customers began receiving inaccurate bills, such as in one case where a bill

for the wrong number of members was sent to a customer, the customers learned that CIGNA

"blew their billing because the eligibility numbers were inaccurate."   The former senior

underwriter pointed to Washington University in St. Louis as one customer that dropped CIGNA

after experiencing inaccurate billing and poor service following the migration of the University's

28

account to the new platform in July 2001. The former underwriter further reported that during the first six months that the Washington University account was on the new computer system, the system generated a bill charging the University $700,000 on a claim that should have been charged to another account.

82.     In July 2001, a former CIGNA senior technology consultant also witnessed inaccurate billing as a result of the improper migration of eligibility data to the new computer system. The former technology consultant specifically identified United Technologies Corp. as one customer that received erroneous bills due to employee eligibility data errors.

83.     According to the former technology consultant, the billing errors were caused by a design problem which caused data to be left out of the reports.

84.     Additionally, according to the former technology consultant, billing errors occurred most often on retroactive bills and intensified as more and more accounts were moved onto the new platform.

85.     Lastly, the former technology consultant explained that in some cases customers would call to complain about erroneous bills, and, in other instances, CIGNA would simply not send the bill because they knew it contained errors. "We lost clients — a couple big ones — because we couldn't get them bills. It was a big cash flow problem for CIGNA," explained the former senior technology consultant. It took a full year for CIGNA to resolve its billing malfunctions, because the platform had to be redesigned to include information at the individual subscriber level.

29

### 2.    CIGNA's Members Receive Even Poorer
### Customer Service as a Result of Transformation

86.    CIGNA began migrating a small number of members (i.e. 10,000 to 15,000 members at a time) to its new platforms in 2001, and promptly determined that the new system lost or corrupted member eligibility data.

87.    On January 1, 2002, CIGNA attempted a massive migration of customer data to the new platform from the legacy systems, moving 2.5 million existing members' accounts and one million new members' accounts, which required the help of manual overrides. But like the earlier small migrations, members' eligibility data did not properly convert to the new platforms and problems again erupted immediately. In sum, the new platforms could not handle the volume of claims being processed.

88.    CIGNA concealed and misrepresented the host of malfunctions which caused compromised eligibility data after the migration. A former CIGNA senior applications developer explained how the compromised eligibility data led to a multitude of problems for CIGNA's customers. For example:

-    CIGNA could not confirm health coverage for some new members for several weeks;

-    members lost coverage when their eligibility information would not load properly into the new systems;

-    claims were improperly denied because the system had provided incorrect eligibility information;

-    members received ID cards with incorrect identifiers;

-    the system reported incorrect dates of birth and/or wrong address information;

-    ID cards were issued without prescription icons, so members could not fill their prescriptions;

30

- members were billed for procedures that were not performed;

- entire corporate coverage was lost;

- many providers were not on the system; and

- many providers' contractual payment rates were incorrect and those claims were paid at the wrong rate, if at all.

89.    The former senior applications developer further stated that the billing malfunctions resulting from the compromised eligibility data began surfacing after the system executed a major release of financial reports, eligibility reports and client bills in January 2002. As a result, the former senior applications developer reported: "[T]hey had a lot of data issues." Instead of correcting the serious computer system malfunctions, CIGNA continued migrating accounts and compromising data. "We spent a lot of time in the latter part of 2002 fixing the problems." In fact, according to this former senior applications developer, the Company had to go back to the old legacy systems to manually retrieve the data that was lost.

90.    Meanwhile, members who experienced these malfunctions deluged CIGNA's customer service centers with complaints. But inasmuch as CIGNA had laid-off a significant number of customer service representatives and claims processors during the fourth quarter of 2001 in order to report cost savings associated with Transformation, there were not enough service representatives to handle the overwhelming volume of calls. The immediate nosedive in CIGNA's customer service metrics, such as "average speed-to-answer," "auto-adjudication rates," "first call resolution," customer satisfaction with migration, and new set-up satisfaction, told senior management that CIGNA had to reverse its prior staff reductions. CIGNA was forced to re-hire previously laid-off customer service representatives and hire new customer service

31

representatives, many of whom were too inexperienced on both the new and old computer systems to handle the members' complaints.

91.     Frustrated callers often waited for long periods on hold and, when they finally reached a customer service representative, the newly hired representatives had not been adequately trained to handle the new technology or solve the myriad problems customers were experiencing.  For example, according to a former CIGNA claims processing manager, before going live, the average waiting time before a caller could speak with a customer service representative was between 45 seconds and one minute and it took the representative an average of 5 to 10 minutes to handle a call.  After the January 1, 2002 migration, the waiting time averaged between 4 and 5 minutes and it took the representative between 15 and 20 minutes to handle each call.

92.     According to a former claims processor, the problems caused by the computer system malfunctions were exacerbated by the fact that the Company had slashed claims processing and customer service jobs prior to the migration.  The reduced claims processing staff was required to manually input more account data than they had to with the old system.  In addition, the new system could not process claims as quickly as the old system because claims processors had to look up more information in order for a claim to be processed.

93.     This former claims-processor explained that CIGNA's managed care accounts' claims data was not properly migrated to the PowerMHS platform.  Customers were forced to resubmit their information.  But even re-submissions failed to resolve the problems caused by the malfunction because the claims processors that received the customer information were not adequately trained on the new system.  In addition, faced with an overwhelming backlog of

32

30,000 customer inquiries or mail, ranging from not receiving insurance cards to claim status updates, claims processors spent their time trying to get a handle on these emergencies rather than performing actual claims processing on the new system.

94.     Similarly, a former CIGNA claims service manager reported that the backlog of customer inquiries was up to thirty days even prior to the migration of data to the new computer system. After the disastrous migration in January 2002, the backlog of customer inquiries grew even larger. The former claims service manager was instructed by CIGNA's upper management to stay positive and make her employees work harder so the stock can rebound.

95.     This information is further corroborated by another former CIGNA customer service representative employed by CIGNA during the Class Period, who reported that CIGNA's customer service operations were severely understaffed, with only four representatives taking calls when seven were needed to do an adequate job. This former service representative stated that call representatives were receiving an extremely large number of calls, between 85 and 100 calls over an eight hour shift.

96.     Yet another former CIGNA customer service representative reported that customer service representatives had to constantly ask customers to resubmit claim information because the information was lost during the migration to the new system or was incorrect. With regard to the huge backlog of customer mail or inquiries, this former claims representative stated that service representatives were instructed never to inform customers that inquiries were lost or delayed by the backlog.

97.     According to a former CIGNA claims processing manager familiar with the PowerMHS system, the problems created by the incorrect processing of CIGNA claims by the

new system resulted in customers' claims not being processed, not being processed in a timely manner, or not being processed correctly. As a result, members began to call CIGNA's depleted customer service centers. In order to handle the volume surge, customer service representatives were working ten hour days.

98.     This former claims processing manager further reported that the increase in the handling time of member calls was a result of the increased volume of calls. Further, when CIGNA recognized that it needed more customer service representatives, the Company hired new and re-hired previously laid-off claim representatives. Many of the new representatives were new hires, hired at lower salary levels, with no training on the PowerMHS system.

99.     According to this former claims processing manager, in order to resolve members' problems, customer service representatives had to switch between the 100 screens on PowerMHS, and even then, did not always find the answer. Some of the more senior customer service representatives would actually go back into the old system to obtain correct information. Less experienced customer service representatives, however, did not know how to access the old system and were practically incapable of resolving members' problems.

100.     The former claims processing manager also stated that the CIGNA employees responsible for processing claims on the ProClaim platform had no experience or training on that system.

101.     According to the former claims processing manager, the problems encountered in the customer service representatives' handling of telephone calls were documented in a CIGNA monthly report entitled, the "Average Handling Time" report, or "AHT." This report included the average time that a caller had to wait on hold before speaking to a customer service

representative. The AHT also documented the average time that it took for each customer service representative to resolve the complaint. The significantly increased times for both categories were included in the AHT, which was distributed to all managers, as well as to defendants Hanway, Stewart, and Sears, throughout the Class Period.

### 3. The New Systems Processed Claims Incorrectly

102.    In addition to transferring incomplete and/or inaccurate eligibility data resulting in customer complaints and erroneous billing, the new computer systems also incorrectly processed claims and, in many cases, were unable to process claims at all.

103.    For example, according to a former claims processing manager familiar with the PowerMHS platform, when PowerMHS went live in January 2002, there were "unbelievable problems." The simultaneous transfer of 3.5 million customers to the new system on January 1, 2002 was too much at once. PowerMHS was unable to handle the quantity of claims submitted after the members were moved to the platform, causing the platform to shut down. There was a flurry of telephone conference calls with different CIGNA offices to decide how to handle the problems and, eventually, additional personnel were brought in to manually re-load customer data into the new system which had been corrupted during the migration.

104.    However, while CIGNA was attempting to restore the lost and compromised customer data, thousands of claims were being incorrectly processed. Indeed, according to this former claims processing manager, following the migration in January 2002, CIGNA was aware that there was a 75% error rate in claims processed by the new PowerMHS platform.

105.    According to this former claims processing manager, CIGNA had to manually review thousands of incorrectly processed claims which took about one or two months to be completed.

106.    The former claims processing manager further stated that additional problems were created by the amount of time it took CIGNA to process claims. In its large national account contracts, CIGNA guaranteed that members' claims would be processed in a set time period. The time to process varied from customer to customer, but the contracts all contained a provision that if CIGNA failed to process the claims within the contractually agreed time-frame, the Company was required to pay a penalty in the form of contributing funds to the customer's insurance costs. The size of the penalties varied, but it was always for either an amount equal to a percentage of the claim or an amount equal to a percentage of the contract. As a result of CIGNA's delays in processing claims, which was caused by both inaccurate claims data and PowerMHS' inability to handle the volume surge, CIGNA was severely penalized.

107.    The Central Provider File ("CPF"), a wrapper architecture which was used to connect eligibility on the front-end with banking and billing on the back-end, was used for CIGNA's claims processing other than ProClaim. Internal CIGNA documents reveal that CPF data included outdated provider fee schedules due to incorrect updating and loading of fee schedules, and provided incorrect diagnosis codes causing billing for the wrong procedures. As a result, CIGNA's claims processing was a disaster, leading to the inclusion of tens of millions of dollars of 2002 claims expense in CIGNA's 2003 financial statements and causing the Company to be unable to know its costs.

36

108.    While the PowerMHS platform processed managed care claims, the ProClaim platform was used to process indemnity claims. Indemnity claims processing was an even bigger disaster than managed care claims processing. According to the former claims processing manager, information was loaded differently into the ProClaim system, but CIGNA encountered some of the same malfunctions with ProClaim that it had with PowerMHS. For example, member information numbers and eligibility data were often incorrect, insurance coverage information was incorrect and incorrect dates of birth and addresses were pervasive.

109.    The former claims processing manager further explained that in order to integrate the claims processing functions of PowerMHS and ProClaim, CIGNA utilized CPF. The wrapper program was original code rather than a purchased program. CIGNA went live with ProClaim around the same time it went live with  PowerMHS in January and February 2002 and immediately encountered processing malfunctions, posting difficulties, and billing problems. The wrapper program confused the providers' contract information, resulting in some providers being paid $50 per visit, while others were paid $15 or $20 for the same visit, and some providers were paid nothing.

110.    In fact, according to a former CIGNA actuary, **from February to April 2002, the ProClaim system could not process any medical indemnity claims submitted by members whose accounts were migrated to the new platform in January 1, 2002.** This former actuary stated, "[E]veryone knew there had to be claims missing — they should have been coming through."

111.    The former actuary further explained that the quantity of claims that the ProClaim platform could not process was significant not only because of the effect it had on customer

billing, but also because actuaries calculated reserves by comparing the number of claims submitted versus premiums received. During the three month hiatus, the actuaries had to provide estimates rather than actual numbers.

112. According to the former actuary, CIGNA HealthCare CFO Mark Preminger received monthly reports showing claims and premium figures, and these reports would have indicated that medical indemnity claims were not being processed after the conversion to the new platform.

113. Indeed, according to another former CIGNA actuary, who was responsible for financial reporting, CIGNA began the second phase of the migration in January 2002. However, after learning that the new computer system was not functioning properly, **the Company was forced to halt the migration and fix the problem**. When CIGNA finally was able to move the PPO business to the new system in early 2002, malfunctions surfaced again, forcing the company to stop the migration and repair the new platform.

114. According to this former actuary, defendant Hanway and the President of CIGNA HealthCare, William Pastore, knew of these serious malfunctions with the ProClaim system.

115. Not surprisingly, the malfunctions with claims processing caused by Transformation also resulted in some of the Company's corporate clients cancelling their contracts with CIGNA. Among the large corporations which cancelled their CIGNA contract was United Technologies, a company with 155,000 employees. According to a former CIGNA senior underwriter, CIGNA lost 300 to 400 accounts, both mid-market and national, because of data errors and service problems associated with the Transformation project. Among the accounts lost, according to the former senior underwriter, were the Enterprise Rent-A-Car and the Federal

38

Reserve Bank of Chicago accounts. The former underwriter stated: "It was ridiculous. We sweet-talked accounts and then didn't deliver." CIGNA's customers lost faith in the Company after it failed to back up all the promises and hype regarding the new computer system with results.

116. The managers in claims processing and customer service were told that if they fielded calls from major corporate clients which indicated they might cancel their CIGNA coverage, they were to route those calls to the heads of their office for handling.

117. Thus, Transformation was doomed not only by CIGNA's haste to get its new systems up and running, but also by its eagerness to cash in on the technology's promise of reduced costs and increased productivity. Despite evidence of serious problems with the new computer systems, CIGNA precipitously eliminated the very people who kept the members satisfied — the customer service representatives. CIGNA's late start, combined with its rush to jump-start the new systems and save money on headcount, caused the first major migration in January 2002 to be a disaster. The benefits in customer service that CIGNA expected to reap from Transformation not only did not materialize but actually backfired because members were antagonized and took their business to CIGNA's competitors.

118. According to Fluor Corporation's ("Fluor") senior manager of benefits, CIGNA convinced Fluor to move all its claims to the new platform on January 1, 2002. Fluor, which is self-insured, pays CIGNA millions of dollars per year in claims processing fees for almost 50,000 employees. CIGNA represented that the new system was "the biggest and the best." Based on CIGNA's representations, Fluor agreed to migrate its employees accounts to the new platform.

39

119.    The senior manager of benefits at Fluor reported that CIGNA said the new platform was a "bigger and better claims processing agent," and that CIGNA said it "really should be charging us more" for the streamlined processing.

120.    CIGNA also represented to Fluor that the changeover would be "essentially transparent to employees," which meant that employees were not supposed to notice any difference in how their claims were handled or in the customer service that CIGNA provided. According to Fluor, in reality, however, "It didn't come off that way.   There was quite a difference.  We had a lot of surprises we were not expecting.  All of their internal systems kind of fell apart."  From the start of the migration in January 2002, Fluor experienced data problems. For example, a lot of employees had to send claims "three, four or five times . . . documents got lost."  To make matters worse, customer service was poor.  For example, the average time it took for CIGNA's customer service representatives to answer the phone before the employees gave up trying — a service metric known as the "abandonment rate" — was six or seven minutes, according to Fluor's senior manager of benefits.  This statistic came from a quarterly report that CIGNA had to provide Fluor as part of their contract.  "The standard is five minutes, and we like to see it around two minutes," stated the senior manager.

121.    The senior benefits manager at Fluor was so concerned about the problems that she sent complaint  letters and complained in person to CIGNA.   Indeed, the senior manager accompanied by several staff members traveled to CIGNA headquarters in Connecticut in February or March 2002 to meet with John Langenus, the head of national accounts, to discuss the customer service problems.  "I felt it was important for him to understand the difficulties we experienced."

122.     After a series of weekly meetings with Fluor representatives, CIGNA sent Fluor a written analysis of the problems sometime in the second quarter of 2002.   As a result of the analysis, CIGNA devoted a team to the Fluor account.   However, even with the efforts of this special team, it took six to nine months for CIGNA to resolve the problems Fluor experienced as a result of the Transformation project.

123.     Then Fluor faced a price increase from CIGNA even after experiencing "such poor service."   The senior benefits manager reported that she did not want to tell workers that they have to pay even more money to continue to receive healthcare from CIGNA.   Therefore, Fluor was taking bids from CIGNA's competitors.

124.     Flour's   federal contractor subsidiary, Fluor-Hanford, which had been with CIGNA since the early 1990s, paying the Company approximately $4 million a year in fees to administer its self-insured health plan, dropped CIGNA in January 2003 and now uses CIGNA's competitor United Healthcare to administer its plan.   According to Fluor-Hanford's coordinator of benefits, prior to 2003, CIGNA processed Fluor-Hanford's claims "the old-fashioned way, by hand."   However, cognizant of the difficulties experienced by its parent-company, "we were concerned about the claims processing" when we were scheduled to migrate to the new system in 2003.   Already dissatisfied with CIGNA's customer service, in fear of experiencing the same problems as its parent, Fluor-Hanford took its business to United Healthcare.

### 4.     Transformation Exacerbates Mispricing of Contracts

125.     In connection with its experience-rated contracts, CIGNA calculates premiums based on projected future losses.   If the contracts are priced too low and losses exceed premiums, CIGNA attempts to recover the excess by raising premiums for future policy periods.   However,

the policyholder is free to cancel the policy or not renew if the future premiums are too high. In the event a customer does not renew, CIGNA must swallow the deficit. As defendant Stewart acknowledged: "When you do not manage the pricing effectively and you have cases that have large deficits in them because you didn't price them well in the beginning, they have a tendency to want to leave you." This is precisely what happened when CIGNA used bad data to set the prices for several large accounts.

126.    Before the Transformation project, CIGNA had been overstating its medical membership figures because the old computer systems were incapable of accurately tracking membership numbers. Accordingly, one objective of the Transformation project was to provide CIGNA's underwriters with more accurate eligibility and claims data to enable them to price contracts with greater precision.

127.    For example, according to a former CIGNA senior underwriter, in addition to integrating billing, eligibility, claims and administrative tasks, the new platforms were supposed to provide more precise data to assist underwriters in pricing account contracts. However, because customers' data was compromised during the migration to the new platforms, these intended benefits did not materialize. The former underwriter reported that CIGNA's underwriters were instead forced to do their eligibility and pricing calculations off-system on Excel spreadsheets, which then had to be manually input into the new systems. Thus, the new platforms actually created additional work. In addition, each of the underwriters used their own methods to calculate eligibility numbers and pricing, which caused this former underwriter to question whether any of the eligibility figures were accurate and whether any of the prices assigned to customer contracts were appropriate.

128.     This former underwriter stated that underwriters provided reports containing customer information, such as eligibility rolls, to regional financial officers on a regular basis. That information was then entered into a "gains and losses database" for the entire region.

129.     As a result of the inaccurate eligibility data, in 2001, CIGNA materially mispriced the premiums on several large customers' experience-rated contracts for 2002. As a result of the material underpricing of these experience-rated contracts for 2002, claims greatly exceeded the premiums CIGNA received, forcing CIGNA, at renewal, to increase the 2003 premiums for some of the large customers by as much as 150%.

130.     For example, in the case of CIGNA's experience-rated contract with the Miami-Dade County Public School District (the "Miami-Dade contract"), CIGNA, relying on two year-old claims experience data, offered rates for the 2002 contract that were so attractive that 85% of the school district's employees jumped to enroll in CIGNA's health plan. As reported in the November 4, 2002 edition of *Business Insurance*, Scott Clark, the risk and benefits officer for the Miami-Dade school district, stated that CIGNA became the health insurer for 85% of the school systems' 40,000 benefit-eligible employees in January 2001 following "very competitive and aggressive pricing." However, according to Mr. Clark, when the school system started the 2003 renewal process in March 2002, "we started getting frantic phone calls from CIGNA about the fact that claims being incurred were far exceeding the premiums they were collecting." In April 2002, CIGNA informed the school district that it expected to lose $50 to $70 million on the account in 2002 and would have to increase premiums by 100% to 150%. Mr. Clark stated that he "needed to protect the tax payers and our employees and move on" and, therefore, awarded Miami-Dade's 2003 health care contract to CIGNA's competitor, United Healthcare.

43

131.    After the Class Period, Goldman Sachs analyst Matthew Borsch ("Borsch") issued

a report on November 13, 2002 following a visit to CIGNA HealthCare's operations center in

Bloomfield, CT.    During his visit, Borsch discussed the Miami-Dade contract with Head of

National Accounts, John Langenus.  Borsch specifically reported, based on information provided

by CIGNA management:

> Underwriting mistakes in 2002 were primarily limited to 10 large
> accounts, one of which was the Miami-Dade contract underwritten
> in April 2001 and supervised under the large government and
> municipalities sales division (not national accounts).    **In the
> Miami-Dade contract, claims experience data used to
> underwrite the contract was 2 years old.  In this case, the 2
> year-old data was used to extrapolate demographic statistics
> and price the contract.** (Emphasis added.)

132.    In addition to the Miami-Dade contract, CIGNA lost other large accounts as a

result of materially mispricing the premiums on 2002 experience-rated contracts and then

drastically increasing premiums for the 2003 contracts in an attempt to recoup its losses.

According to an August 2, 2002 investment report issued by analyst Roberta Goodman

("Goodman") of Merrill Lynch, CIGNA sought a 60% increase in premiums on the State of

Arizona's experience-rated contract after substantially mispricing the contract in 2001.

133.    Goodman also issued another investment report on November 4, 2002 in which she

criticized CIGNA's explanation concerning the reason why the mispricing of these accounts was

not revealed until the third quarter of 2002:

> We find it disturbing that Cigna did not recognize these problems
> until the third quarter (*why isn't Cigna reviewing its cost
> performance on a regular basis rather than waiting until the third
> quarter?*) particularly since local newspapers publicized issues with
> several large accounts in the late spring and early summer.
> (Emphasis in original)

134.   In addition to the foregoing, as discussed herein, as a result of the claims processing disasters caused by Transformation discussed herein, CIGNA did not know its medical costs, which, by itself, created a pricing nightmare.

### E.   The Devastating Effect of the Account Migrations on Customer Satisfaction

135.   Unknown to investors, CIGNA's own internal customer service survey revealed that 43% of its members were dissatisfied with the customer service they received.

136.   In addition, undisclosed responses from an employer forum held on or around January 2002 indicated that CIGNA's service levels had deteriorated in early 2002. Indeed, 25% of the employers attending the forum reported that they experienced problems with the conversion of their accounts to the new platforms. Similarly, in a 2003 employer survey conducted by Goldman Sachs, CIGNA ranked last in customer service against Blue Cross/Blue Shield, United HealthCare, and Aetna.

137.   The magnitude of the malfunctions resulting from the botched migration of customer accounts to the new platforms was captured in the March 15, 2003 *CIO Magazine* article, which states in pertinent part:

> CIGNA CIO ANDREA ANANIA looked out at 250 peers at an October 2001 conference in Rancho Mirage, Calif., and declared that she had successfully re-engineered her company's IT. These days, she said, projects are completed on time and within budget.
>
> Anania spoke too soon.
>
> Four months later, in January 2002, Cigna HealthCare's $1 billion IT overhaul and CRM initiative went live in a big way, with 3.5 million members of the health insurance company moved from 15 legacy systems to two new platforms in a matter of minutes.
>
> **The migration did not go smoothly. In fact, there were**

45

> **glitches in customer service so significant that millions of dissatisfied customers walked away, causing the nation's fourth largest insurer to lose 6 percent of its health-care membership in 2002.** (Emphasis added.)

138.   Another fallout of the disastrous January 2002 migration was CIGNA's revision of its schedule for converting members to the new system. Later in 2002, CIGNA drastically slowed the pace of migration to 300,000 members. Indeed, following the January 1, 2002 migration debacle, CIGNA decided to move only twenty of the large national accounts to the new platforms on January 1, 2003.

139.   Similarly, in contrast to defendants' Class Period statements, in order to obtain new business, CIGNA was forced to reduce its margins on customers' health care contracts. During an analysts conference call on October 28, 2002, defendant Hanway recognized CIGNA's need to grant price concessions to maintain new customers and retain existing customers, stating: "We did not price as effectively as we have in the past on this book of business, and we did make concessions for competitive reasons."

140.   According to a former CIGNA financial analyst, CIGNA intentionally underpriced the policies because that was the only avenue by which it could compete with United Healthcare, and if the Company did not slash prices and reduce its margins they would not be able to retain existing clients and attract new customers.

141.   The negative effects of the disastrous migration were also manifested by numerous violations of performance guarantees built into the Company's large national account contracts — which it identifies as the 5,000+ employee multi-site companies. These performance guarantees required CIGNA to compensate its customers if certain service levels were not met. Ninety-six percent of the national accounts are administrative services only accounts. Like its competitors,

20%-25% of CIGNA's fee from national accounts is subject to service performance metrics such as implementation and claims adjudication.

142.     Shortly after the end of the Class Period, defendants admitted that instead of gaining members as a result of Transformation, the Company expected to <u>lose</u> hundreds of thousands of members.  During an analyst conference call on October 28, 2002, defendant Hanway stated that he expected that membership would be down 4% to 5% on January 1, 2003 versus year ago levels.

143.     On November 10, 2002, *The Philadelphia Inquirer* reported that CIGNA expected large customer losses, stating:

> [M]ost employers are reluctant to change [health] insurers,
> [however] problems with Cigna's pricing policies, billing systems
> and medical rules have made it tough to win new business.  It has
> also had trouble keeping some big name clients in line: In the last
> year, Cigna has lost accounts with big-name customers including
> Dade County, Fla.; DaimlerChrysler Corp.; and Campbell Soup Co.
> . . .  **Cigna expects to lose up to 1 in 20 covered patients when
> companies renew their policies in January.**  (Emphasis added.)

144.     According to a former CIGNA senior underwriter,  CIGNA lost  300 to 400 accounts, both mid-market and national, as a result of data contamination and service problems associated with the Transformation project.  Among the accounts lost, according to the former senior underwriter, were the Enterprise Rent-A-Car and the Federal Reserve Bank of Chicago accounts.  The former senior underwriter also specifically mentioned Quantum Corp. as a customer who dropped CIGNA after the Company failed to timely deliver ID cards and pay claims.

145.     In response to the onslaught of customer complaints, CIGNA intentionally lowered the premiums for several accounts in an effort to hold on to their business.  These price

concessions came at the same time nearly all of CIGNA's competitors were raising prices by 15%

or more, according to a November 4, 2002 *Wall Street Journal* article.

146.    In a report issued on December 17, 2002, analyst Joshua Rankin of Lehman

Brothers discussed CIGNA's poor customer service levels and Transformation's impact on

account retention:

> At the heart of CIGNA's account retention issues were poor
> service levels, which the company suggested was caused by, among
> other things, trying to push too many clients through the
> transformation process too quickly. . . .  Of the employers who
> migrated on 1/1/02, only 57% were satisfied with the conversion
> according to the company's internal research.  When service issues
> arose, the company was not adequately staffed at its call centers for
> the deluge of calls that started coming in early this year.   An
> example of the kind of issues that transformation led to related to
> CIGNA's assigning each member a new identification number upon
> conversion to the new system. The company admits they did not
> adequately communicate these changes with their providers so that
> when members went to the doctor or tried to fill a prescription, the
> new identification number was not recognized and the member was
> denied.    This type of miscommunication resulted in confusion,
> followed by frustration and ultimately dissatisfaction. . . .

147.    Analyst Charles Boorady of Salomon SmithBarney likewise reported the negative

effect Transformation was having on service, account retention, and account pricing in a February

20, 2003 investment report:

> Transformation was expected to attract net new customers to
> CIGNA as the company began to deliver on enhanced technology.
> **The opposite is happening in the near term, as customers have
> been leaving due to the drops in service quality during the
> transition . . . about 1 million customers, or 8%, are marching
> out of CIGNA, in main part to UnitedHealth Group and Blue
> Cross and Blue Shield plans in 2003.** (Emphasis added.)  . . .

148.    According to a former CIGNA claims processing manager, CIGNA's data

contamination and claims processing problems  that arose from the migration of customer

48

accounts to the PowerMHS platform caused a number of the Company's large national customers to cancel their contracts, including United Technologies Corp., a company with 155,000 employees, which was "at their wits' end over the problems."

149.    The aftermath of the disastrous account migrations and data contamination continued into 2003.  On February 9, 2003, Goldman Sachs analyst Matthew Borsch issued a report commenting on CIGNA fourth quarter of 2002 earnings, which were down 34% from the year ago period.  Borsch stated in relevant part:

> The decline in earnings reflect weakness in CIGNA's healthcare business that result from problems with CIGNA's systems Transformation project that negatively impacted service and account retention that CI attempted to rectify through price concessions, leading too poor underwriting results.
>
> * * *
>
> We continue to view CI's problems as company-specific . . . .  CI's woes create mkt-share gain opportunities for competitors . . . .

150.    Similarly, On February 10, 2003, Merrill Lynch analyst Roberta Goodman issued a report in which she stated in relevant part:

> [S]ince other companies (most notably, United and the Blues) are continuing to advance their platforms, business processes and networks while Cigna's last 2+ years have been marred with service problems, we think Cigna will have competitive challenges even after the business is fully migrated to the new platform.  Thus, we think Cigna's enrollment prospects could remain poor as both national and regional competitors can build the case that they can deliver superior medical cost trends and more consistently good service.

151.    In fact, UBS Warburg analyst William McKeever downgraded CIGNA's common stock to "neutral" from "buy" on June 3, 2003 after an April 2003 employer poll showed that 28% of CIGNA's customers were planning to switch to a plan offered by CIGNA's competitors.

## VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

152.    On August 1, 2001, following an analyst conference call, Charles Boorady of

Goldman Sachs issued an investment report in which he applauded the Transformation project.

In that report, Boorady explained to investors that

> 2Q01 was clearly a weak quarter, as is always the case after a weak
> 1Q01 in this business.   Worst now behind and we recommend
> purchasing CI after any 2Q earnings dust settles.  **The 13% [year-
> over-year] net income growth in core health plan biz is better
> than almost every competitor and should accelerate in 2001 and
> 2002 when the $1bn Transformation project delivers faster
> enrollment and lower cost.** (Emphasis added.)

> * * *

> WORST BEHIND CIGNA.  We expect the worst is behind CIGNA
> now after a very weak first half 2001 related to a **competitive
> disadvantage that stemmed from years of neglect in systems
> and operations investments.  We see that issue being addressed
> with the Transformation project** that is now launching new
> systems and products and driving growth again in 2001. (Emphasis
> added.)

153.    Analyst Christine Arnold of Morgan Stanley issued an investment report on

October 23, 2001 in which she opined that CIGNA's customer service was the primary cause of

the HealthCare segment's disappointing performance in 2001, and that "improving this situation

is the key to its long-term success."  Arnold, who maintained an "outperform" rating on CIGNA's

common stock with a $98 price target, went on to state that she was "hopeful that the company's

business transformation process will improve both internal reporting and service metrics."

A.      **The November 2001 Misrepresentation**

154.      On November 2, 2001, CIGNA issued a press release announcing its financial results for the third quarter of 2001, reporting net income of $270 million, or $1.81 per share, compared with net income of $278 million, or $1.74 per share, for the third quarter of 2000. The Company reported a 5% increase in after-tax operating income for the Health Care segment. Reported indemnity operating income increased 12% over the third quarter of 2000.

155.      Following the issuance of the November 2, 2001 press release, CIGNA held a publicly accessible conference call with analysts, in which defendants Hanway and Stewart participated.    In that conference call defendant Stewart commented on the status of Transformation, stating:  *"First of all, we are on track with our own schedule."*

156.      Defendant Stewart's statement in the preceding paragraph was false and misleading because, as a result of an analysis of Transformation issues which took place in October 2001, defendant Stewart knew or recklessly disregarded that the Company was not "on track with our own schedule."  Rather, CIGNA had committed itself to migrate millions of its customers to its flawed and inadequately tested new computer platforms on January 1, 2002, knowing that there were numerous critical outstanding problems which had not been resolved, for which there were neither solutions on the immediate horizon nor quick fixes that could avert disaster.  In an internal memo authored by defendant Hanway which was sent to defendant Stewart, summarizing the issues discussed during the October 2001 analysis, Hanway stated that they "do not have the option" to "delay implementation" of the January 2002 migrations.  He made the decision to proceed with the January 1, 2002 migrations, although, as he stated, those outstanding unresolved Transformation problems would cause:

- *Significant eligibility disjoints and related service issues (phones, access to care issues, etc. . . .).*

- *Inability to pay claims correctly.*

- *Inability to bill customers correctly.*

> *All resulting in a financial and customer relations nightmare.*
> (Emphasis added.)

Thus, defendants Hanway and Stewart knew at the time of the November 2, 2001 conference call that their decision to proceed with the implementation of the January 2002 migrations even though numerous critical systems, including those which processed eligibility data and billing, were not yet functioning properly or ready to handle the volume of the January 2002 migrations, would ". . . **[result] in a financial and customer relations nightmare. . . .**" This is precisely what happened.

157.   For example, defendant Hanway's memorandum recounting the issues analyzed in October 2001 described CARBS (CIGNA Accounts Receivable and Billing System) as a "material issue." At the time defendant Hanway described CARBS as a "material issue," the head of Transformation had concluded that CARBS' technical issues impacted the ability to accurately bill and collect commercial HMO premiums, and that CARBS was "significantly behind schedule for Release 2 deliverables." CARBS was such a technical disaster that it had to be redesigned, at a cost of $55 million. In addition, as set forth herein, CARBS caused customer service billing disasters which were apparent as early as July 2001, with very large customers billed for amounts that should have been charged to other accounts, bills for the wrong number of employees, etc. As set forth herein, large customers were lost due to CIGNA's inability to bill them properly. The inability of CARBS to produce timely and accurate bills which persisted

52

throughout 2002 resulted in hundreds of millions of dollars of non-applied cash to customers accounts by mid-2002, and was a cause of the increased service and technical problems that caused the deterioration in CIGNA's operating earnings in the third quarter of 2002, which defendants announced on October 24, 2002.

158.   Defendant Stewart's representation in the November 2 conference call that Transformation was "on track with [the Company's] own schedule" was also materially misleading due to the fact that the delays caused by the technical flaws and delays that were outstanding at the time of the May 2, 2001 analyst conference call (CED/CDB, VISTA, Multi-Site MHS, ISS, Provider, DocGen, Web Profile, ePro, etc.) continued to exist, with the result that it was impossible for CIGNA to deliver properly functioning systems to customers whom the Company planned to migrate to the new systems on January 1, 2002, as evidenced by the fact that, as defendant Hanway expected, those systems could not pay claims correctly, could not bill correctly and resulted in coverage denials and snafus due to eligibility disjoints. Also, as disclosed in an internal CIGNA document with the title "PIT High Priority Issues", in November there was an "[i]mpediment to linking structure of migrating accounts from Legacy to End State." This means that there was an impediment to linking data from the legacy systems to the new applications, which was catastrophic. The document also points out that there was no known solution to the problem.

159.   Defendant Stewart's representation in the November 2, 2001 conference call that the Transformation project was "on track with [the Company's] own schedule" was also false and misleading in that, as CIGNA's Internal Audit Report for May-August 2001, delivered to CIGNA's Audit Committee, stated:

> Processes around the management of a sales and underwriting system development project continue to need substantial improvement because of inadequate design and architecture to ensure required functionality.

160.    In addition to the foregoing, at the time of the November 2 conference call, the delays and technical issues that existed at the time of the May 2, 2001 conference call, which caused defendant Hanway's representation that the Transformation project was "right on our internal tracking, our internal time frame to get that done . . ." continued, and caused the November 2 representation that "we are on track with our own schedule" to be materially misleading for those reasons, as well.  Indeed, a Transformation group analyzing performance of CIGNA's PowerMHS claims processing platforms noted in October 2001, when PowerMHS and CED were supposed to be fully functional and interactive, that 45% of CED messages failed to load for Power MHS, *i.e.*, PowerMHS was not receiving 45% of the data necessary to process the claims from CED.

161.    On November 6, 2001, analyst Charles Boorady of Goldman Sachs issued a report following the release of CIGNA's third quarter of 2001 financial results (and the November 2 conference call), reminding investors that CIGNA "remains our best long-term value stock idea." Boorady explained that results were improving and **the "worst of its 'Transformation' project is behind CIGNA."**

### B.    The February 2002 Misrepresentations

162.    In a January 9, 2002 press release, CIGNA announced that it would realign service operations to improve service, was moving customers to its new service platforms, and would record a fourth quarter 2001 restructuring charge to account for the realignment.    More specifically, the Company stated:

As part of efforts underway to enhance service capabilities, CIGNA Corp. (NYSE: CI) announced today that it will realign service operations in its Employee Health Care, Life and Disability Benefits segment and record a fourth quarter 2001 after-tax charge of approximately $65 million ($100 million, pre-tax).

"The actions that we announce today are part of our strategic commitment to further improve service for our customers and members. As part of this initiative, we are moving health care customers to new service platforms and supporting technologies and consolidating existing health care service operations into regional service centers. These changes will result in greater efficiencies for our customers and reduced operating expenses in 2003 and beyond," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

The $65 million after-tax charge relates predominantly to realignment and consolidation of service operations in CIGNA's Employee Health Care, Life and Disability Benefits segment operations. *These changes will result in a net reduction of approximately 2,000 positions*. The $65 million after-tax charge consists of approximately $33 million of severance costs and $32 million of facilities costs. Annual operating expense savings of $45-55 million after-tax are expected to be realized in 2003 and beyond as a result of these actions. (Emphasis added.)

163. On February 8, 2002, CIGNA issued a press release announcing its 2001 and fourth quarter financial results. Although reported operating income of $1.1 billion, or $7.22 per share for the year, was 6% higher than reported 2000 operating income, for the fourth quarter, CIGNA reported operating income of $277 million, or $1.92 per share, which was 2.8% lower than the same quarter of 2000.

164. Following the issuance of the February 8, 2002 press release, CIGNA held a publicly accessible conference call with analysts. Defendant Hanway stated that CIGNA was seeing improvement in customer retention and that Transformation would continue to contribute to increased retention levels:

> We have talked about account retention as I acknowledged.  For
> January, *we saw improvement in the large employer sector.  We
> think the initiatives that we have underway relative to the new
> product development, relative to the service and Transformation
> are all initiatives that will contribute to continuing satisfaction
> and continuing favorable retention levels with those customers. . .
> . [W]e've really focused very heavily on what we call national
> accounts.  I feel pretty good about our progress there.*  (Emphasis
> added.)

165.    The highlighted representations by defendant Hanway in the preceding paragraph

were false and misleading in that, as John C. Langenus, CIGNA's Senior Vice President for

National Accounts, told the Chief Financial Officer of CIGNA HealthCare and others in January

2002, IBM, General Electric, Philip Morris, Fluor, General Motors, ITT, Intel and Bank of

America were among the migrated CIGNA accounts that should be classified "as having a 'bad'

experience," and that "[t]oday any buying decision they made would be impacted either to a

deferral of a decision or an award to a competitor."

166.    In the February 8 conference call, defendant Hanway also stated that there were no

technology issues with respect to the January 2002 migration, and that customer issues were

behind the Company, as follows:

> I mentioned 3.5 million members and that refers to about 1,500
> accounts. . . . [A] number of them all got new ID cards. There may
> be new account numbers here . . . [which] required a lot of work
> and obviously drove a fair amount of call volume.    But we
> responded to those very quickly. . . . I think that has worked very,
> very well. *I would stress that there are no technology issues here.
> . . . [T]here were some specific customer issues that we worked
> pretty aggressively, and feel for the most part are behind us.*
> (Emphasis added.)

167.    Defendant Hanway's representations in the preceding paragraph were false and

misleading, and were altogether contrary to statements he made in writing, as he expressed them

56

in writing to defendant Stewart in an internal CIGNA document, in which he stated that **Transformation was a "financial and customer relations nightmare" due to "[s]ignificant eligibility disjoints and related service issues . . . [and] [i]nability to pay claims correctly, [i]nability to bill customers correctly."** In addition, those representations were also materially misleading due to the overwhelming system malfunctions, including, in particular, the claims processing malfunction, described herein, and the failure to disclose those facts.

168.   In an interview with Carmen Roberts of Bloomberg News that same day, defendant Hanway represented that CIGNA's pricing of policies was favorable:

> And, while you are correct, we didn't raise prices as much as we should have early last year, which caused us some difficulties throughout 2001, *our pricing right now, as we come into 2002, is quite good.*

169.   Defendant Hanway's statement that "our pricing right now, as we come into 2002, is quite good" was materially false and misleading because defendant Hanway knew or recklessly disregarded: (i) that CIGNA's underwriters had insufficient data to adequately price contracts and often had to raise premiums at later dates; and (ii) the facts concerning concessions to customers set forth herein. As defendant Hanway admitted on the October 28, 2002 and November 1, 2002 conference calls, pricing and margin concessions were made to make up for service and Transformation shortfalls. For example, he stated on November 1, 2002: "We reduced margins on both renewals and new sales, in order to retain existing members or to write new cases."

170.   On February 28, 2002, CIGNA filed its Form 10-K for 2001 with the SEC, confirming the previously announced financial results. The Form 10-K was signed by defendants Hanway, Sears and Stewart. The 2001 Form 10-K contained the following representation with regard to "technology" in the Health Care segment:

57

> CIGNA's health care, life and disability benefits businesses are highly dependent on automated systems and systems applications. These businesses are working to improve their system infrastructure, standardize business processes and design more flexible, easier-to-use products. CIGNA is engaged in a multi-year project to convert its health care business to newly designed systems and processes. The transition to newly designed systems presents risks regarding customer satisfaction and retention in the event of transition difficulties. ***CIGNA is working to mitigate these risks through extensive testing of these new systems*** and by developing and implementing alternative plans to provide sufficient customer service resources in the event of difficulties. (Emphasis added).

171.    The 2001 Form 10-K representation that "CIGNA is working to mitigate these risks through extensive testing of these new systems" was materially false and misleading due to the absence of extensive testing described herein.   In addition, defendant Hanway stated to defendant Stewart in an internal CIGNA document that, with respect to ProClaim, **"[t]hey have completed no testing – simulation testing is just starting; we do not have a successful track record to rely on the simulation testing."**

**C.     The May 2002 Misrepresentations**

172.    On May 2, 2002, CIGNA issued a press release announcing its financial results for the first quarter of 2002. The May 2 press release reported operating income of $275 million, or $1.92 per share, which exceeded the $272 million operating earnings reported for the first quarter of 2001 by only $3 million. Additionally, CIGNA represented that operating income for the full year 2002 was expected to be in the range of $7.85 to $8.15 per share. More specifically, the Company stated:

> The company currently expects to generate operating income per share in 2002 in the range of $7.85-$8.15. These amounts reflect the full year 2002 effect of $48 million after-tax from the implementation of SFAS No. 142.   2001 operating earnings

58

included $52 million after-tax from the company's former Japanese life insurance operation, which was fully divested in November 2001.

173.   Following CIGNA's first quarter 2002 earnings announcement, defendants held a publicly accessible conference call with analysts on May 2, 2002.   In that conference call, defendant Hanway stated:

> Thus, the total earnings for the [HealthCare] segment, including amortization of non-goodwill intangibles, are expected to be in the range of $925 - $955 million, and this compares to a 'Street' estimate of about $960 million.   Consistent with our previous guidance, *we continue to expect full year medical membership growth in the 1-2% range, an improvement from a flat first quarter reflecting the impact of actions to increase growth that I mentioned previously*. (Emphasis added).

174.   In the May 2 conference call, defendant Hanway stated:

> I would just add one additional thought.   I don't know if you were inferring this or not, but none of the decisions we have made relative to the pacing of either putting new business on the system, or the migration of existing customers is driven by expense issues. What's driving us is ensuring that the quality and effectiveness of the service for both the new customers and the migrated customers. I feel very good about the current state of Transformation and the quality of service that can be delivered from it.
>
> \*   \*   \*
>
> *I do think we've also demonstrated, when we do find errors, for whatever reason, we can respond very effectively and that's been acknowledged by our customers.   So, I think we've gotten the migration process now, I won't say down to a science, but engineered pretty well*. (Emphasis added).
>
> \*   \*   \*
>
> I would say we have tracked very closely the satisfaction levels of a large group of customers.   And I would say those satisfaction levels have been consistently improving.   So, we are to the point now where we have customers who are clearly willing to recommend

this particular capability as being an advantage. So, that to me is a good measure of the progress we're making, both in getting the migration done effectively, but also in delivering some of the promise of Transformation.

175.    During the question and answer portion of the May 2 conference call, defendant Hanway stated that Transformation was providing members with improved customer service:

First of all, we've been quite pleased with what we've seen in the area of increased auto adjudication for claims. We've been quite pleased in what we've seen in the improvement for what we call first call resolution rates. That's where you call in and you don't get bounced around to three or four different people, or you don't have to wait for a return call, but we have all the information available to give you an answer quickly. So, at an aggregate or a macro level, what we are seeing in those areas is consistent with what we had expected.

176.    Defendant Hanway further emphasized the Company's focus on improving membership:

*We are expecting that membership is going to improve for the balance of the year, which is a good early indicator*. And, as we get into the large account cycle here in the summer, or early fall, we'll continue to get reinforcement that the direction we're going is right. We're focused on two things. *One is continuing to improve retention, which we're doing now in middle market*. And the other is new sales, and we think we can improve in both areas. (Emphasis added).

177.    Defendant Hanway's representations concerning membership growth and improvement in the May 2 conference call were materially misleading in light of the facts, which were well known to defendants but concealed from investors, that CIGNA HealthCare customers were experiencing service disasters that would inevitably cause customers to cancel or fail to renew their membership. At that time, CIGNA customer service representatives were given a

60

script with instructions to discuss the following service problems with customers assigned to them:

a)      **Eligibility and Coverage**: "In the first few months of 2002, some of your members may have experienced eligibility and coverage issues, such as being inappropriately informed by providers or CIGNA HealthCare Customer Service Associates . . . that their coverage had been terminated or denied."

b)      **ID Cards**: "Around the effective date of your account (some/many/all) of your employees and their dependents received 2002 CIGNA HealthCare member ID cards with incorrect information on them."

c)      **Claims Processing Inaccuracies**: "I understand that some of your members experienced claims processing inaccuracies . . ."  Indeed, claims inaccuracies due to Transformation were so bad that a senior Transformation executive noted that Transformation claim accuracy was worse than the legacy systems.

d)      **Claims Time-to-Process Results**: "We understand that we did not meet our [claim] time-to-process performance guarantees for the first quarter of 2002."  In fact, claims processing had gotten so bad that by May 2002, the current "run rate" for late claim interest penalties payable under state laws setting time limits for the payment of claims had escalated by 350%, from $9.6 million in 2001, **to a rate of $31.5 million for 2002.**

178.    In fact, in a memorandum discussing the HealthCare April 2002 Monthly Operating Review, defendant Hanway noted that "[m]embership continues to decline," and that "[membership] persistency continues to be a problem."  Defendant Hanway's membership representations were also materially misleading by reason of the failure to disclose these facts.  In

fact, in each of the third and fourth quarters of 2002, CIGNA's medical membership was **down**, "primarily [due to] cancellations."

179.    In an interview with Susan Lisovicz and Ali Velshi of the *Money Gang* on May 2, defendant Hanway denied that CIGNA was experiencing difficulties with Transformation, specifically dismissing a large number of complaints arising from members in Georgia:

> [W]e clearly want to be known for the level of our consumer service and don't think that, that particular survey in Georgia is indicative at all of what we're delivering across the country.

180.    In an interview with Monica Bertran of Bloomberg News, also on May 2, 2002, defendant Hanway represented that CIGNA's pricing of premiums was favorable and accurate:

> *Well, we actually had very good progress in raising premiums. It more than offset the cost of the health-care increases.* The investment losses you refer to, are from our investment portfolio, and really aren't related to the health-care prices.  *Our price increases were good*, and our loss ratios in the HMO business improved.
>
> \* \* \*
>
> *I think we have to always be sure that we are keeping premiums ahead of loss costs, which we have done.* (Emphasis added).

181.    When questioned about the progress of Transformation, defendant Hanway assured investors that, despite some minor problems, the Transformation process was running smoothly:

> Well, this is a massive undertaking, first of all, and, certainly, anything of this size, you're going to have a few bumps in the road. We had that. I think we've learned quite a bit. *The processes are working well, and we feel very confident about getting the benefits, both for ourselves, but also for our customers.*
>
> *So 'Transformation' is proceeding as we expected.* (Emphasis added).

62

182. In addition to the other reasons stated herein, the statements made in ¶¶174-177, 180-182 were also false and misleading because they misrepresented and/or concealed the following material adverse facts:

a) defendants' statements that CIGNA's pricing of policies was good, in that the Company had good progress in raising premiums, was false and misleading because defendants knew or recklessly disregarded: (i) that CIGNA's underwriters had insufficient data to adequately price contracts and, as a result of raising premiums at later dates, was losing customers; and (ii) the facts concerning concessions to customers set forth herein, as admitted by defendant Hanway on October 28, 2002 and November 1, 2002.

b) defendants' statement that the Company had "migration . . . engineered pretty well" was false and misleading because defendants knew or recklessly disregarded that the numerous customer and technology problems experienced in January 2002 were continuing; and

c) defendants' statement that customer satisfaction levels were improving was false and misleading because defendants knew or recklessly disregarded that customer dissatisfaction levels were high as evidenced by CIGNA's key service metrics and the Company's internal customer survey.

183. On August 2, 2002, CIGNA issued a press release announcing its financial results for the second quarter of 2002. The Company reported that operating income for the quarter, excluding non-recurring items, was $279 million, or $1.95 per share, which exceeded the $262 million, or $1.73 per share, operating earnings reported by CIGNA for the second quarter of 2001.

184.    On August 2, 2002, the same day as the conference call described below, CIGNA

filed its Form 10-Q for the second quarter of 2002, which was signed by defendants Hanway,

Stewart and Sears, with the SEC.  In the section of the Form 10-Q entitled "Outlook for 2002,"

the Company represented that it expects operating income for the year 2002 to exceed $1.1

billion, stating in pertinent part as follows:

> *[M]anagement expects full year adjusted operating income to
> improve slightly in 2002 compared to 2001 adjusted operating
> income of $1.1 billion.*

185.    Following the issuance of the August 2, 2002 press release, defendants held a

publicly accessible conference call with analysts on August 2, 2002, in which defendant Hanway

made representations about CIGNA's estimates of operating earnings for both 2002 and the third

quarter of 2002.  In that conference call, defendant Hanway provided estimates of 2002 operating

earnings for the HealthCare business segment, the other Company segments, and for the total

Company, stating that CIGNA expected:

> *[F]or . . . employee healthcare . . ., total earnings of $925 to 955
> [million] . . .*
>
>         \*   \*   \*
>
> *Adding it all together, we expect full year consolidated . . .
> operating income of $1.12-$1.18 billion . . .*

186.    On September 3, 2002, CIGNA issued a press release announcing that it would

record an after-tax charge of $720 million to increase reserves for reinsurance contracts.  Seeking

to forestall a collapse in its stock price, CIGNA reassured the market that these developments

would not impact its operations, expressly representing that operating income for the third quarter

and full year of 2002 would not be negatively affected, confirming its earlier representations in

the August 2, 2002 conference call and second quarter 2002 Form 10-Q about the Company's
third quarter and 2002 earnings estimates.

> **The Company also said that it expects operating income for the
> third quarter and full year 2002, excluding non-recurring items
> referenced in "Outlook for 2002" on page 19 of CIGNA's
> second quarter Form 10-Q, to be in-line with previous
> guidance. On its August 2, 2002 conference call the company
> indicated that, excluding those non-recurring items, it expected
> third quarter 2002 earnings in the range of $1.90 to $2.05 per
> share and full year 2002 earnings in the range of $7.85 to $8.15
> per share.** [Emphasis added].

## IX.    OCTOBER 2002: DEFENDANTS ADMIT FACTS THEY HAD PREVIOUSLY MISREPRESENTED OR CONCEALED

187.    On October 23, 2002, CIGNA announced that defendant Stewart would be retiring
from his post as Chief Financial Officer in December 2002.

188.    After the stock market closed on October 24, 2002, CIGNA announced that,
contrary to its affirmations as recently as September 3, it would not meet its third quarter and full
year 2002 guidance, excluding the recent $720 million and $315 million charges for liabilities
connected with workers compensation reinsurance pool. In fact, the October 24 press release
revealed the accuracy of defendant Hanway's assessment that Transformation would be a
"financial nightmare." The Company stated that it expected third quarter operating income to be
$1.47 per share, significantly lower than the previously touted range of $1.90 to $2.05 per share.
For the full-year 2002, CIGNA stated that it expected consolidated operating income of $915
million to $950 million (instead of $1.1 billion as represented in the Form 10-Q, the August 2,
2002 conference call, and the September 3, 2002 press release), or approximately $6.50 to $6.75
per share, rather than the represented $7.85-$8.15 per share. **For the HealthCare segment,
CIGNA stated that it expected third quarter operating income of $160 million, sharply**

**(30%) lower than defendant Hanway's August and September estimates of $230-$240 million, and for the full year expected operating earnings of $725-$750 million, which was 21% less than defendant Hanway's August and September estimates of $925-$955 million 2002 operating earnings, and almost $100 million or more lower than 2001 operating earnings**. The Company attributed the substantial shortfall to weak results in the HealthCare segment, stating:

> The company expects operating income (net income excluding realized investment results) for the third quarter of approximately $205 million or $1.47 per share, excluding the previously announced charges . . . .

> The change in expectations primarily reflects weaker than expected health care results in the Employee Health Care, Life and Disability segment.

> * * *

> The company said that it expects consolidated full year 2002 operating income, excluding nonrecurring items, in the range of $915 million to $950 million or approximately $6.50 to $6.75 per share. The Employee Health Care, Life and Disability segment is expected to have operating income, excluding nonrecurring items, in the range of $725 million to $750 million for the full year.

189. During a publicly accessible conference call with securities analysts on October 28, 2002 in which defendants Hanway and Stewart, as well as Patrick Welch, President of CIGNA HealthCare, participated, defendant Hanway said that the sharply revised forecast was due to (1) "increased spending to improve service operations, while we continue to invest in new technology and service platforms," and (2) pricing and margin concessions to make up for Transformation and service shortfalls. Defendant Hanway stated that $100 million of the estimated decline in 2002 HealthCare operating earnings from 2001 operating earnings was the

result of "expenses in excess of membership growth."  Defendant Hanway admitted that "We . . . did not execute well on the fundamentals, including service, our Transformation project . . . and underwriting . . . ."

190.    The increased spending and investment in new technology referred to in the preceding paragraph were due to Transformation disasters and costs that were concealed and misrepresented by defendants as set forth herein.   Moreover, defendants knew about the "increased spending to improve service operations" before the August estimates and months before the October admissions, as evidenced by the fact that in June 2002, CIGNA HealthCare service employees were 2400 in excess of plan, because the Company had been forced to add hordes of employees to attempt to deal with Transformation disasters.  Further, the pricing concessions referred to in the preceding paragraph were due, in part, to the fact that CIGNA underwriters could not get accurate cost data as a result of the inability of Transformation systems to process claims accurately, leading to an almost 350% increase in state law penalties and interest for late claims payment in 2002, to approximately $32 million in 2002 from approximately $9 million in 2001, as well as the failure to pay tens of millions of dollars of claims in 2002, which were paid in 2003, when the claims were "reprocessed."

191.    During the October 28, 2002 conference call to analysts, Mr. Welch discussed the Transformation "financial nightmare" as follows:

> *[W]e have not executed well on Transformation . . . .*
>
> *We did have problems with migrations on January 1, 2002 . . . [T]ransformation shortfalls have led to lower new sales and retention . . .*
>
>           \*  \*  \*

*Claim Processing and productivity have not reached our objective and have led to higher spending . . .*

\* \* \*

*I know there has been considerable speculation that Transformation is a failure.*

192.    In the same conference call, defendant Hanway discussed CIGNA's 2003 outlook:

First, at the consolidated level, for 2003 our expectation is operating income of $875-925 million.    And that translates to $6.25-$6.50 per share. *Our estimate of 2003 operating income for the Employee Health and Life segment is $675-725 million. That's a decline of about $25-$50 million, relative to our 2002 operating income estimates of $725-$750 million.*

*Even with 2003 as a rebuilding year, we do not expect to see quantitative progress as measured by membership growth or operating income improvement.    Relative to membership, given what we know at this point, we expect the January 1, 2003 membership to be down in the 4-5% range on a same-store basis.* Relative to operating income, the year-over-year $25-$50 million projected decline in 2003, which I cited, is consistent with the decline in our business base; that is, the 4-5% decline in membership.

193.    As stated by CIBC World Markets analyst, John Szabo, in *The Philadelphia Inquirer* on October 26, 2002, echoing his October 24, 2002 research report:

"CIGNA's problems may put it in a precarious financial position," CIBC World Markets analyst John Szabo warned.    He blamed CIGNA's problems on its "disastrous" attempt to upgrade its computer technology, "which by nearly every measure has been a complete failure."

Only a week earlier, Mr. Szabo had issued a research report lauding CIGNA's strong financial profile.

194.    In that same vein, in a October 25, 2002 research report, Goldman Sachs analyst Matthew Borsch called CIGNA's failure to hit its earnings projections "worse than worst case,"

68

attributing the Company's financial woes to its 5-year, $1 billion Transformation project. Lehman Brothers analysts, Joshua Raskin, referred to the project as "out of control" and said that "the only results we have seen are added costs." According to Alliance Capital Management fund manager Norman Fidel, "CIGNA's problems are basically due to their information-systems transformation, which left them not knowing their costs and with customer-service problems. . . . It doesn't have implications for the rest of the industry."

195.    On November 1, 2002, CIGNA issued a press release reporting the Company's financial results for the third quarter of 2002. The November 1 press release reported 2002 third quarter operating income for the Company of $208 million, down $65 million or 24% from the $273 million operating income reported for the third quarter of 2002, and $57 million less than the low end of defendant Hanway's estimate in the August 2 conference call, which was confirmed in the September 3 press release. For HealthCare, the November 1 press release reported operating income of $163 million, down $46 million from the $209 million operating income reported for the third quarter of 2001, and $67 million less than the low end of the range of defendant Hanway's estimate in the August 2 conference call, which was confirmed in the September 3 press release. The November 1 press release, like the October 28 conference call, cited "higher spending to improve service" and "continued investment in technology" as reasons for these disastrous results.

196.    On November 1, 2002, after the issuance of the November 1 press release, CIGNA held a publicly accessible conference call with securities analysts, in which defendants Hanway and Stewart participated. In that conference call, defendant Hanway in effect admitted that the

Company had lost credibility as a result of the Transformation issues, and the divergence between

the Company's estimates and its performance.  Defendant Hanway stated:

> . . . I . . . recognize that some investors and analysts are currently
> skeptical about our ability to deliver on our 2003 guidance.

> \* \* \*

> . . . [T]he top question that we have heard, which is not surprising,
> given our guidance change and the timing, is why didn't you know
> until the third quarter about the healthcare shortfall?

> \* \* \*

> Now, another line of questioning [is] given the fact that our
> competitors are doing very, very well what's happened with us?

197.    In the November 1 conference call, defendant Hanway admitted that price

concessions made in order to retain existing customers and attract new ones impacted third

quarter results:

> We reduced margins on both renewals and new sales, in order to
> retain existing members or to write new cases.

> \* \* \*

> . . . [W]e identified underwriting misjudgments and margin
> concessions that impacted third-quarter results.

198.    In the November 1, 2002 conference call, Terry Shu of J.P. Morgan explained that

the reason no one believes the Company's forecast is that it assumes simultaneous service

improvements and cost reductions.  In response, CIGNA's Mr. Welch admitted that there is

"execution risk."

199.    The SEC shared analysts' skepticism, and commenced an investigation of CIGNA

following the announcement of the October 2002 revised forecast.

200.    The impact of Transformation continues to be devastating to CIGNA. After-tax adjusted operating income of CIGNA's HealthCare segment fell 43% from the fourth quarter of 2001 to the fourth quarter of 2002. Fourth quarter 2002 indemnity results declined 62% from the fourth quarter of 2001 due to "margin deterioration in the company's experience-rated business, poor performance of certain new indemnity accounts, and higher spending on service and technology initiatives." Fourth quarter 2002 HMO results from continuing operations decreased 27% from the fourth quarter of 2001, reflecting "higher operating expenses for customer service and technology initiatives and higher medical costs...." CIGNA's net income for the fourth quarter of 2002 fell 75% to $47 million or $.33 per share, compared with $191 million, or $1.32 per share in the fourth quarter of 2001.

201.    After placing CIGNA's credit on CreditWatch, S&P cut CIGNA's counterparty credit rating to "BBB+" from "A" on October 31, 2002. On October 29, 2002, CIGNA's senior debt was downgraded to "A-" from "A" and its subordinated debt to "BBB+" from "A-" by Fitch Ratings. On November 1, 2002, A.M. Best Co. downgraded CIGNA's corporate debt rating. Each of the ratings agencies cited their respective reevaluations of CIGNA's risks and the costs required to implement the hedging program as the basis for their downgrades.

## X.    MID-2003: THE CHICKENS COME HOME TO ROOST - CIGNA HEALTHCARE'S EARNINGS, MEMBERSHIP AND STOCK PRICE PLUNGE ONCE AGAIN – 2002 FINANCIAL REPORTING "ERRORS" ARE CORRECTED

202.    On Friday, July 11, 2003, after the close of the market, CIGNA issued yet another press release warning that the Company's operating earnings would be far below the estimates previously provided to analysts. The July 11 press release revealed that **2003 CIGNA HealthCare's operating profits were expected to be $550 million, which was $175 million**

71

less than the estimate provided on May 2, 2003, and down from 2002 reported operating income of $724 million. Of course, this caused a corresponding downward revision in the estimate of total Company 2003 operating income. The July 11 press release attributed this dire news to "higher medical costs and lower medical membership." The higher medical costs were said to be due to **"operational challenges associated with the transition to the new healthcare facilitation centers, accelerating costs related to certain provider contract terms, and the impact of reprocessing certain 2002 medical claims."** The July 11 press release also disclosed that **"[t]otal medical membership at year-end 2003 is now expected to be approximately 10% lower compared to year-end 2002 . . ., reflecting lower than expected sales and lower customer retention rates."**

203.     The market response to the July 11 press release was swift and severe. On July 14, 2003, the first trading day after the July 11 press release was issued, the market price of CIGNA stock fell 7.17%.

204.     On July 14, 2003, CIGNA held a publicly accessible conference call with analysts in which defendant Hanway and Michael Bell, CIGNA's Chief Financial Officer who replaced defendant Stewart, participated. In the July 14 conference call, Bell admitted that **tens of millions of dollars of the reduced estimate of 2003 HealthCare operating profit was the result of the need to include in 2003 financial statements tens of millions of dollars of claims that should have been included in the Company's 2002 financial statements, mainly reflecting "fallout from the service issues that we experienced in 2002." Thus, Bell admitted that CIGNA experienced the "financial reporting disaster" from Transformation that had been predicted internally, in marked contrast to defendants' public statements.**

72

205.    In the July 14, 2003 conference call, **defendant Hanway acknowledged that "service issues" were responsible for the Company's sharp decline in medical membership, and that the Company's competitors had targeted CIGNA "because of some of our service challenges."** As defendant Hanway had expected in 2001, Transformation was a "customer relations nightmare," and as defendant Hanway told the President of CIGNA HealthCare in early May 2001, "our competitors will aggressively use Transformation against us in the marketplace."

206.    CIGNA's July 11 announcement caused analysts to question the Company's credibility once again.    William McKeever, a UBS Investment Analyst, said: "CIGNA's management team has now disappointed the Street three times in 12 months, which is likely to strain the company's credibility . . . ."

207.    The deterioration in the Company's 2003 financial performance caused a further blow to investors when the Company announced that it was cutting its dividend from $.33 per share to $.025 per share.

## XI.    SCIENTER ALLEGATIONS

208.    As alleged herein and throughout this Complaint, defendants acted with scienter in that they knew or recklessly disregarded that the public statements and/or documents issued or disseminated in the name of the Company were materially false and misleading.  Defendants knew that such statements and/or documents would be issued or disseminated to the investing public and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and/or documents.  As set forth in detail elsewhere herein, defendants, by virtue of their receipt of information reflecting the true facts regarding CIGNA, their control over, and/or receipt and/or modification of the Company's allegedly materially

73

misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CIGNA, knowingly participated in the fraudulent actions alleged herein.

209.    Actual knowledge or reckless disregard of the undisclosed adverse material facts alleged herein can be imputed to defendants, rendering their public statements materially false and misleading for the following reasons:

a)    The Transformation project was a multi-year, billion dollar upgrade of CIGNA's computer system platform in the HealthCare segment, which was CIGNA's largest segment, accounting for approximately 75%-80% of CIGNA's operating income. As defendant Hanway stated on February 8, 2002, Transformation is "a fundamental repositioning and re-engineering of our business." Since the Transformation project was a major transformation of CIGNA's operations and defendants were the highest ranking executives of CIGNA, defendants knew or were reckless in not knowing of the material undisclosed facts alleged herein.

b)    As a result of defendants' positions with the Company, they had access to the documents which contained the facts that made their statements materially misleading and knew or recklessly disregarded those facts, including (1) CIGNA's own internal research which revealed that almost half of the customers who migrated on January 1, 2002 were dissatisfied; (2) key service metrics about which defendant Hanway commented in his letter to shareholders in the 2001 Annual Report. (Those key service metrics included turnaround time for processing claims, financial and clerical accuracy in claims processing and call waiting and resolution time); (3) "Average Handling Time" – AHT reports, which were monthly reports detailing the average time that a caller had to wait on hold before speaking to a customer service representative to resolve a

74

call, which were received by defendants Hanway, Stewart and Sears, among others. The significantly increased time for both categories after the January 1, 2002 migration were included in this monthly report; (4) "Scope Changes" for delays in Transformation releases, which were approved, communicated to and/or reviewed by the Operating Committee, Program Managers, Transformation Office leads and Architects and the CEO and CFO of CIGNA HealthCare, which were distributed to defendants Hanway, Stewart and Sears, among others; (5) Monthly and Quarterly Operating Reports in CIGNA HealthCare containing, among other things, financial results and projections, were distributed to defendant Stewart and other top executives of CIGNA HealthCare; and (6) CIGNA was experiencing losses of some of its largest customers.

c)      CIGNA HealthCare conducted monthly meetings called Monthly Operating Reviews, referred to within CIGNA as CHC "MORs." During the Class Period, these meetings were attended by defendants Hanway, Stewart and other members of top management from the HealthCare segment. Among the topics regularly disclosed at the monthly CHC MOR meetings included Transformation issues, retention and membership issues and cost issues. Notes reflecting the topics discussed at the CHC MORs were regularly prepared by defendant Stewart and sent to defendant Hanway. For example, those notes disclose that as a result of discussions at the November 2001 CHC MOR, defendants Hanway and Stewart knew that "[r]etention is still an issue. No improvement evident" and that "[r]etail disenrollment a serious problem. . ." Among the issues discussed at the January 2002 CHC MOR were "[s]ales poor," and "[e]xpense pressure due to Transformation difficulties a real issue," "persistency is horrible." The February 2002 CHC MOR dealt with, among other topics: "[p]ersistency continues to be a major disappointment;" "membership declines a serious problem," ". . . member relationship is not

good;" and "[d]elay on billing CHMO revenue is a concern. Assume this is Transformation related." The March 2002 MOR notes state that "Persistency keeps sliding," "Hard to grow lives with [medical membership] persistency at 88%." In the April MOR, persistency was again an issue. The notes of the April meeting state: "Persistency down again and will end [2002] below '01," state that "Membership continues to decline" and that there is [l]ots more downside than upside in the earnings forecasts. At the May 2002 CHC MOR, a "service scorecard" detailed the following problems: "[l]ooks like call volume is up, we're slow to answer and handle time (end state) is below target/productivity is way below goals;" "[c]laim quality remains below 90%;" "[m]ail on hand remains high," and "[b]illing weak." As a result of defendant Hanway's attendance at the monthly CHC MORs and receipt of notes prepared by defendant Stewart, defendants Hanway and Stewart knew that the representations they made during the Class Period about Transformation were materially false and misleading.

d)      There was a complete absence of medical indemnity claims coming through CIGNA's new platform for three months (February through April) after the January 1, 2002 migration of 3.5 million accounts to the new platforms. The total absence of any claims for three months in CIGNA's largest business unit was at the very least a red flag of serious problems with the Transformation, which defendants knew or recklessly disregarded.

e)      Defendants knew about or recklessly disregarded the serious customer relations problems resulting from Transformation because CIGNA itself was one of the large accounts whose members experienced problems.

f)      Defendant Hanway knew, as early as the October 2001 analysis of Transformation issues that the Transformation systems could not process claims or bill properly

76

and suffered from disastrous eligibility disjoints, which would result in a "financial and customer relations nightmare" because the Company intended to proceed with the January 2002 migration.

g)      Defendant Hanway knew about the claims processing disaster after the January 2002 migration because he was notified personally by a disgruntled customer that "EVERY single claim submitted for my dependents has been butchered . . . . I had no problem until January and now I ONLY have problems . . . ."

210.    Defendant Stewart knew that planned 2001 Transformation spending was $341 million, as evidenced by his 2001 note to the Chief Financial Officer of CIGNA HealthCare demonstrating his familiarity with that plan, and memorandum setting forth the amount of 2001 planned Transformation costs described herein.     In addition, defendant Stewart's note demonstrates that he knew that 2001 Transformation spending had exceeded plan by $50 million months before the end of the year.     Indeed, this information, which revealed that the Transformation project had run into such serious problems as to cause cost overruns of hundreds of millions of dollars, was regularly and readily accessible to defendant Stewart and the other defendants in monthly operating reports.

211.    Defendants had motive and opportunity to misrepresent and omit the material facts alleged herein because, as CIGNA's highest executive officers with opportunity to do so:

> (I)      Approximately 90% of defendant Hanway's total pay opportunity is variable compensation such as bonuses and stock options. It is at risk and tied to competitive business results. In assessing the performance of CIGNA to determine defendant Hanway's compensation, the People Resources Committee of CIGNA's Board considers, among other things, the profitability of each business unit, customer service and membership growth in the healthcare business.     As major components in defendant Hanway's compensation, he had a motive and opportunity to misrepresent and omit the material facts alleged herein regarding customer service,

membership numbers and the profitability of the HealthCare segment.

(ii) According to CIGNA's March 2002 and March 2003 Proxy Statements, defendant Hanway's overall compensation package for 2001 and 2002 took into account "investments in customer service, technology and e-commerce that are expected to have a positive impact on future earnings." Since the success of the Transformation project was tied directly to defendant Hanway's compensation, he had a motive and opportunity to misrepresent the material facts alleged herein.

(iii) Defendant Hanway's compensation package for 2002 took into account "disappointing core healthcare results." Since his compensation was directly tied to healthcare results, which were negatively impacted by the Transformation, he had motive and opportunity to misrepresent and omit the material facts alleged herein.

(iv) The Executive Compensation Program, which applied to defendants Hanway and Stewart provides that annual bonus awards recognize contributions to annual business results as measured against competitors and against CIGNA's operational plans. Financial results must be achieved within the context of customer service, quality and financial integrity standards. Therefore, defendants Hanway and Stewart had motive and opportunity to misrepresent and omit the material facts alleged herein.

(v) Defendants had the motive and opportunity to misrepresent and conceal the truth about Transformation and its ramifications in order to maintain CIGNA's HealthCare's competitive positions. As defendant Hanway recognized as early as May 2001, CIGNA's competitors would attempt to use Transformation to their advantage to lure CIGNA's customers. Since Transformation was, in fact, the "customer relations nightmare" that defendant Hanway expected, he had the motive to conceal this fact in an attempt to preserve CIGNA's deteriorating competitive position.

## XII.   LOSS CAUSATION

212.   As alleged herein, sharp declines in CIGNA stock at various times during the Class Period and at the end of the Class Period were proximately caused by the facts that were

misrepresented and concealed by defendants, as set forth above, in that the disclosed facts which caused the declines were (i) either themselves previously misrepresented or concealed by defendants; or (ii) proximately caused by the facts misrepresented and concealed by defendants. SERS suffered damages due to declines in the market price of CIGNA stock that were proximately caused by defendants' misrepresentations and omissions alleged herein, including damages resulting from the October 24, 2002 and subsequent disclosures described herein and resulting sharp declines in the market price of CIGNA stock described herein.

213.    The equity investments for SERS' portfolio are made solely by independent investment advisors, to whom SERS delegates complete investment authority, including all decisions to purchase or sell any particular stock.    These investment advisors are wholly independent of each other, operate entirely separately from each other and there is no transfer of shares between SERS' accounts managed by the separate investment advisors.

214.    SERS held thousands of shares of CIGNA stock on October 24, 2002 in one of its accounts with one of its investment advisors which it had bought from April through September 2002, at an average price in excess of $80 per share, and suffered huge losses as a result of the fraud disclosed beginning on October 24, 2002, which caused the market price of CIGNA stock to fall sharply to approximately $45 per share, which was approximately $55 per share less than the purchase price of those shares. The decline was proximately caused by the misrepresentations and omissions SERS' alleged herein.    At the time of the April 2002 purchases, there were no CIGNA shares in that account.

215.    In addition, SERS bought other shares in other accounts and sold them after declines in the market prices of CIGNA stock which were proximately caused by the fraud

79

alleged herein, as CIGNA announced disappointing earnings that were due, in part, to the concealed facts alleged herein, and as certain disclosures of the adverse effects of Transformation began to appear in the press.

## XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

216.  The market for CIGNA's securities was an efficient market at all relevant times, for the following reasons, among others:

a)  The Company's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)  As a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

c)  The Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)  The Company was followed by several securities analysts employed by major brokerage firms who prepared reports which were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

217.  As a result of the foregoing, the market for CIGNA's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in CIGNA's stock price. Under these circumstances, all purchasers of

80

CIGNA's common stock during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

218.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized or approved by an executive officer of CIGNA who knew that those statements were false when made.

### COUNT I

### Against All Defendants For Violations
### Of Section 10(b) Of The Exchange Act And Rule 10b-5

219.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

220.   During the Class Period, CIGNA and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CIGNA's common stock;

81

and (iii) cause Lead Plaintiff and other members of the Class to purchase CIGNA's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

221.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for CIGNA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

222.    CIGNA and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse material information and to fail to correct false and misleading statements about the business, operations and future prospects of CIGNA as specified herein.

223.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to cause investors to have an incorrect picture of CIGNA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CIGNA and its business operations and future prospects in light of the circumstances under which they were made, not

82

misleading, and the failure to correct, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CIGNA's common stock during the Class Period.

224.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (I) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

225.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CIGNA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by defendants' misstatements regarding the Company's  business, operations and earnings throughout the Class period, defendants had actual knowledge of the misrepresentations and omissions alleged or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83

226. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CIGNA's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of CIGNA's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired CIGNA common stock during the Class Period at artificially high prices and were damaged thereby.

227. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and omissions, and believed the statements made by CIGNA and the other defendants to be true and complete. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of CIGNA, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired CIGNA common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

228. By virtue of the foregoing, defendants have violated Section10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

229. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

84

## COUNT II

### Against The Individual Defendants For
### Violations Of Section 20(a) Of The Exchange Act

230.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

231.    Each of the Individual Defendants acted as a controlling person of CIGNA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or soon after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

232.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

233.    As set forth above, CIGNA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

85

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of CIGNA's and the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as class counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper, including but not limited to corporate governance changes.

86

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 30, 2006                Respectfully submitted,

**BERGER & MONTAGUE, P.C.**


By:      *Sherrie R Savett*
         Sherrie R. Savett (I.D. #17646)
         Carole A. Broderick (I.D. #12001)
         Barbara A. Podell (I.D. #28583)
         Phyllis M. Parker (I.D. #77336)
         Roslyn G. Pollack (I.D. #17487)
         Joshua C. Schumacher (I.D. #200142)
         1622 Locust Street
         Philadelphia, PA 19103
         (215) 875 - 3000
         (215) 875 - 4604 (Fax)
         **Counsel for the Pennsylvania State**
         **Employees' Retirement System**

         **BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
         Mel E. Lifshitz
         Keith M. Fleischman
         Francis P. Karam (I.D. #77910)
         Michael S. Bigin
         Stephanie M. Beige
         10 East 40th Street
         New York, NY 10016
         (212) 779-1414
         (212) 779-3218 (Fax)

         **CO-LEAD COUNSEL**

                        **And**

**OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION**
Thomas W. Corbett, Jr., Attorney General
Daniel J. Doyle (I.D. #54855), Senior Deputy
Attorney General
Susan J. Forney, Chief Deputy Attorney General
15th Fl. Strawberry Square
Harrisburg, PA 17120
(717) 787-2944
(717) 772-4526 (Fax)

**LEGAL OFFICE OF THE
PENNSYLVANIA STATE EMPLOYEES'
RETIREMENT SYSTEM**
Michael A. Budin, Chief Counsel (I.D. #21528)
Brian McDonough (I.D. #55866)
30 North Third Street
Harrisburg, PA 17101
(717) 783-7317
(717) 787-5751 (Fax)

**Counsel for the Pennsylvania State
Employees' Retirement System**

404158_01.wpd

## CERTIFICATE OF SERVICE

I, Barbara A. Podell, hereby certify that on March 30, 2006, I caused a copy of the Second

Revised Consolidated Amended Class Action Complaint to be served on:

**E-Mail and Hand Delivery**
Eleanor Morris Illoway, Esq.
HARKINS CUNNINGHAM LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042
Tel. 215/851-6700

**E-Mail and First-Class Mail**
Alexander R. Sussman, Esq.
FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY 10004
Tel.  212/859-8000

**Counsel for Defendants**

**E-Mail and First-Class Mail**
Robert I. Harwood, Esq.
WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Fl.
New York, NY 10022
Tel. 212/935-7400

**Counsel for Derivative Plaintiffs**

Barbara A Podell
BARBARA A. PODELL

404158_02.wpd